**No. 24-2993**

# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE 1, et al.,

*Plaintiffs-Appellants,*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division, No. 1:23-cv-00542-SEB-MJD.
The Honorable Sarah Evans Barker, Judge Presiding.

## BRIEF AND APPENDIX OF PLAINTIFFS-APPELLANTS

Jonathan D. Selbin
Jessica A. Moldovan
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013 -1413
(212) 355-9500

Michelle A. Lamy
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000

Elizabeth A. Fegan
FEGAN SCOTT, LLC
150 South Wacker Drive
24th Floor
Chicago, IL 60606
(312) 741-1019

Michael J. von Klemperer
FEGAN SCOTT, LLC
1763 Columbia Road NW
Suite 100
Washington, DC 20009
(202) 921-0002

Lynn A. Toops
Arend J. Abel
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
(317) 636-6481

*Interim Class Counsel and Counsel for
Attorneys for Plaintiffs-Appellants*

*Liaison Counsel*

 COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al v. NCAA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

 John Doe 12, John Doe 13, John Doe 14

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Lieff Cabraser Heimann & Bernstein LLP, Fegan Scott LLC, Cohen & Malad LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Jonathan Selbin　　　　　　Date:

Attorney's Printed Name:  Jonathan Selbin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　　**Yes** [✓]　**No** [ ]

Address:  250 Hudson Street, 8th Floor

 New York, NY 10013

Phone Number:  (212) 355-9500　　　　　　Fax Number:  (212) 355-9592

E-Mail Address: jselbin@lchb.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al v. NCAA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

John Doe 12, John Doe 13, John Doe 14

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Lieff Cabraser Heimann & Bernstein LLP, Fegan Scott LLC, Cohen & Malad LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Jessica Moldovan     Date:

Attorney's Printed Name:  Jessica Moldovan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  250 Hudson Street, 8th Floor

New York, NY 10013

Phone Number:  (212) 355-9500      Fax Number:  (212) 355-9592

E-Mail Address: jmoldovan@lchb.com

rev. 12/19 AK

Save As   Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al. v. NCAA

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

John Doe 12, John Doe 13, John Doe 14

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Fegan Scott LLC, Lieff Cabraser Heimann & Bernstein, LLP, and Cohen & Malad, LLP

(3)  If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Elizabeth A. Fegan          Date: November 22, 2024

Attorney's Printed Name:  Elizabeth A. Fegan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address:  150 S. Wacker Dr., 24th Floor

Chicago, IL 60606

Phone Number: (312) 741-1019          Fax Number:  (312) 264-0100

E-Mail Address: beth@feganscott.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al v. NCAA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

John Doe 12, John Doe 13, John Doe 14

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Lieff Cabraser Heimann & Bernstein LLP, Fegan Scott LLC, Cohen & Malad LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)       Identify all its parent corporations, if any; and

        N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Michelle Lamy      Date:

Attorney's Printed Name:  Michelle Lamy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  275 Battery Street

San Francisco, CA 94111

Phone Number: (415) 956-1000        Fax Number:  (415) 956-1008

E-Mail Address: mlamy@lchb.com

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al. v. NCAA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

        John Doe 12, John Doe 13, John Doe 14

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        Fegan Scott LLC and Lieff Cabraser Heimann & Bernstein, LLP, and Cohen & Malad, LLP

(3)     If the party, amicus or intervenor is a corporation:

        i)        Identify all its parent corporations, if any; and

                  N/A

        ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                  N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: /s/ Michael von Klemperer                    Date: November 22, 2024

Attorney's Printed Name:  Michael von Klemperer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐    No ☒

Address:  1763 Columbia Rd. NW, Suite 100

          Washington, D.C. 20009

Phone Number: (202) 921-0002                         Fax Number:  (312) 264-0100

E-Mail Address: mike@feganscott.com

                                                                        rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al. v. NCAA

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

John Doe 12, John Doe 13, John Doe 14

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Fegan Scott LLC and Lieff Cabraser Helmann & Bernstein, LLP, and Cohen & Malad, LLP

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Lynn A. Toops      Date: January 27, 2025

Attorney's Printed Name:  Lynn A. Toops

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  One Indiana Square, Suite 1400

Indianapolis, Indiana 46204

Phone Number: (317) 636-6481      Fax Number:  (317) 636-2593

E-Mail Address: ltoops@cohenmalad.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2993

Short Caption: John Doe 1, et al. v. NCAA

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 9, John Doe 10, John Doe 11,

John Doe 12, John Doe 13, John Doe 14

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Fegan Scott LLC and Lieff Cabraser Helmann & Bernstein, LLP, and Cohen & Malad, LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Arend J. Abel    Date: January 27, 2025

Attorney's Printed Name: Arend J. Abel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: One Indiana Square, Suite 1400

Indianapolis, Indiana 46204

Phone Number: (317) 636-6481    Fax Number: (317) 636-2593

E-Mail Address: aabel@cohenmalad.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES ..................................................................2

STATEMENT OF THE CASE......................................................................2

    I.     FACTUAL BACKGROUND............................................................9

        A.    The NCAA Regulates Intercollegiate Sports at the National Level. ........................................................................9

        B.    The NCAA Is Uniquely Situated to Study and Regulate Sexual Misconduct by Coaches and Athletics Personnel and Has Selectively Sanctioned Member-Institutions for Egregious Conduct in the Past. ......................................................................................14

        C.    The NCAA Fails to Take Reasonable Steps to Protect Student-Athletes from Sexual Misconduct by Coaches and Athletics Personnel. ...............................19

        D.    Appellants and the Class Suffered and Will Continue to Suffer Harm because of the NCAA's Failures.............................................................................22

    II.    PROCEDURAL HISTORY ............................................................26

SUMMARY OF ARGUMENT......................................................................28

ARGUMENT..............................................................................................31

    I.     STANDARD OF REVIEW..............................................................31

## TABLE OF CONTENTS
### (continued)

**Page**

II. THE DISTRICT COURT ERRED BY FINDING AS A MATTER OF LAW THAT THE NCAA OWES ITS STUDENT-ATHLETES *NO* LEGAL DUTY TO REGULATE SEXUAL MISCONDUCT BY COACHES AND ATHLETICS PERSONNEL. ................................................32

 A. The District Court Erred by Deciding the Issue of Duty on the Pleadings. ...........................................................33

 B. Appellants Plausibly Alleged the Existence of a Duty.....................................................................................36

  1. Appellants Plausibly Alleged that the NCAA Voluntarily Assumed a Duty to Regulate Sexual Misconduct by Coaches and Athletics Personnel....................................................................36

  2. Appellants Plausibly Alleged that the NCAA Had a Common Law Duty to Regulate Sexual Misconduct By Coaches and Athletics Personnel....................................................................43

III. THE DISTRICT COURT ERRED BY FINDING APPELLANT JOHN DOE 1 LACKED STANDING TO SEEK PROSPECTIVE RELIEF. .....................................................62

CONCLUSION .............................................................................................71

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB Turbo Sys. AG v. Turbousa, Inc.,*
774 F.3d 979 (Fed. Cir. 2014) ...................................................................56

*Aldrich v. Nat'l Collegiate Athletic Ass'n,*
565 F. Supp. 3d 1094 (S.D. Ind. 2021) ...................................................68

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................................29

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................29

*Bennet v. Spear,*
520 U.S. 154 (1997) ...................................................................................69

*Bennett v. Schmidt,*
153 F.3d 516 (7th Cir. 1998) ....................................................................34

*Bogie v. Rosenberg,*
705 F.3d 603 (7th Cir. 2013) ....................................................................10

*Bradley v. Nat'l Collegiate Athletic Ass'n,*
249 F. Supp. 3d 149 (D.D.C. 2017) .........................................................40

*Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield,*
140 N.E.3d 837 (Ind. 2020) .......................................................... 33, 53, 54

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .....................................................................................69

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Delta Tau Delta v. Johnson,*
  712 N.E.2d 968 (Ind. 1999),................................................................... 36, 37

*Dixon v. Shiel Sexton Co., Inc.,*
  196 N.E.3d 717 (Ind. Ct. App. 2022).............................................................37

*Doe 1 v. Nat'l Collegiate Athletic Ass'n,*
  No. 22-cv-01559-LB, 2023 WL 105096 (N.D. Cal. Jan. 4, 2023) ....................26

*Doe v. Delta Tau Delta Beta Alpha Chapter,*
  No. 16-01480, 2018 WL 3375016 (S.D. Ind. July 11, 2018) ..................... 50, 55

*Doe v. Indiana Univ. Bloomington,*
  No. 116CV01480JMSDKL, 2016 WL 7188214 (S.D. Ind. Dec. 12, 2016)......35

*Doe v. University of Tennessee,*
  186 F. Supp. 3d 788 (M.D. Tenn. 2016) ..........................................................68

*E.E.O.C. v. Concentra Health Servs., Inc.,*
  496 F.3d 773 (7th Cir. 2007) ..........................................................................34

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.,*
  62 N.E.3d 384 (Ind. 2016) ........................................................... 32, 44, 49, 50

*Hamilton v. Steak n' Shake Operations Inc.,*
  92 N.E.3d 1166 (Ind. Ct. App. 2018).............................................................53

*Holt v. Quality Motor Sales, Inc.,*
  776 N.E.2d 361 (Ind. Ct. App. 2002).............................................................44

*J.A.W. v. Roberts,*
  627 N.E.2d 802 (Ind. Ct. App. 1994)................................................... 44, 45, 46

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Johnson v. Allsteel, Inc.,*
259 F.3d 885 (7th Cir. 2001) ................................................................64

*Johnson v. Nat'l Collegiate Athletic Ass'n,*
108 F.4th 163 (3d Cir. 2024) ...............................................................48

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,*
422 F.3d 490 (7th Cir. 2005) ....................................................... 32, 64

*Lanni v. Nat'l Collegiate Athletic Ass'n,*
42 N.E.3d 542 (Ind. Ct. App. 2015).......................................... passim

*Lanni v. Nat'l Collegiate Athletic Ass'n,*
989 N.E.2d 791 (Ind. Ct. App. 2013).................................................34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ..............................................................................69

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ..............................................................................69

*Manning v. Miller,*
355 F.3d 1028 (7th Cir. 2004) ..................................................... 31, 35

*Murthy v. Missouri,*
603 U.S. 43 (2024) ......................................................................... 69, 70

*Nat'l Collegiate Athletic Ass'n v. Alston,*
594 U.S. 69 (2021) ..................................................................................5

*Neal v. IAB Fin. Bank,*
68 N.E.3d 1114 (Ind. Ct. App. 2017).................................................45

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*O'Boyle v. Real Time Resolutions, Inc.,*
   910 F.3d 338 (7th Cir. 2018) ........................................................................31

*ONB Ins. Grp., Inc. v. Est. of Megel,*
   107 N.E.3d 484 (Ind. Ct. App. 2018)............................................................57

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.,*
   95 F.4th 501 (7th Cir. 2024), *cert. denied,* No. 23-1280, 2024 WL 5036271
   (U.S. Dec. 9, 2024) .......................................................................................66

*Pennington v. Mem'l Hosp. of S. Bend, Inc.,*
   223 N.E.3d 1086 (Ind. 2024) ........................................................................32

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,*
   631 F.3d 436 (7th Cir. 2011) ........................................................................56

*Pisciotta v. Old Nat'l Bancorp,*
   499 F.3d 629 (7th Cir. 2007) ................................................................. 64, 71

*Prosser v. Becerra,*
   2 F.4th 708 (7th Cir. 2021) ...........................................................................66

*Regents of Univ. of Cal. v. Superior Ct.,*
   4 Cal. 5th 607 (2018)....................................................................................46

*Reilly v. Ceridian Corp.,*
   664 F.3d 38 (3d Cir. 2011)............................................................................64

*Remijas v. Neiman Marcus Grp., LLC,*
   794 F.3d 688 (7th Cir. 2015) ........................................................................32

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Richard Roe W.M. v. Devereux Foundation*,
  No. CV 21-2655, 2023 WL 173918 (E.D. Pa. Jan. 12, 2023) ..........................68

*Rogers v. Martin*,
  63 N.E.3d 316 (Ind. 2016) ................................................................ 36, 37

*Schmitz v. Nat'l Collegiate Athletic Ass'n*,
  67 N.E.3d 852 (Ohio Ct. App. 2016) *aff'd sub nom.*
  122 N.E.3d 80 (Ohio 2018) ...............................................................35

*Sierakowski v. Ryan*,
  223 F.3d 440 (7th Cir. 2000) ..............................................................63

*Silha v. ACT, Inc.*,
  807 F.3d 169 (7th Cir. 2015) ..............................................................32

*Simic v. City of Chicago*,
  851 F.3d 734 (7th Cir. 2017) ..............................................................63

*Smith v. Delta Tau Delta, Inc.*,
  9 N.E.3d 154 (Ind. 2014) ................................................................ 33, 42

*Spierer v. Rossman*,
  798 F.3d 502 (7th Cir. 2015) ..............................................................36

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...........................................................................63

*Strahin v. Cleavenger*,
  216 W. Va. 175 (2004)........................................................................49

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ..........................................................................63

*Sutton v. St. Jude Med. S.C., Inc.,*
   419 F.3d 568 (6th Cir. 2005) ...........................................................67

*Swanson v. Citibank, N.A.,*
   614 F.3d 400 (7th Cir. 2010) ...........................................................31

*Teitge v. Remy Const. Co. Inc.,*
   526 N.E.2d 1008 (Ind. Ct. App. 1988)............................................36

*W. Bend Mut. Ins. Co. v. Schumacher,*
   844 F.3d 670 (7th Cir. 2016) ...........................................................31

*Webb v. Jarvis,*
   575 N.E.2d 992 (Ind. 1991) .............................................................44

*Williams v. Cingular Wireless,*
   809 N.E.2d 473 (Ind. Ct. App. 2004)..............................................57

*Wissel v. Ohio High Sch. Athletic Assn.,*
   605 N.E.2d 458 (Ohio Ct. App. 1992), *cause dismissed,*
   595 N.E.2d 943 (Ohio 1992) ............................................................61

*Yost v. Wabash College,*
   3 N.E.3d 509 (Ind. 2014) ........................................................... passim

**Statutes**

28 U.S.C. § 1291..................................................................................1

28 U.S.C. § 1332(d)(2)........................................................................1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Rules**

*Prosser and Keeton on the Law of Torts* 6
    (W. Page Keeton et al. eds., 5th ed. 1984)........................................................58

Restatement (Second) of Torts § 315 (1965).......................................................45

**Treatises**

Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete
    Relationships in Bounds*, 22 Marquette Sports L. Rev. 39 (Jan. 1, 2012).......51

Joy D. Bringer et al., *Defining Appropriateness in Coach-Athlete Sexual
    Relationships: The Voice of Coaches*, 8 J. Sexual Aggression (2002)................51

National Collegiate Athletic Association, *Sexual Violence Prevention: An
    Athletics' Tool Kit for a
    Healthy and Safe Culture*, 3rd ed. (2023)........................................................18

Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds: An NCAA
    Model Policy to Prevent Inappropriate
    Relationships Between Student-Athletes and Athletics
    Department Personnel* (2012)................................................................ 14, 16, 51

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because (a) there are at least 100 class members, (b) the matter in controversy exceeds $5 million, exclusive of interest and costs, and (c) at least one member of the class is a citizen of a state different from Defendant-Appellee National Collegiate Athletic Association ("NCAA"). For example, Plaintiff-Appellant John Doe 1 is a citizen of the state of California and the NCAA is an unincorporated association headquartered and has its principal place of business in the state of Indiana. The District Court granted a motion to dismiss all of Plaintiffs-Appellants' claims on July 2, 2024, and entered a judgment in favor of Defendant-Appellee on October 4, 2024. Short Appendix ("SA") at 52 (Order) and 55 (Order Directing Entry of Judgment). Final judgment was entered on October 4, 2024. SA-58 (Judgment). Plaintiffs-Appellants timely noticed an appeal on November 1, 2024. Dkt. 281 (Notice).

This Court has subject matter jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the District Court.

## STATEMENT OF THE ISSUES

1. Did the District Court err in concluding as a matter of law on the pleadings that the NCAA owes no legal duty to student-athletes to regulate sexual misconduct by coaches and athletics personnel at NCAA member-institutions?

2. Did the District Court err in concluding that Plaintiff-Appellant John Doe 1—who suffered actual harm at an NCAA member-institution and continues to face a heightened risk of future harm at another NCAA member-institution due to the NCAA's failure to regulate sexual misconduct by coaches and athletics personnel—lacks standing to seek injunctive relief?

## STATEMENT OF THE CASE

Plaintiffs-Appellants John Doe 1, John Doe 2, and John Doe 3 ("Appellants") are NCAA student-athletes who suffered sexualized abuse while members of the baseball team at non-party University of San

Francisco ("USF"),[1] an NCAA member-institution. Appellants' experience of sexual misconduct at the hands of their coaches—who had years earlier been reported to the NCAA—is far too common. The epidemic of sexual and sexualized abuse of student-athletes by college coaches and athletics personnel is well-documented, with every month bringing another story of abuse at another NCAA member-institution.

The NCAA is uniquely situated to learn of, redress, and prevent such abuse at and across its member-institutions. It is not some remote governing body engaged in generalized hands-off oversight that espouses mere aspirational principles. It enacts, implements, monitors, and enforces detailed policies and rules governing the very minutiae of college athletics generally, and student-athlete wellness specifically, at its member-institutions. The NCAA exercises direct oversight and control over the day-to-day activities of coaches and student-athletes—right down to when and where coaches and student athletes can meet and train, their tobacco use

_____

[1] USF and the coaches are not parties to this case or appeal, as related claims against them are proceeding contemporaneously in federal court in California. *See John Doe 1, et al. v. University of San Francisco, et al.*, No. 3:22-CV-1559-LB (N.D. Cal.).

and gambling habits, what student-athletes can eat, and when they can eat it. It is the only entity that sits atop—and has visibility into and across—all member-institutions, as well as the coaches, athletics personnel, and student-athletes at all of them.

Yet, to this day, the NCAA refuses to adopt a single policy addressing sexual abuse of student-athletes by coaches and athletics personnel. Pause there: in 2025, the NCAA has *no* policies governing sexual abuse of student-athletes by coaches and athletics personnel. Not one. The implication is clear: the NCAA seeks to draw an artificial boundary around its avowed duty to student-athletes: when student-athlete wellness implicates the NCAA's bottom line, the NCAA embraces (and discharges) its duty; when it does not, it disavows (and breaches) it.

The NCAA argued below—and the District Court held as a matter of law on the pleadings—that the NCAA's failure to act in any way to regulate sexual misconduct by coaches and athletics personnel at its member-institutions somehow immunized it from liability for any related claims. The District Court's holding boils down to this: the NCAA does not

- 4 -

owe a duty to regulate sexual misconduct by coaches and athletics personnel at its member-institutions because it does not regulate sexual misconduct by coaches and athletics personnel at its member-institutions.

That holding is contrary to logic and the law. Indeed, the District Court's circular logic is reminiscent of the NCAA's (rejected) argument in the antirust context that "colleges may decline to pay student athletes because the defining feature of college sports, according to the NCAA, is that the student athletes are not paid." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 109 (2021) (Kavanaugh, J., concurring). Here, Appellants plausibly alleged in detail that the NCAA's failure to act runs counter to its duty to regulate sexual misconduct by NCAA coaches and athletics personnel. They were entitled to try to prove it.

There should be no dispute that the NCAA has a duty to protect student-athlete safety and well-being. The NCAA's Constitution provides that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of

student-athletes."[2] First Am. Compl. ("FAC") ¶ 75, Dkt. 41. The NCAA

proclaims that keeping student-athletes safe "on the field and off" is one of

its foundational principles. *Id.* ¶ 67. Its then-President Mark Emmert

testified before the United States Senate that the NCAA has "a clear, moral

obligation to make sure that we do everything we can to support and

protect student-athletes." *Id.* ¶ 1. And there is no dispute that the NCAA

tries to discharge this duty—as to all areas *except sexual misconduct by*

*coaches and athletics personnel*—by enacting and enforcing detailed

regulations through which it exercises exacting control over the day-to-day

activities of student-athletes, coaches, and athletics personnel in a whole

host of areas.

The NCAA's refusal to take *any* steps to regulate sexual misconduct

by coaches and athletics personnel is particularly egregious given that it

has long known that sexual abuse of student-athletes at its member-

institutions is rampant. Appellants plausibly alleged that the NCAA has

---

[2] Citations to the record use the following abbreviations: "SA" for the short appendix and "Dkt." for docket entries in the district court, No. 1:23-cv-00542-SEB-MJD.

and had knowledge that student-athletes are particularly vulnerable to sexual misconduct by coaches and athletics personnel at its member-institutions, as well as the vast scope and ongoing nature of that misconduct. Still today, in 2025, the NCAA—unlike *every* one of its peer organizations (e.g., the U.S. Olympic Committee)—has adopted *no* policies or bylaws to prevent or address the epidemic of student-athlete abuse at its member-institutions or punish coaches or athletics personnel who create damaging sexualized environments. No policies or bylaws specifically addressing or prohibiting romantic or sexual relationships between coaches and athletics personnel and student-athletes. No policies or bylaws specifically mandating training regarding sexual relationships between coaches and athletics personnel and student-athletes. No policies or bylaws specifically addressing or prohibiting grooming or other sexually exploitative behaviors by coaches and athletics personnel. *Nothing*.

Not even abuse as horrific in nature and scale as that by Larry Nassar—the doctor who sexually abused hundreds of athletes at Michigan State University (an NCAA member-institution) and USA Gymnastics—

- 7 -

motivated the NCAA to act. FAC ¶ 90. This is so despite the NCAA's visibility across and into its member-institutions and its unique ability to stop abusive coaches from simply jumping from one school to the next when their offending conduct is uncovered.

It is not fair to say the NCAA turned a blind eye to this epidemic of abuse. It saw, knew what was happening, and was uniquely situated to act. It did *nothing*.

In this vacuum, Appellants suffered actual abuse at the hands of their coaches at USF. Through this action, they seek to hold the NCAA responsible for its complete abdication of responsibility to protect them from such harm by regulating sexual misconduct at its member-institutions, both by awarding them damages for their past harm and injunctive relief to force the NCAA to finally take action to regulate sexual misconduct by coaches and athletics personnel and protect them and student-athletes like them.

Appellants submit that the District Court committed reversible error in holding as a matter of law on the pleadings that: 1) Appellants failed to

- 8 -

plausibly allege the NCAA owed them a duty of care; and 2) Appellant

John Doe 1 lacked standing to pursue injunctive relief.[3] Appellants

respectfully request that this Court reverse and remand so they can pursue

their claims to hold the NCAA accountable for its failure to protect them.

## I.    FACTUAL BACKGROUND

### A.    The NCAA Regulates Intercollegiate Sports at the National Level.

To achieve its "basic purpose" of "support[ing] and promot[ing]

healthy and safe intercollegiate athletics," the NCAA regulates college

athletics at member-institutions in minute detail through its Constitution,

Operating Bylaws, Administrative Bylaws, and other rules. FAC ¶ 119.

Many of the rules, including those in the NCAA Constitution, are

contained within the annually published NCAA Manual. *See* Dkt. 257-2

---

[3] Appellants are not seeking reversal of the District Court's dismissal of their contract-based claims, their claims based on fiduciary duty or vicarious liability, or the Court's holding barring some claims on the basis of the statute of limitations. With respect to standing to seek injunctive relief, the District Court held that John Does 1, 2, and 3 lacked standing to seek injunctive relief. SA-9. While the District Court's decision was erroneous as to all three Does on the face of the complaint, because the injunctive relief claims of John Does 2 and 3 have since become moot, only John Doe 1 appeals the dismissal of his claim for injunctive relief.

(the "Manual").[4] Article 1, Section D of the NCAA Constitution specifically governs the principle of "Student-Athlete Well-Being" and provides that "[i]ntercollegiate athletics programs shall be conducted by the Association, divisions, conferences and member institutions in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes." *Id.* at 2 (Const., Art. 1 § D); *see also* FAC ¶ 75. The NCAA touted its commitment to athlete safety "on the field and off" as a founding principle, dating back to 1906. FAC ¶ 67. More recently, then-President Mark Emmert reiterated that promise, testifying to the United States Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student athletes." *Id.* ¶ 1.

The NCAA in fact regulates student-athlete safety and wellbeing in numerous ways and at every level. Specific NCAA Bylaws govern everything from whether a player may consume electrolyte drinks or

---

[4] The NCAA agreed to incorporation of the Manual by reference in the court below. Dkt. 55 at 36 n.13; *see also Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (district courts may consider "documents referenced in the pleading if they are central to the claim"). For ease of reference, Appellants cite to the 2023-2024 version of the Manual that is on the District Court docket as it does not materially differ from the 2020-2021 version cited and incorporated by reference in the FAC.

energy bars (Manual at 216 (Bylaw 16.5.2.7)), to whether a player may receive frequent flier points/miles for travel relating to practice or competition (*id.* at 218 (Bylaw 16.11.1.6)), to the number of "countable athletically related activities" a player may engage per week (*id.* at 227 (Bylaw 17.1.7.1)). Coaches must abide by these safety regulations, including the limits on the number of hours—and which hours—student-athletes can play (*id.* at 227-36 (Bylaw 17.1.7), 26 (Bylaw 11.1.1)), as well as rules governing what substances student-athletes can ingest (*id.* at 23 (Bylaw 10.1), 26 (Bylaw 11.1.1)). The NCAA's website, which was cited and incorporated in the FAC, notes that member-institutions are also "subject to rules related to independent medical care," which are "[b]ased on the inter-association best practices developed by the NCAA's Sport Science Institute." FAC ¶ 67 n.45. And the NCAA itself monitors student-athlete well-being through a designated NCAA Faculty Athletic Representative ("FAR") on each campus, who plays a "leading role" in matters of student-athlete welfare. *Id.* ¶¶ 159-65. Among other duties, FARs conduct exit interviews to assess "student perceptions of the health of the athletics

- 11 -

programs, especially with regard to their interactions with coaches and with the operating policies of the program." *Id.* The NCAA instructs FARs to participate in various student welfare situations, including sexual violence in athletics, and to report all violations to the NCAA. *Id.* ¶ 165.

With respect to sexual misconduct specifically, the NCAA requires college *athletes* seeking to transfer within the NCAA to disclose whether their conduct previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence. FAC ¶ 106. Schools are also required to take reasonable steps to confirm this information. *Id.* Notably, however, the NCAA does not impose the same reporting requirements on *coaches* and other athletics personnel, allowing them to migrate from one NCAA member-institution to another throughout their careers with no required reporting relating to sexual abuse. *Id.* ¶ 107.

The NCAA's decision to regulate *student* sexual misconduct but not *coach* sexual misconduct is particularly puzzlingly in light of the exhaustive level of control the NCAA otherwise exercises over coaches: the Manual

includes specific Bylaws regarding coaching bonuses and other compensation, education requirements and compensation restrictions for certain types of coaching personnel, responsibility for violations of NCAA regulations, marketing to sports agents, the use of the NCAA name, the use of tobacco, required contractual provisions, recruiting, scouting, and limitations on the number and duties of coaching and other stuff members. *Id.* ¶ 80. And the NCAA subjects coaches to disciplinary or corrective action for violations of its rules and demands cooperation from member-institutions in enforcing them. *See id.* ¶¶ 80, 111, 113.

In other words: in all areas *but this one*, the NCAA's regulation of student-athlete well-being—including regarding the behavior of coaches and other athletics personnel—is comprehensive and exacting. Sexual misconduct *by coaches and athletics personnel* stands alone as the sole area in which the NCAA fails to act regarding student-athlete safety. Indeed, the NCAA is utterly silent on limitations on coaches with respect to: sexual harassment or abuse of student-athletes and sexual relationships with student-athletes; internal or external reporting of coaches who engage in

such behavior; the necessity for independent investigation of coaches who engage in such behavior; a centralized reporting repository so that complaints about coaches can be tracked between and among schools; and mandatory training of coaches relating to sexual harassment or abuse of student-athletes. FAC ¶ 81.

> **B.    The NCAA Is Uniquely Situated to Study and Regulate Sexual Misconduct by Coaches and Athletics Personnel and Has Selectively Sanctioned Member-Institutions for Egregious Conduct in the Past.**

The NCAA's failure to regulate in this one area—despite all of the other ways it exerts control over coaches and other athletics personnel—is even more inexplicable in light of the NCAA's research and oversight regarding the issue. In 2012, the NCAA published *Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel* ("*Staying in Bounds*"), in which it acknowledged that "[s]exual relationships between coaches and student-athletes have become a serious problem." FAC ¶¶ 46, 95. The NCAA drew particular attention to the tremendous emotional control and power coaches wield over student-athletes:

- 14 -

> In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.

*Id.* ¶ 46. In research published one year later, the NCAA again acknowledged the vital—and vulnerable—process of identity formation that NCAA student-athletes begin when they arrive to campus, most often as teenagers. *Id.* ¶ 39.

In the same 2012 publication, the NCAA explained that the power imbalance between coaches and athletes should be treated like asymmetrical relationships—such as lawyer-client, physician-patient,

judge-party/lawyer, or clergy-parishioner—for which sexual relationships

are strictly forbidden:

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.

FAC ¶ 96.

In light of the increased risk created by the coach-athlete dynamic,

the NCAA concluded in *Staying in Bounds* that adoption of policies

prohibiting coaches from sexually abusing their student-athletes is crucial

to addressing sexual misconduct on campuses: "NCAA member

institutions must unambiguously and effectively prohibit such

relationships to ensure that sport programs offer a safe and empowering

experience for all student-athletes." FAC ¶ 46 n.20 at 4, also available at

- 16 -

Dkt. 257-11 at 4. Yet, more than a decade later, the NCAA itself has not heeded its own call: the NCAA still does not prohibit such relationships, nor require that its member-institutions do so. FAC ¶ 48.

Its failure to enact such requirements also stands in stark contrast to its ability and willingness to do so in specific instances when public pressure is great enough. On July 23, 2012, the NCAA sanctioned Penn State because of its "conspiracy of silence" relating to Jerry Sandusky's sexual abuse of boys. FAC ¶ 89. In addition to a $60 million fine (equating to one year's gross revenue from the university's football program), the NCAA banned Penn State's participation in post-season football games for four years, among other penalties. *Id.* The NCAA announced that its punishment of Penn State was intended to "driv[e] cultural change." *Id.* Notably, the NCAA received pushback for having acted "outside the typical enforcement process," underscoring the need for NCAA rules and regulations regarding sexual misconduct by coaches and athletics personnel, rather than, as one scholar described it, "making exceptions for exceptionally bad or criminal conduct." *Id.*

- 17 -

In 2014, the NCAA began to take a more visible stance on sexual assault prevention. FAC ¶ 97. That year, the NCAA Executive Committee issued a Statement on Sexual Violence Prevention and Compliance Resolution. *Id*. Though the resolution recognized the "societal issue of sexual violence" as a "core issue[] that affect[s] the Association," the NCAA continued to try to lay responsibility for that issue on colleges and universities: "[I]t is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play." *Id*. ¶¶ 97-98.

In 2016 (updated 2022), and in furtherance of the above resolution, the NCAA's Sport Science Institute published a document entitled "Sexual Violence Prevention: An Athletics' Tool Kit for a Healthy and Safe Culture" ("Tool Kit"). FAC ¶ 99. In it, the NCAA broadly defines "sexual misconduct" to include "sexual and gender-based harassment, sexual assault/sexual violence, stalking and intimate partner violence." *Id*. ¶ 100. Again, however, the NCAA foists responsibility for ensuring college student-athlete environments are safe and healthy solely on the institutions themselves: "Member schools have a responsibility to protect the health of

and provide a safe environment for each of their participating student-athletes." *Id*. And though the NCAA acknowledged again that coaches have an "influential" relationship over student-athletes, the NCAA identified coaches as those tasked with "preventing and responding to sexual violence," thereby ignoring the fact that coaches may very well be the perpetrators. *Id*. ¶ 101.

Despite the NCAA's knowledge regarding sexual violence affecting its student-athletes, and despite calls by eight U.S. senators and its own Commission to Combat Campus Sexual Violence (the "Commission"), the NCAA continued to resist any meaningful reform. FAC ¶ 103. Instead, in 2018, the NCAA disbanded its Commission, and the NCAA promised only to continue to "monitor and track on sexual violence issues." *Id*. No additional reform efforts have been made. *Id*.

## C.    The NCAA Fails to Take Reasonable Steps to Protect Student-Athletes from Sexual Misconduct by Coaches and Athletics Personnel.

Despite its research into, oversight of, and ability to act on the problem, and despite regulating everything else about student-athlete

safety at its member-institutions including day-to-day interactions with coaches, the NCAA remains a singular outlier among sports governing bodies in adopting *no* policies about sexual misconduct by coaches and athletics personnel.

Beginning in 1992, the United States Olympic & Paralympic Committee ("USOPC") issued an Ethics Code prohibiting sexual harassment by coaches and sexual/romantic relationships between coaches and athletes. FAC ¶¶ 49-51. In 1998, individual National Governing Bodies ("NGBs"), such as USA Swimming, followed suit, providing for discipline for any "sexual contact or advances directed toward an athlete by a person who, in the context of swimming, was in a position of authority over that athlete." *Id.* ¶ 52. Over the years, USA Swimming refined its policies, including a reporting requirement (2010), an anti-retaliation policy (2010), and a prohibition on bullying (2012). *Id.* ¶¶ 52-55. In 2007, the International Olympic Committee ("IOC") issued a "Consensus Statement" on "Sexual Harassment and Abuse in Sport" that highlighted the power differences between athletes and authority figures and recommended that all sport

- 20 -

organizations develop policies to protect athletes from sexual abuse and harassment. *Id.* ¶ 56.

Following a congressional investigation that found inconsistences among NGBs in identifying those disciplined or banned and in how to handle reports of abuse, the United States Center for SafeSport ("USCSS") was created on March 3, 2017. FAC ¶¶ 61-63. It is a centralized and neutral organization that oversees education programs for safe sports and adjudicates claims of sexual misconduct. *Id.* ¶ 63. USCSS created the SafeSport Code for the U.S. Olympic and Paralympic Movement ("SafeSport Code"), which sets out "expectations for Participants related to emotional, physical, and sexual misconduct in sport, including bullying, hazing, and harassment." *Id.* ¶ 64. Prohibited conduct in the SafeSport Code includes sexual misconduct, emotional and physical misconduct, including stalking, bullying, hazing, and harassment, aiding and abetting, and misconduct related to reporting. *Id.*

Despite these long-standing efforts by NGBs to create and implement effective measures to address sexual abuse and harassment, the NCAA still

has done *nothing*. The NCAA has no standards of conduct governing abusive coaches: no policies addressing sexual misconduct by athletics personal, no training mandates regarding sexual misconduct by athletics personnel, and no tracking system to prevent serial sexual predation. FAC ¶¶ 4, 9, 48, 66, 81.

> **D.    Appellants and the Class Suffered and Will Continue to Suffer Harm because of the NCAA's Failures.**

In the vacuum left by the NCAA's inaction, Appellants experienced rampant sexualized harassment and misconduct at the hands of Coach Anthony Giarratano and Assistant Coach Troy Nakamura (the "USF Coaches") while members of the USF baseball team. FAC ¶¶ 193-201, 203-204, 220-230, 241-260. It was not unusual for Nakamura to expose himself to student-athletes—both on and off the field. For example, Appellants observed Nakamura naked on the baseball diamond, swinging his penis like a helicopter or putting a baseball bat between his legs like an erect penis. *Id.* ¶¶ 146-48. It was not unusual for the USF Coaches to shower with the players in the players' locker room (as opposed to their own locker room) and look at and comment upon players' genitalia. *Id.* ¶¶ 150-51. It

was not unusual for the USF Coaches to use sexualized and abusive language, regularly calling Appellants "faggot" or "pussy," or asking about their sexual encounters. *Id.* ¶¶ 305, 328, 345, 346, 355, 457. And it was not unusual for the USF Coaches to humiliate Appellants by forcing them to strip down to their underwear for making a mistake, while the Coaches and other players laughed. *Id.* ¶ 130. The abuse caused such severe emotional distress that several players contemplated suicide. *Id.* ¶ 5.

Any players (like Appellants) who did not participate in this misconduct were retaliated against. These players were ostracized by the USF Coaches, told they were "a cancer," "worthless," a "piece of shit," or a "fucking pussy." FAC ¶¶ 127, 459. After Appellant John Doe 1's mother reported the USF Coaches' abuse, he was excluded from team meetings, Giarratano went out of this way to discredit his accomplishments (including academic), and he was ultimately kicked off the team. *Id.* ¶¶ 206-216. Others players had similar experiences. *See, e.g., id*. ¶¶ 225-230 (alleging Appellant John Doe 2 was run off the team after reporting the USF Coaches' abuse); *id*. ¶¶ 250-253 (alleging same for Appellant John Doe

3, after his refusal to condone the USF Coaches' misconduct and his reporting to the USF Director of Player Development). The USF Coaches were well known for running players off the team as retaliation, costing them not only their careers but also their scholarships. *Id.* ¶¶ 127, 177. Indeed, the USF Coaches retaliatory "running off" was prolific: in the 1999 academic year, when Giarratano first became head coach, only one of fifteen players returned for their sophomore year. *Id.* ¶ 178. Of the twelve or thirteen players who entered USF baseball program in 2013, only five played baseball at USF for all four years of college, and one of those players was Giarratano's son. *Id.* ¶ 179. Every other player transferred. *Id.* Of the sixteen freshman recruits in the 2020 USF baseball class, eleven had left as of the filing of the FAC. *Id.* ¶ 180. In other words, nearly 70% of the 2020 recruiting class left the team—when compared to the similar figures from 1999, this confirms the USF Coaches' sexual misconduct, ruthlessness, and retaliation persisted over years. *Id.* And the USF Coaches' retaliation did not end when players left—the Coaches were well known to "blackball"

- 24 -

players who did not condone their abuse, by attempting to kill their prospects at other schools or professionally. *Id.* ¶¶ 279, 284, 285, 339, 431.

The NCAA knew about the USF Coaches' misconduct. In May of 2014, John Doe 6's parents sent the USF NCAA FAR a letter detailing the fact that the USF Coaches were engaged in abusive behavior. FAC ¶ 166. The letter described the "hostile environment" for the athletes, who were "being called out and . . . told they are 'pathetic', 'weak-minded', 'a cancer to the team', and that they 'need to understand that their baseball career is over'." *Id.* ¶ 168. John Doe 6's parents noted the attrition rates of players leaving the baseball program. *Id.* ¶ 171. John Doe 6's parents also highlighted the fact that Giarratano's wife, who was an employee of USF and an academic advisor to baseball players, retaliated against players who would not endorse her husband's behavior. *Id.* ¶ 170. Giarratano's wife had engaged in similar retaliatory conduct with other players as well. *Id.* ¶¶ 371-374.

The NCAA was again notified about the USF Coaches' misconduct in 2016, through yet another report to the NCAA FAR. The FAR learned of a

sexualized incident at the team's annual holiday party where one player was forced to spank the team nutritionist as part of freshman hazing. *Id.* ¶ 173. The NCAA FAR interviewed John Doe 13 regarding this incident and, on information and belief, a Title IX investigation related to the actions of *the players* was initiated. *Id.* ¶ 174. The NCAA, however, did nothing. As a result of the NCAA's policy failures, Appellants realized, and all class members continue to face, a substantial and heightened risk of sexual misconduct and retaliation by coaches and athletics personnel. *Id.* ¶¶ 4, 34-47, 67-119.

## II.   PROCEDURAL HISTORY

On March 11, 2022, a subset of Appellants filed this case in the Northern District of California against the Coaches, USF, and the NCAA for violations of state tort and contract claims, as well as discrimination and retaliation under Title IX as it pertained to USF. After the Northern District of California Court dismissed without prejudice all claims against the NCAA based on lack of personal jurisdiction,[5] Appellants brought this

---

[5] *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, No. 22-cv-01559-LB, 2023 WL 105096, at *1 (N.D. Cal. Jan. 4, 2023).

proposed class action against the NCAA on March 28, 2023 on behalf of a prospective nationwide class of "[a]ll student-athletes who are currently participating in NCAA sports at NCAA member institutions." Compl. ¶ 434, Dkt. 1. On June 20, 2023, Appellants filed an amended complaint, alleging that, among other things, the NCAA breached its duty by not having any policies regarding sexual misconduct by coaches or athletics personnel. *See generally* FAC. On July 12, 2023, the NCAA moved to dismiss and/or strike Plaintiffs' First Amended Complaint. Dkt. 54. Appellants opposed the NCAA's motion on August 16, 2023, Dkt. 64, and the NCAA filed its reply on August 30, 2023, Dkt. 73.

Shortly before filing its motion to dismiss, the NCAA moved to stay discovery in the case. Dkt. 44. The magistrate judge denied the NCAA's motion, and set a fast-paced discovery schedule. Dkt. 47, 50. As a result, the parties engaged in extensive discovery while the NCAA's motion to dismiss was pending, culminating in Appellants filing their motion for class certification on June 14, 2024. Dkt. 254. On July 2, 2024, the District Court issued an order dismissing Appellants' Amended Complaint. SA-2.

On October 4, 2024, the District Court entered final judgment, dismissing Appellants' claims for injunctive relief without prejudice for lack of standing and all other claims with prejudice. SA-58. On November 1, 2024, Appellants filed a timely notice of appeal. Dkt. 281.

## SUMMARY OF ARGUMENT

The District Court erred by (1) concluding as a matter of law on the pleadings that the NCAA owes no legal duty to student-athletes to regulate sexual misconduct by coaches and athletics personnel at NCAA member-institutions, and (2) concluding that Appellant John Doe 1—who suffered actual harm at an NCAA member-institution and continues to face a heightened risk of future harm at another NCAA member-institution, due to the NCAA's failure to regulate sexual misconduct—lacks standing to seek injunctive relief. As a whole, the Order is out of step with a district court's task on a Rule 12(b)(6) and 12(b)(1) motion: to determine whether the complaint's allegations, accepted as true and construed in the light most favorable to the plaintiffs, plausibly state a claim for relief. *See*

*generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

*First*, Appellants asserted that the NCAA assumed a duty of care to student-athletes and that it had a duty of care under the common law. Despite recognizing that both theories require *factual* analysis, the District Court decided the issue as a matter of *law* on the pleadings and ignored key factual allegations in the process. Specifically, the District Court ignored numerous allegations regarding the NCAA's control over student-athletes, coaches, and athletics personnel; the ways in which the NCAA already regulates student-athlete safety and wellbeing; and the NCAA's regulation of *student*-on-student sexual misconduct. The District Court also misconstrued Indiana law on the element of foreseeability, finding notice of imminent harm necessary, rather than sufficient, to give rise to a duty. Finally, the District Court gave short shrift to the public policy reasons to find a duty.

*Second*, Appellant John Doe 1 plausibly alleged that he had standing to seek injunctive relief as a result of the combination of his actual *past*

- 29 -

abuse at an NCAA member-institution and the substantial *risk* of abuse he faces as a current student-athlete at an NCAA member-institution. In finding to the contrary, the District Court erroneously concluded that John Doe 1 could have standing only if he was still at USF (where the abuse occurred) or alleged abuse at his current NCAA institution (where no abuse has been alleged)—otherwise, the District Court reasoned, the injury was not sufficiently imminent to constitute an injury-in-fact. This was error. Factually, the District Court ignored Appellants' allegations that the NCAA's inaction with respect to sexual misconduct heightened the risk of sexual abuse for all student-athletes at all NCAA member-institutions, and that this risk was tragically realized for Appellants while they were NCAA student-athletes at USF. Legally, the District Court ignored precedent finding standing for injunctive relief where plaintiffs allege a combination of past harm and substantial risk of future harm by the same entity—the NCAA.

## ARGUMENT

## I.     STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6). *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018). The Court must construe the complaint in the light most favorable to the plaintiffs, accept all allegations in the complaint as true, and draw all reasonable inferences in the plaintiffs' favor. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). A motion to dismiss "should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Manning v. Miller*, 355 F.3d 1028, 1031 (7th Cir. 2004) (quotation marks and citation omitted). If the plaintiff "give[s] enough details about the subject-matter of the case to present a story that holds together," the case proceeds. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

This Court applies the same plausibility standard on a Rule 12(b)(1) motion for lack of standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir.

2015). Thus, "general factual allegations of injury . . . may suffice," *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005), and the court "must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor," *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015).

## II. THE DISTRICT COURT ERRED BY FINDING AS A MATTER OF LAW THAT THE NCAA OWES ITS STUDENT-ATHLETES *NO* LEGAL DUTY TO REGULATE SEXUAL MISCONDUCT BY COACHES AND ATHLETICS PERSONNEL.

To state a claim for negligence under Indiana law, a plaintiff must allege: "(1) that the defendant owed the plaintiff a duty of care, (2) that the defendant breached this duty by allowing its conduct to 'fall below the applicable standard of care,' and (3) that the breach 'proximately caused' a 'compensable injury.'" *Pennington v. Mem'l Hosp. of S. Bend, Inc.*, 223 N.E.3d 1086, 1094 (Ind. 2024) (quoting *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016)).

The District Court held as a matter of law on the pleadings that the NCAA owes no legal duty to its student-athletes to regulate sexual

- 32 -

misconduct by coaches and athletics personnel because it does not undertake to regulate sexual misconduct by coaches and athletics personnel. On the basis of this circular holding, the Court dismissed all of Appellants' negligence claims.[6] That holding is erroneous both because the District Court decided the issue on the pleadings, and because it is contrary to specific detailed facts Appellants plausibly alleged regarding that duty.

### A.    The District Court Erred by Deciding the Issue of Duty on the Pleadings.

As a threshold matter, the District Court committed reversible error by finding that the NCAA owed no duty of care to Appellants as a matter of law on the pleadings. *Every* Indiana case on which the District Court relied for its substantive duty analysis was decided on a full factual record at summary judgment. *See Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 840 (Ind. 2020); *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014); *Yost v. Wabash College*, 3 N.E.3d 509 (Ind. 2014); *Lanni v. Nat'l Collegiate Athletic Ass'n*, 42 N.E.3d 542 (Ind. Ct. App. 2015).

---

[6] Appellants brought claims for gross negligence (Count IV), negligence (Count V), breach of fiduciary duty (Count VI), negligent failure to warn, train, or educate (Count VII), and negligent infliction of emotional distress (Count IX). *See* FAC.

Indeed, prior to its 2015 ruling affirming summary judgment, the appellate court in *Lanni* held that the trial court erred when it entered summary judgment in favor of the NCAA on this issue "without awarding Lanni a reasonable opportunity to present relevant materials in opposition to the motion for summary judgment" and reversed. *Lanni*, 42 N.E.3d at 547 (quoting *Lanni v. Nat'l Collegiate Athletic Ass'n*, 989 N.E.2d 791, 799 (Ind. Ct. App. 2013)).

As discussed in the following section, the duty question here is particularly fact-intensive. Despite acknowledging this fact and recognizing that "a different legal standard . . . is applied at the motion to dismiss stage," the District Court nevertheless ruled against Appellants as a matter of law. SA-31. This was error: "[l]itigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's *proof* . . . defeats the function of [Federal Rule of Civil Procedure] Rule 8." *Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998); *see also E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 780 (7th Cir. 2007) ("[A] plaintiff might sometimes have a right to relief

- 34 -

without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim."); *Manning*, 355 F.3d at 1031 (emphasizing that a motion to dismiss "should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") (quotation marks and citation omitted); *Doe v. Indiana Univ. Bloomington*, No. 116CV01480JMSDKL, 2016 WL 7188214, at *3 (S.D. Ind. Dec. 12, 2016) (refusing to dismiss the plaintiff's negligence claim at the pleadings stage based on cases where the Indiana Supreme Court made its rulings only after "extensively detailing the evidence the parties presented" and noting that "[w]hile [those] cases . . . may carry the day . . . on summary judgment, today is not that day"); *Schmitz v. Nat'l Collegiate Athletic Ass'n*, 67 N.E.3d 852, 866 (Ohio Ct. App. 2016) *aff'd sub nom.* 122 N.E.3d 80 (Ohio 2018) (denying NCAA's motion to dismiss plaintiff's negligence claim because the NCAA did "not offer a single case . . . where

an Indiana court has decided this issue at the pleadings stage"). So, too, here.

### B. Appellants Plausibly Alleged the Existence of a Duty.

#### 1. Appellants Plausibly Alleged that the NCAA Voluntarily Assumed a Duty to Regulate Sexual Misconduct by Coaches and Athletics Personnel.

Under Indiana law, "[a] duty of care may . . . arise where one party assumes such a duty, either gratuitously or voluntarily. The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999), *abrogated on other grounds by Rogers v. Martin*, 63 N.E.3d 316 (Ind. 2016) (citation omitted). "[T]he existence and extent of an assumed duty is generally a question of fact for the jury," though "it may be resolved as a matter of law if the designated *evidence* is insufficient" to establish a duty. *Spierer v. Rossman*, 798 F.3d 502, 511 (7th Cir. 2015) (emphasis supplied) (citing *Teitge v. Remy Const. Co. Inc.*, 526 N.E.2d 1008, 1014 (Ind. Ct. App. 1988)). While *Spierer* upheld a finding of no duty on a motion to dismiss, the Indiana cases resolving duty as a matter of law—including *Teitge,* upon which it relies—

typically do so on summary judgment on a full evidentiary record, not on a motion to dismiss, as the District Court did here. *See e.g.*, *Rogers*, 63 N.E.3d at 316; *Delta Tau Delta*, 712 N.E.2d 968; *Dixon v. Shiel Sexton Co., Inc.*, 196 N.E.3d 717 (Ind. Ct. App. 2022).

Regardless, whether framed as a question of law tethered to the specific factual circumstances pled, as in *Spierer*, or as a question of fact that must be decided on an evidentiary record, as the Indiana cases hold, Appellants plausibly alleged specific facts to support that the NCAA assumed a duty here. In its Constitution and Bylaws, the NCAA expressly undertakes a duty to protect student-athletes, vowing that "athletic programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes." FAC ¶ 75; *see also id.* ¶ 67 (repeating promise on website). The NCAA's then-President Mark Emmert reiterated that promise, testifying to the United States Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." *Id.* ¶ 1. And, in many ways, the NCAA lives up to this promise: as the District Court noted

but found insufficient to constitute "a voluntary undertaking extending to actual oversight and control over the behavior of individual coaches and their daily interactions with student-athletes to protect their health and safety," SA-30, the NCAA regulates recruitment, sports wagering, and tobacco usage. *Id*.

But that is not all Appellants alleged the NCAA does to regulate student-athlete safety and wellbeing—far from it. Appellants also alleged that the NCAA regulates how often student-athletes can engage in "countable athletically related activities" (Manual at 227 (Bylaw 17.1.7.1))— and whether coaches can force them to play more (they cannot) (*id*. at 227- 36 (Bylaw 17.1.7), 26 (Bylaw 11.1.1)); whether a player may consume electrolyte drinks or energy bars—and whether coaches can give them those substances (they can) (*id*. at 216 (Bylaw 16.5.2.7)); who can participate in workouts (it depends) (*e.g., id*. at 117 (Bylaw 13.11.3.8.1)) ; and what trainings coaches must receive before they may coach (including as it relates to safety) (*id.* at 26 (Bylaw 11.1.4)). In light of these allegations, the District Court's conclusion as a matter of law that Appellants did not

sufficiently allege that the NCAA had "actual oversight and control over the behavior of individual coaches and their daily interactions with student-athletes to protect their health and safety" strains credulity; at the very least, it contravenes the District Court's obligation to make all inferences in favor of the non-moving party.

The District Court concluded that because Appellants did not allege any "specific undertaking by the NCAA in the area of sexual abuse and harassment of student-athletes by coaches," they "failed to plausibly allege that the NCAA assumed a duty to protect them from such misconduct." SA-32. But that is the very basis of Appellants' case: the NCAA's failure to take steps to regulate *in this one area* is a breach of its express, admitted duty to protect student-athletes' physical and mental health and safety. The District Court's ruling is thus circular at best. Moreover, Appellants alleged that the NCAA requires *student-athlete* transfers to disclose to prospective schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence and noted the problematic inconsistency in the NCAA's decision

*not* "to impose those very same requirements on coaches and other athletics department personnel who commit the same or similar acts." FAC ¶¶ 106-07. And Appellants alleged that the NCAA has, in fact, sanctioned schools for sexual misconduct by coaches when it has suited them to do so. *See id.* ¶ 89.

It is up to the factfinder, not the court on the pleadings, to determine whether evidence proves that the NCAA's "specific undertaking" to protect student-athletes' physical and mental health and safety and well-being—including as it pertains to sexual misconduct by fellow student-athletes—includes the duty to protect student-athletes from sexual misconduct *by coaches and athletics personnel* as well. *See Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 168 (D.D.C. 2017) (holding plaintiff pleaded sufficient facts to establish the NCAA had a duty where she asserted that the NCAA "undertook and assumed a duty to protect the physical and mental well-being of all student-athletes participating in intercollegiate sports, including . . . a duty to protect student-athletes from brain injuries"). Appellants plausibly alleged that it does.

The cases on which the District Court relied to conclude the NCAA did not assume a duty are distinguishable and underscore the importance of not deciding the issue on the pleadings. In *Yost v. Wabash College*, the Indiana Supreme Court held that a national fraternity did not assume a duty to protect local pledges from hazing because "the materials designated on summary judgment provide evidence that the national fraternity engaged in educational outreach programs to enhance proper behavior and to discourage hazing" but "the specific undertaking did not extend to actual oversight and control over the behavior of individual student members of the local fraternity." 3 N.E.3d at 521. Here, Appellants plausibly alleged that the NCAA had precisely that actual oversight and control over the behavior of coaches and athletics personnel (and student-athletes). *See supra* § I.A.

Likewise, in *Smith v. Delta Tau Delta*, the Indiana Supreme Court found no voluntary assumption of duty because there was "no designated evidentiary material that shows that the national fraternity had a right to exercise direct day-to-day oversight and control of the behavior of the

activities of the local fraternity and its members" and "no evidence that the national fraternity assumed any duty of preventative, direct supervision and control of the behaviors of its local chapter members." 9 N.E.3d at 163. Again, Appellants here allege that the NCAA had a right to exercise direct day-to-day oversight and control of the behavior of the activities of the coaches and athletics personnel (and students) at its member institutions, and that it assumed a duty of preventative, direct supervision and control of their behaviors. *See supra* § I.A.

Relying on these two cases, the Court of Appeals of Indiana held in *Lanni*—again on a full evidentiary record at summary judgment—that the NCAA did not assume a duty to "assur[e] protection of . . . student-athletes from injuries that may occur at sporting events." 42 N.E.3d at 553. There, a student-athlete was injured while in a waiting area after her fencing match, i.e., while she was a *spectator*. *Id.* at 546. And the connection to the NCAA was minimal: the NCAA's website said the NCAA "takes appropriate steps to modify safety guidelines, playing rules[,] and standards to minimize those risks" and the NCAA defined a fencing area to include a "Removable

Area," which "usually represents a series of pipes that delineate where spectators may and may not go." *Id.* at 553. Appellants' allegations here are far stronger and more specific than the generalized duty alleged in *Lanni*: as discussed *supra*, the NCAA exercises day-to-day control over coaches and athletics personnel (and student-athletes) and requires the reporting and sharing of information related to sexual misconduct by student-athletes. Assuming a duty to regulate sexual misconduct by coaches and athletics personnel is simply not analogous to assuming a duty to protect student-athletes from getting hurt in *any* way (including as a spectator) at *any* sporting event.

> **2.    Appellants Plausibly Alleged that the NCAA Had a Common Law Duty to Regulate Sexual Misconduct By Coaches and Athletics Personnel.**

In addition to plausibly alleging the NCAA assumed a duty to regulate sexual misconduct by coaches and athletics personnel, Appellants alleged the NCAA had a duty under the common law because "reasonable persons would recognize it and agree that it exists." *Yost*, 3 N.E.3d at 520.

To determine whether a duty that has not already been declared exists, Indiana courts employ a three-part balancing test considering: (1) the relationship between the parties; (2) the foreseeability of harm; and (3) public policy concerns. *Goodwin*, 62 N.E.3d at 387 (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995-97 (Ind. 1991)). Whether a special relationship exists is "fact sensitive," and "where factual questions are interwoven with the determination of the existence of a relationship, then the existence of a duty becomes a mixed question of law and fact, ultimately to be resolved by the factfinder." *J.A.W. v. Roberts*, 627 N.E.2d 802, 810-11 (Ind. Ct. App. 1994), *abrogated on other grounds by Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361 (Ind. Ct. App. 2002). All three factors support finding a duty here.

**Relationship Between the Parties.** A duty arises to control the conduct of a third party to prevent him from causing harm to another where "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection." *Neal v. IAB Fin. Bank*, 68 N.E.3d 1114, 1118

(Ind. Ct. App. 2017) (quoting Restatement (Second) of Torts § 315 (1965)). A relationship is characterized as "special" when "the level of interaction or dependency between the parties . . . surpasses what is common or usual." *J.A.W.*, 627 N.E.2d at 809.

Appellants plausibly alleged that the NCAA has a special relationship with student-athletes giving rise to a duty to protect them from sexual misconduct by coaches and athletics personnel. Contrary to the District Court's characterization of the relationship as tenuous, SA-36. Appellants alleged that the NCAA exerts tremendous oversight over student-athletes, effectively regulating all aspects of their lives as athletes, including the amount of time they are allowed to play (Manual at 227-36 (Bylaw 17.1.7)), if and how they may profit from their name, image, and likeness (*id.* at 48-52 (Bylaw 12.5)), if they are eligible to receive athletic aid (*id.* at 179 (Bylaw 15.01.1)), what they may (or must) wear (*id.* at 52 (Bylaw 12.5.4)), and what substances they can ingest (*id.* at 23 (Bylaw 10.1), 26 (Bylaw 11.1.1)). Indeed, student-athletes depend on the NCAA for eligibility to play college sports at all, and must go through the NCAA's

- 45 -

Transfer Portal to play their sport at another school. FAC ¶¶ 9 n.5, 187.[7]

This is a far cry from *Yost*, to which the District Court analogized, where

the court found (on summary judgment) that the national fraternity's

interaction with local chapter's individual members was limited to

providing educational materials, approving their advisor liaison, and

having the ability to discipline members. 3 N.E.3d at 521. Nor is *Lanni*

apposite on this point: there the court (again at summary judgment) found

no special relationship between the NCAA and a student-athlete in her role

as a *spectator* at a fencing competition. *See* 42 N.E.3d at 549.

The District Court's minimization of the relationship between the

NCAA and student-athletes is particularly odd in this context given the

fact that the NCAA regulates *student*-on-student sexual misconduct, *see*

FAC ¶¶ 104, 106, while declining to regulate *coach*-on-student sexual

---

[7] Moreover, for many student-athletes, "college is the first time they have lived away from home," and though "college students may no longer be minors under the law, they may still be learning how to navigate the world as adults." *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 625 (2018). Given the NCAA's power over student-athletes, the NCAA is in a special position to protect them. *See J.A.W.*, 627 N.E.2d at 809 (finding special relationships giving rise to a duty to protect in circumstances involving a power imbalance, such as supervising adults and children, teachers and students, and nursing homes and patients).

misconduct. Moreover, the District Court's articulation of the duty was too broad: Appellants do not allege that the NCAA has a generalized duty to protect student-athletes "against [all] third-party sexual misconduct"— only that it has a duty to regulate sexual misconduct *by coaches and athletics personnel at its member institutions*, over whom Appellants alleged even greater oversight and control by the NCAA. Indeed, Appellants alleged that the NCAA prohibits coaches from, among other things, sports wagering, providing banned substances, providing prospective or current student-athletes improper inducements or extra benefits, and facilitating a meeting between a student-athlete and an agent. FAC ¶ 79. And, contrary to the District Court's suggestion that Appellants alleged that the duty arises from only the existence of the NCAA FAR and the NCAA's "power to discipline and sanction coaches for violations of [its] rules and standards," SA-37, they alleged more: Appellants alleged that the NCAA regulates coaching bonuses and other compensation, education requirements, the use of tobacco, required contractual provisions, recruiting protocols, and the number and duties of coaching and other staff

members (with differences depending on the sport). FAC ¶ 80. The District

Court's conclusion that "Plaintiffs have not alleged (nor could they) that

the NCAA has direct oversight or control over coaches' conduct or the

ability to monitor coaches on a day-to-day basis," SA-37, either flatly

ignores these allegations or inappropriately usurps the factfinder's role.

Indeed, the District Court's parenthetical—"(nor could they)"—suggests

the Court did not view the analysis as "fact-sensitive" but, rather, as

predetermined.[8]

Here, Appellants plausibly alleged that the NCAA exerts sufficient

control over coaches and athletics personnel and has a sufficiently special

relationship with student-athletes to give rise to a duty to protect them

from abuse by coaches and athletics personnel.

**Foreseeability.** In the context of duty, an act is foreseeable when

"there is some probability or likelihood of harm that is serious enough to

---

[8] Moreover, as has become clear in numerous legal contexts, the NCAA's relationship to student-athletes and coaches is not so easily defined. *See, e.g.*, *Johnson v. Nat'l Collegiate Athletic Ass'n*, 108 F.4th 163, 182 (3d Cir. 2024) (holding that NCAA student-athletes cannot be barred as a matter of law from asserting claims under the Fair Labor Standards Act).

induce a reasonable person to take precautions to avoid it." *Goodwin*, 62 N.E.3d at 392. To make this determination, Indiana courts look to "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Id.* at 393. Crucially, the Indiana Supreme Court has been steadfast in its guidance that a court's task "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Id.* at 391 (quoting *Strahin v. Cleavenger*, 216 W. Va. 175, 207 (2004)). Indeed, this wider lens is what differentiates the foreseeability component of the duty analysis from the foreseeability component of proximate cause. As the *Goodwin* court explained:

> [T]he foreseeability component of the duty analysis must be something different than the foreseeability component of proximate cause. More precisely, it must be a lesser inquiry; if it was the same or a higher inquiry it would eviscerate the proximate cause element of negligence altogether. If one were required to meet the same or a higher burden of proving foreseeability with respect to duty, then it

> would be unnecessary to prove foreseeability a second time with respect to proximate cause.

*Goodwin*, 62 N.E.3d at 390. Finally, "a defendant's actual knowledge is an appropriate consideration in determining foreseeability and the existence of any duty owed." *Doe v. Delta Tau Delta Beta Alpha Chapter*, No. 16-01480, 2018 WL 3375016, at *4 (S.D. Ind. July 11, 2018).

Here, Appellants plainly alleged—*and the District Court agreed*—that it is reasonably foreseeable that a student-athlete (the broad type of plaintiff) would be sexually harassed or abused by their coach in the absence of policies forbidding such conduct (the broad type of harm). *See* SA-39 ("As a general matter, it is, of course, foreseeable that a coach could take advantage of the power imbalance in their relationship with a student-athlete to engage in sexual harassment or abuse . . . ."). Appellants alleged in painstaking detail the research that exists, *including conducted by the NCAA itself*, supporting the conclusion that student-athletes are at a heightened risk for sexual harassment, exploitation, and mental abuse by coaches. *See* FAC ¶ 35 ("A coach's power over athletes can extend to virtually all aspects of an athlete's life in such ways that clear boundaries

are hard to delineate. This near-total control is rarely questioned.")

(quoting Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete*

*Relationships in Bounds*, 22 Marquette Sports L. Rev. 395, 405 (Jan. 1, 2012));

*id.* ¶ 41 ("As researchers suggest, 'the culture of sport, specifically the

power invested in the coach, facilitates an environment conducive to, and

tolerant of, sexual exploitation.'") (quoting Joy D. Bringer et al., *Defining*

*Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, 8 J.

Sexual Aggression 83, 83 (2002)); *id.* ¶ 46 ("For intercollegiate athletes, the

magnitude of the coach's control will likely exceed that of any other single

individual at that student-athlete's institution. For many, it will exceed the

extent of control any individual has ever had over them at any point in

their lives, with the exception of their parents.") (quoting *Staying in Bounds*

at 15).

Appellants then described the actions taken by other sporting

organizations, including the United States Olympic Committee, the

International Olympic Committee, and USA Swimming, to prohibit

coaches from engaging in sexual relationships with athletes; to protect

athletes from sexual harassment; and to preserve the safety and well-being of athletes, culminating in the creation of the SafeSport Code for the U.S. Olympic and Paralympic Movement. FAC ¶¶ 48-66. That is, Appellants alleged the existence of "reasonable [actors]" who not only "would recognize [the duty] and agree that it exists," *Yost*, 3 N.E. at 520, but actually have done so. Finally, Appellants alleged the NCAA's specific knowledge of and pronouncements about the problem of sexual relationships between coaches and student-athletes, as well as the reporting requirements the NCAA imposes for student-athletes—*but not coaches and athletics personnel*—who have had claims of sexual misconduct against them investigated. FAC ¶¶ 95-107.

Despite all of these allegations and agreement that the harm alleged was foreseeable "[a]s a general matter," the District Court nevertheless found foreseeability lacking because Appellants "[fell] short in alleging facts plausibly suggesting that the NCAA knew or should have known of any 'present and specific circumstances,' rendering the probability of harm more imminent," such as "knowledge of prior incidents of sexual

misconduct or harassment at USF." SA-39 (quoting *Cavanaugh's Sports Bar*

*& Eatery, Ltd.*, 140 N.E.3d at 840). But that is not the test for foreseeability as

it relates to establishing a duty under Indiana law. Indeed, in *Cavanaugh's*

*Sports Bar & Eatery, Ltd. v. Porterfield*, the Indiana Supreme Court explicitly

rejected the dissent's contention that the court was "rais[ing] the bar of the

question of foreseeability in the context of duty by requiring

contemporaneous evidence of imminent harm." 104 N.E.3d at 841 n.1

(emphasis omitted). Rather, the court explained, it was clarifying that "*[i]f*

landowners had reason to know of any imminent harm, that harm was as a

matter of law, foreseeable in the duty context."[9] *Id.* at 841 (emphasis

supplied). In other words, "[c]oncurrent knowledge of imminent harm is a

sufficient, not necessary, condition of foreseeability in the duty context." *Id.*

at 841 n.1 (emphasis omitted). Here, by requiring Appellants to allege that

---

[9] As such, under Indiana law, a bar owner could not foresee that a patron would blind another patron during a *sudden* parking lot fight (and thus did not have a duty) but a restaurant owner could foresee a fight breaking out when he knew of "[a]n escalating thirty-minute encounter" between specific groups (and thus did have a duty). *Id.* at 843 (quoting *Hamilton v. Steak n' Shake Operations Inc.*, 92 N.E.3d 1166, 1173 (Ind. Ct. App. 2018)).

the NCAA had contemporaneous knowledge of imminent harm, the District Court flipped it—or, worse, demanded the type of "historical evidence" that the Indiana Supreme Court forbids in a duty analysis.[10] *Id.* at 844.

Moreover, even if Appellants were required to allege that the NCAA "knew or should have known of any 'present and specific circumstances' regarding the probability of harm" specifically at USF (SA-39), *they did*. Appellants alleged that "at least as early as May 2014," the NCAA was or should have been on notice of abuse within USF's baseball program due to complaints that were made to USF's NCAA FAR. FAC ¶ 172. As explained *supra*, the NCAA FAR is a member of a school's faculty that serves as a liaison between the school and the NCAA, among other functions. FAC ¶¶ 159-161. Specifically, Appellants alleged that in 2014, a USF baseball player's parents sent the NCAA FAR a detailed letter about the USF

---

[10] Notably, in *Yost*, the Indiana Supreme Court did not find foreseeability lacking—rather, it said of the three factors—relationship between the parties, foreseeability, and public policy—the first and third tipped the scales against finding a duty, suggesting that the likelihood that a fraternity pledge would be harmed by hazing *was* foreseeable to a national fraternity. *See* 3 N.E.3d at 521.

baseball Coaches' abuse, including the Coaches' creation of a "hostile environment," retaliation faced by players who did not acquiesce to the Coaches' behavior, and the fact that "other players were likely in the same plight as their son." FAC ¶¶ 166-170. The 2014 complaint also discussed an unusually high rate of attrition on USF's baseball team. *Id.* ¶ 171. Two years later, the NCAA FAR was again put on notice of problems on the baseball team and even interviewed John Doe 13 in connection with a sexualized incident that occurred at a team holiday party. *Id.* ¶ 173. These allegations are no different than the evidence presented in *Doe v. Delta Tau Delta Beta Alpha Chapter*, where the court concluded (on summary judgment) that a fraternity owed a duty to protect the plaintiff from sexual assault while she was a guest at the fraternity because the fraternity knew of a prior sexual assault allegation against the member accused of assaulting the plaintiff. 2018 WL 3375016, at *4-5.

Here, the District Court erroneously ignored Appellants' allegations and demanded more: it found foreseeability lacking because Appellants had not alleged that the NCAA FAR "ever informed the NCAA of such

- 55 -

reports of abuse" and "it [was] not plausible that the NCAA would or should have known" that USF's high transfer rate indicated that the Coaches were engaging in sexual harassment and abuse. SA-39. But by informing the NCAA FAR, Appellants *had* informed the NCAA—the FAR *is* the NCAA's representative on campus. FAC ¶¶ 159-161. And whether the NCAA FAR *did his job* and communicated those reports to the NCAA leadership and whether the NCAA leadership understood that the unusually high attrition rate on the baseball team was a potential red flag are *factual* issues beyond the scope of knowledge Appellants possibly could have (and thus alleged) in a complaint. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (noting that even under heightened pleading standards for fraud "courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail"); *see also ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 988–89 (Fed. Cir. 2014) (emphasizing "the importance of a 'context-specific' application of Rule 8, and the particular need to apply the plausibility standard with a recognition that direct evidence of some

facts—such as guilty knowledge, in some cases—may be distinctively in the defendant's possession, requiring that the threshold standard of plausibility be applied to more circumstantial evidence") (citations omitted). At the very least, the District Court should have made all inferences in Appellants' favor—it did not.

**Public Policy.** "The final factor in the *Goodwin* test is the public policy consideration of who is, or should be, in the best position to prevent injury and how society should allocate the costs of such injury." *ONB Ins. Grp., Inc. v. Est. of Megel*, 107 N.E.3d 484, 494 (Ind. Ct. App. 2018) (quotation marks and citation omitted). "Various factors play into this policy consideration, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, and the moral blame attached to the wrongdoer." *Williams v. Cingular Wireless*, 809 N.E.2d 473, 478 (Ind. Ct. App. 2004). Each factor strongly supports finding the existence of a duty here.

*First*, the NCAA is well-equipped—*uniquely* equipped—to protect student-athletes from sexual misconduct by coaches and athletics

- 57 -

personnel. The NCAA already regulates coaches in myriad ways and has extensive systems in place to enforce its policies *across* member-institutions (including a nearly 60-member enforcement team that investigates potential violations of existing NCAA policies). FAC ¶ 113. Moreover, the NCAA already has policies and systems in place to ensure that *student-athletes* who engage in sexual misconduct cannot simply transfer to another school. *Id.* ¶¶ 104-06. In addition, the NCAA already has acted to sanction schools for sexual misconduct perpetrated by coaches when it found the transgressions beyond the pale, such as with respect to Jerry Sandusky at Penn State. *Id.* ¶¶ 89, 113. There is thus no question that the NCAA already has the administrative ability to help detect this harm and the systems in place to redress it.

*Second*, there is also no question that the NCAA has the capacity to bear the loss and is best positioned to prevent it. *See Prosser and Keeton on the Law of Torts* 6 (W. Page Keeton et al. eds., 5th ed. 1984) (explaining that where defendants in tort cases are "industrial corporations, commercial enterprises, . . . and others[] who by means of rates, prices, taxes or

insurance are best able to distribute to the public at large the risks and losses which are inevitable in a complex civilization," courts "tend[] . . . to shift [the loss] to the defendants . . . [r]ather than leave the loss on the shoulders of the individual plaintiff"). The NCAA is a profoundly well-resourced organization. FAC ¶ 113. More importantly, as *the* umbrella organization that governs collegiate athletics, the NCAA is the only entity situated to regulate sexual misconduct by coaches across its member-institutions. It can require member-institutions to report coach misconduct and, like SafeSport does with respect to the Olympic Committee and amateur sports, track this information to ensure the offending coach does not simply jump ship to another school. *Id.* ¶¶ 63-65. Moreover, unlike member-institutions, the NCAA is not incentivized to cover up coaches' bad behavior to preserve institutional reputations and attendant alumni donations, athletic revenue, and enrollment. *Id.* ¶ 112.

*Third*, as its then-President proclaimed to Congress, the NCAA has "a clear, moral obligation to make sure that [it] do[es] everything [it] can to support and protect student-athletes," and that obligation extends to

protection from sexual misconduct by coaches. FAC ¶ 77. The NCAA knows well the potential for this type of abuse—it has studied it and has received complaints about it. The NCAA effectively stands alone in the field of sport for not having policies that prohibit coaches from engaging in sexual relationships with athletes or otherwise protect athletes from sexual misconduct by athletics personnel. FAC ¶¶ 48-66. As detailed above, National Governing Bodies started to address this issue beginning in the 1990s, and Congress passed the Safe Sport Act in 2017, which, among other things, bans all forms of sexual misconduct and requires the legislation's enforcing body, the U.S. Center for SafeSport, to maintain a published centralized database that tracks complaints made against coaches. *Id.* In recognition of the power disparities between coaches and athletes and confronted with the prevalence of coach-athlete sexual abuse, the NCAA's peers have taken action. The NCAA's decision not to, in light of its knowledge and capacity, renders it morally culpable for the continued harm that student-athletes face.

In finding no public policy basis for a duty, the District Court considered *none* of these factors and addressed *none* of these allegations. *See* SA-40. Instead, the court fell back on its factual—and factually incorrect— conclusion that the NCAA does not exert everyday oversight and control over coaches or student-athletes. The District Court said such facts did "not favor recognition of a specific duty of care" toward individual student members of the national organization, which "should be encouraged, not disincentivized to undertake programs to promote safe and positive behavior." *Id.* (quoting *Yost*, 3 N.E.3d at 521). That cursory conclusion misses the mark.

As a preliminary matter, "[t]he fact that [the NCAA] purport[s] to act gratuitously and for noble purposes does not, *ipso facto*, absolve [it] of a legal duty of care toward the athletes." *Wissel v. Ohio High Sch. Athletic Assn.*, 605 N.E.2d 458, 465 (Ohio Ct. App. 1992), *cause dismissed*, 595 N.E.2d 943 (Ohio 1992). More importantly, the NCAA and the national fraternity in *Yost* are not analogues. The NCAA does not simply provide educational resources and espouse "aspirational objectives." *Yost*, 3 N.E.3d at 521. Here,

- 61 -

Appellants alleged that the NCAA controls *everything* about the student-athlete experience—beginning at recruitment (i.e., before a student-athlete steps foot on an NCAA field), continuing daily on every topic from diet to schedule, and ending only when the student-athlete has exhausted his eligibility (and utility to the NCAA). The *only* area the NCAA abdicates this control is with respect to safeguarding those same student-athletes from those same coaches' sexual misconduct. Public policy supports not allowing the NCAA to have its cake and eat it too.

For the reasons set forth above, this Court should reverse the District Court's conclusion as a matter of law that the NCAA owed Appellants no duty of care to regulate sexual misconduct by coaches and athletics personnel.

## III.   THE DISTRICT COURT ERRED BY FINDING APPELLANT JOHN DOE 1 LACKED STANDING TO SEEK PROSPECTIVE RELIEF.

The District Court erred when it concluded that Appellant John Doe 1 lacked standing to seek injunctive relief.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed" by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing for forward-looking relief, such as an injunction, exists where injury "is 'certainly impending' *or* there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis supplied). While "past wrongs [are] not sufficient to confer standing for injunctive relief, [they] may be evidence that future violations are likely to occur," *Sierakowski v. Ryan*, 223 F.3d 440, 445 (7th Cir. 2000), particularly when accompanied by "continuing, present adverse effects," *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017).

The District Court concluded that Appellants did not have standing because they did not establish an injury in fact. SA-7. To establish injury-in-fact, an injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Driehaus*, 573 U.S. at 158 (quotation marks and citation omitted). Despite the District Court's focus

on the "imminent" prong, *see* SA-13, this Court has confirmed in numerous contexts that a "substantial risk" of harm—not simply an imminent harm—is sufficient to confer standing for prospective relief. *See Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) (increased risk of data theft after hacker access); *Lac*, 422 F.3d at 498-500 (risk that government compact might hinder approval of off-reservation gaming application); *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 888 (7th Cir. 2001) (risk that ERISA benefits might be denied). As other courts have found, this is particularly true in cases that "hinge[] on human health concerns" and cannot "be redressed in due time through money damages after the harm occurs." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011).

Here, John Doe 1 alleged that by failing to promulgate policies prohibiting sexual misconduct by coaches and athletics personnel and requiring member-institutions to report coaches who engage in such behavior, the NCAA both exposed him to actual abuse by the Coaches and *continues* to expose him to an ongoing substantial and heightened risk of abuse. Although it purported to accept for purposes of the motion that

NCAA student-athletes in general face a heightened risk of abuse and harassment at the hands of coaches, given the dynamics of those relationships, "which risk is exacerbated in part by the NCAA's failure to enact centralized regulations and reporting requirements," the District Court found that Appellants fell short of plausibly suggesting "that they personally face an imminent or substantial risk of injury." SA-9. The court found this to be so because Appellants had all left USF and did not allege that "they ha[d] been subjected to or threatened with sexual harassment or abuse by their coaches at their new programs." *Id.* at 11. The District Court's analysis fails on the facts and the law.

As a factual matter, the District Court's narrow focus on USF (where the abuse occurred) and Appellants' risk at other NCAA member-institutions (where no abuse has been alleged) misunderstands Appellants' factual allegations, which pertain to the NCAA's own role in heightening the risk. That is, Appellants allege the NCAA's policies and practices (and lack thereof with respect to sexual abuse and retaliation by coaches and athletics personnel) as they apply to *all* student-athletes and coaches at *all*

NCAA member-institutions place *all* student-athletes at such institutions at a substantial risk of harm, including John Doe 1 whose prior abuse and retaliation at NCAA member-institution USF underscores the magnitude and likelihood of the risk of abuse and retaliation at his current NCAA member-institution. This is not the sort of purely speculative harm that doomed standing in cases where a policy may or may not have any effect—and, in fact, had not yet had one. *See, e.g., Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wis.*, 95 F.4th 501, 506 (7th Cir. 2024), *cert. denied,* No. 23-1280, 2024 WL 5036271 (U.S. Dec. 9, 2024) (finding no standing where parents' "expressions of worry and concern do not suffice to show that any parent has experienced actual injury or faces any imminent harm attributable to the [school policy]" they challenge); *Prosser v. Becerra*, 2 F.4th 708, 714 (7th Cir. 2021) (finding no injury in fact where alleged harm never came to fruition). Rather, the NCAA's failures have already caused harm to Appellants (and many other student-athletes at many other member-institutions), and those failures—and the

corresponding risk—are ongoing and unabated because the NCAA still refuses to act.

Legally, the District Court's holding improperly conflates standing based upon a substantial risk of future harm with standing for current harm. Appellants need not stay at the member-institution where the coaches abused or retaliated against them or go to a new member-institution where coaches again abuse or retaliate against them. The substantial risk of abuse and retaliation they challenge is caused by the entity that oversees all of the member-institutions, the NCAA, whose failure to act to protect them caused their actual past harm and puts them at substantial risk of future harm *at any NCAA member-institution*. That is, this is a closed universe where the heightened risk follows them to whichever member-institution they go, and "[w]aiting for a plaintiff to suffer physical [harm] before allowing any redress whatsoever is both overly harsh and economically inefficient." *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 575 (6th Cir. 2005).

It is the combination of past harm and substantial risk of future harm that, contrary to the District Court's conclusion, distinguishes this case from *Aldrich v. National Collegiate Athletic Association*, 565 F. Supp. 3d 1094 (S.D. Ind. 2021) (finding no standing where plaintiffs who had suffered sexual abuse in the past were no longer student-athletes and would not be subject to the risk again, and the current student-athlete plaintiff had never faced abuse in the past). It also distinguishes this case from *City of Los Angeles v. Lyons* and *Lujan v. Defenders of Wildlife*: there is no question that John Doe 1 continues to face the substantial risk of harm of abuse and retaliation because he currently attends an NCAA member-institution.[11] *See*

---

[11] In the District Court, Appellants also analogized this case to *Richard Roe W.M. v. Devereux Foundation* and *Doe v. University of Tennessee* in which courts found plaintiffs had standing based on a heightened risk of abuse. Dkt. 64 at 7-8 (citing *Devereux*, No. CV 21-2655, 2023 WL 173918, at *4 (E.D. Pa. Jan. 12, 2023); *Doe*, 186 F. Supp. 3d 788, 813-14 (M.D. Tenn. 2016)). The District Court found those cases distinguishable because, it said, the plaintiffs in those cases "remained confined at or continued to attend the specific institution where they had been abused, which locations they alleged continued to maintain the longstanding policies and practices of covering up and failing to address abuse that had led to their past injuries" whereas Appellants are no longer at USF. SA-13. But that is precisely what Appellants are saying in the context of NCAA member-institutions—the fact that the member-institutions themselves may (and indeed do) *also* bear responsibility goes to the traceability of the injury, which need only be "fairly traceable" to the defendant's conduct, not *solely* traceable to the defendant's conduct. *Lujan*, 504 U.S. at 560. Indeed, this inquiry does not require that a defendant be the proximate cause of the plaintiff's injury; it requires only that that injury be "fairly

*City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (finding no standing where it was speculative that the plaintiff would suffer another chokehold while moving about the city in his day-to-day life); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (finding no standing where plaintiffs professed only an "intent" to return to the places they previously visited without concrete plan of doing so). It defies logic, and the law, to require that student-athletes not only be abused because of the NCAA's failure to act, but be abused again by *separate bad actors* at *every NCAA institution they attend* to have standing to seek injunctive relief *from the NCAA*.

The Supreme Court's decision this term in *Murthy v. Missouri*, 603 U.S. 43 (2024), is instructive as to how and when evidence of *past* harm is relevant to establishing standing for *future* harm. As a starting point, the Court reaffirmed that "[p]ast exposure to illegal conduct can serve as evidence of threatened future injury but does not in itself show a present case or controversy regarding injunctive relief." *Id.* at 59 (quotation marks

---

traceable to the defendant's conduct," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014), and is a "relatively modest" burden to meet at the pleading stage, *Bennet v. Spear*, 520 U.S. 154, 171 (1997).

and citation omitted). To accomplish the latter—the issue here—plaintiffs must plausibly allege a link between the defendant that caused them the past harm and that same defendant's ongoing ability to inflict that harm on them in the future. *Id.* at 58-62. Appellants here do so.

In *Murthy*, plaintiffs sued state actors for damages for pressuring social media platforms to censor their posts in the past, and seeking forward-looking injunctive relief to prevent future censorship. *Id.* at 48-53. But the government entities were the defendants, not the platforms. Plaintiffs argued that the fact that they previously had their social media posts censored *by the social media platforms* gave them standing to sue *the government entities* over potential future censorship by *the platforms*. *Id.* at 58-59. The Supreme Court disagreed—to carry their burden, the plaintiffs had to show that the *government actors'* "allegedly wrongful behavior w[ould] likely occur or continue . . . But without proof of an ongoing pressure campaign, it [was] entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 69 (emphasis omitted).

John Doe 1's allegations here are anything but speculative and properly tie the NCAA's responsibility for his *past* harm to his substantial risk of *future* harm. He alleges that the NCAA's failure to protect him from sexual abuse and retaliation by coaches and athletics personal was responsible for his past abuse and retaliation at USF *and* subjects him (and others like him) to a substantial risk of future harm at other NCAA member-institutions. *See supra* § I.D. *See Pisciotta*, 499 F.3d at 634 ("[T]he injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions."). For these reasons, John Doe 1 has standing to seek injunctive relief from the NCAA.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court reverse the District Court's Order dismissing Appellants' negligence claims as a matter of law and its finding that John Doe 1 lacked standing to seek injunctive relief and remand the case for further proceedings.

Dated: January 27, 2025                 Respectfully submitted,

                                        */s/ Jonathan D. Selbin*

                                        Jonathan D. Selbin
                                        jselbin@lchb.com
                                        Jessica A. Moldovan
                                        jmoldovan@lchb.com
                                        **Lieff Cabraser Heimann**
                                        **& Bernstein, LLP**
                                        250 Hudson Street
                                        8th Floor
                                        New York, NY 10013
                                        Telephone: (212) 355-9500
                                        Facsimile: (212) 355-9508

                                        Michelle A. Lamy
                                        mlamy@lchb.com
                                        **Lieff Cabraser Heimann**
                                        **& Bernstein, LLP**
                                        275 Battery Street
                                        29th Floor
                                        San Francisco, CA 94111
                                        Telephone: (415) 956-1000
                                        Facsimile: (415) 956-1008

Elizabeth A. Fegan
beth@feganscott.com
**Fegan Scott, LLC**
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

Michael von Klemperer
mike@feganscott.com
**Fegan Scott, LLC**
1763 Columbia Road NW, Suite 100
Washington DC 20009
Telephone: (202) 921-0002
Facsimile: (312) 264-0100

*Interim Class Counsel and Counsel for Appellants*

Lynn A. Toops, No. 26386-49
ltoops@cohenandmalad.com
Arend J. Abel, No 10763-49
aabel@cohenandmalad.com
**Cohen & Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

*Liaison Counsel*

- 73 -

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) and Cir. R. 32(c) because it contains 13,582 words,

excluding the items in Fed. R. App. P. 32(f), and as measured by Microsoft

Word's word-count feature.

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5)(A), as modified by Cir. R. 32(b), and the type style

requirements of Fed. R. App. P. 32(a)(6), because it is prepared in a

proportionally spaced typeface using Palatino Linotype in 14-point font.

Dated: January 27, 2025          */s/ Jonathan D. Selbin*
                                 Jonathan D. Selbin
                                 **Lieff Cabraser Heimann**
                                 **& Bernstein, LLP**
                                 250 Hudson Street,
                                 8th Floor
                                 New York, NY 10013
                                 212.355.9500
                                 jselbin@lchb.com

                                 *Counsel for Plaintiffs-Appellants*

- 74 -

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiffs-Appellants, hereby

certifies that on January 27, 2025, the aforementioned Brief was filed with

the Clerk of the Court for the United States Court of Appeals for the

Seventh Circuit by using the appellate CM/ECF system. All participants in

the case are registered CM/ECF users and will be served by the appellate

CM/ECF system.

Dated: January 27, 2025　　　　　*/s/ Jonathan D. Selbin*

Jonathan D. Selbin
**Lieff Cabraser Heimann
& Bernstein, LLP**
250 Hudson Street,
8th Floor
New York, NY 10013
212.355.9500
jselbin@lchb.com

*Counsel for Plaintiffs-Appellants*

## <u>CIRCUIT RULE 30(d) STATEMENT</u>

Pursuant to Circuit Rule 30(d), counsel certifies that all material

required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated: January 27, 2025                /s/ *Jonathan D. Selbin*

Jonathan D. Selbin

**Lieff Cabraser Heimann**

**& Bernstein, LLP**

250 Hudson Street,

8th Floor

New York, NY 10013

212.355.9500

jselbin@lchb.com

*Interim Class Counsel and Counsel for*
*Appellants*

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Order on Defendant's Motion to Dismiss and/or Strike First Amended Complaint, Dkt. 270, filed July 2, 2024 ........................................................... A-1

Order Directing Entry of Final Judgment, Dkt. 279, filed October 4, 2024 ................................................................................. A-55

Judgment, Dkt. 280, filed October 4, 2024 ..................................................... A-58

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE 1, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00542-SEB-MJD |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE FIRST
AMENDED COMPLAINT**

Now before the Court is Defendant's Motion to Dismiss and/or Strike First

Amended Complaint [Dkt. 54]. Plaintiffs in this putative class action are thirteen current

and former college student-athletes who are proceeding anonymously as John Does[1] 1–6

and 8–14,[2] and have brought this action against the Defendant National Collegiate

Athletic Association ("NCAA"), alleging that they have been harmed as a result of the

NCAA's deliberate decision to remain silent in the face of rampant sexual abuse and

harassment by various coaches at NCAA-member institutions. Specifically, Plaintiffs

allege that the NCAA should have adopted policies to prevent harassment by their

coaches, that its failure to do so constitutes a breach of contract (Counts I–III) and

---

[1] On June 7, 2024, the Court granted Plaintiffs' Renewed Motion to Proceed Pseudonymously,
holding that Plaintiffs have demonstrated that they are entitled to continue to proceed
anonymously in this case under the standard recently set forth by the Seventh Circuit in *Doe v.
Trustees of Indiana University*, 2024 WL 1824967, at *4 (7th Cir. Apr. 26, 2024).
[2] On May 1, 2024, Doe 7 filed a notice of voluntary dismissal of his claims and is no longer a
party to this case.

A-1

negligence (Counts IV–VII), and that the NCAA is vicariously liable for the emotional

distress they allege was inflicted on them by their coaches (Counts VIII–IX).  The

prospective class is a nationwide group of all student-athletes currently participating in

any NCAA sport at any member institution.

The NCAA has moved to dismiss Plaintiffs' complaint on the grounds that the

relevant statute of limitations bars the claims asserted by Does 4–14, that none of the

Plaintiffs have standing to seek injunctive or declaratory relief, and that the remaining

allegations fail to state claims under Federal Rule of Civil Procedure 12(b)(6).  To the

extent any portion of the amended complaint survives dismissal, Defendants contend that

the class allegations must be stricken.  Plaintiffs oppose Defendants' motion to dismiss

and/or to strike.  For the reasons detailed below, we <u>GRANT</u> Defendants' Motion to

Dismiss Plaintiffs' Amended Complaint.

<div align="center"><b><u>Factual Background</u></b>[3]</div>

**The Parties**

Plaintiffs are thirteen current and former student-athletes each of whom was a

member of the baseball team at the University of San Francisco ("USF") between 1999

and 2022.  Am. Compl. ¶¶ 15–28.   Does 4–6 and 8–14 are former student-athletes who

allege that two of their coaches at USF, Troy Nakamura and Anthony Giarratano (the

"Coaches"), engaged in conduct that created a sexualized, abusive environment, which

---

[3] Plaintiffs' prolix amended complaint spans more than 120 pages.  Following the parties' lead, we have included in this order only those facts relevant to the issues presented in Defendants' motion to dismiss and/or strike.

<div align="center">2</div>

<div align="center">A-2</div>

caused them harm.  *See, e.g., id.* ¶ 5.  Does 1 and 2 are current student-athletes who allege that they suffered retaliation as well as emotional and sometimes physical abuse perpetrated by the Coaches when they refused to "play along" with the sexually charged atmosphere at USF.  *Id.* ¶¶ 193, 220.  These two Plaintiffs have since transferred to other NCAA member organizations where, at least so far, they have not experienced sexual abuse or harassment but nonetheless face an increased risk of such harm in the future, given the NCAA's alleged pattern of inaction and turning a blind eye.  *Id.* ¶¶ 4, 94, 476.  Plaintiffs allege that Doe 3, who has departed USF, "will continue playing college baseball," but is not a current student-athlete at any NCAA member institution.  *Id.* ¶ 260.

The NCAA is a voluntary unincorporated association geographically located in Indiana.  *Id.* ¶ 29.  Its members include approximately 1,100 colleges and universities dotted across the country who have voluntarily delegated to the NCAA the power to administer intercollegiate athletic competitions.  *Id.*

**Procedural History**

This case was originally filed in the Northern District of California by three current and nine former student athletes (Does 1–12), against the Coaches who allegedly had sexually harassed them, as well as against the NCAA, USF, and the Coaches who were responsible for that harassment.  The Northern District of California Court dismissed without prejudice all claims against the NCAA based on a lack of personal jurisdiction.  *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, No. 22-cv-01559-LB, 2023 WL 105096, at *1 (N.D. Cal. Jan. 4, 2023).  Currently, certain claims against USF and the Coaches remain pending in the Northern District of California.

<div align="center">3</div>

<div align="center">

A-3

</div>

**The Instant Litigation**

On March 28, 2023, Does 1–12 filed their complaint in our district, adding Does 13–14 as additional Plaintiffs; they later amended their complaint on June 20, 2023. Plaintiffs' claims are framed as actions brought on their own behalf as well as brought on behalf of the prospective nationwide class of "[a]ll student-athletes who are currently participating in NCAA sports at NCAA member institutions." Am. Compl. ¶ 516. Their primary contention is that the NCAA should have adopted policies to prevent the alleged harassment by the Coaches. Accordingly, Plaintiffs nine claims include theories of relief for breach of contract (Count I); breach of implied contract (Count II);[4] breach of contract as third-party beneficiaries (Count III); gross negligence (Count IV); negligence (Count V); breach of fiduciary duty (Count VI); negligent failure to warn, train, or educate (Count VII); intentional infliction of emotional distress (Count VIII); and negligent infliction of emotional distress (Count IX). Plaintiffs seek to recover monetary damages as well as obtain injunctive and declaratory relief.

The NCAA's Motion to Dismiss and/or to Strike seeks dismissal of all the claims alleged in the amended complaint. To the extent any of Plaintiffs' claims survive dismissal, the NCAA moves to have Plaintiffs' class allegations stricken for lack of an

---

[4] Although Count II in the Amended Complaint is labeled as a breach of oral contract claim, the substance of the allegations establish an implied—not oral—contract. In their briefing in response to the NCAA's motion to dismiss, Plaintiffs never refer to the existence of an oral contract, only express and implied contracts. Thus, we interpret Plaintiffs' claim in Count II as a breach of implied contract.

4

A-4

adequate representative.  Plaintiffs have filed their response in opposition to the NCAA's

motion, making the motion now fully briefed and ripe for ruling.

<div align="center">**Legal Analysis**</div>

## I.    Applicable Legal Standard

Defendant has moved for the dismissal of Plaintiffs' complaint pursuant to Federal

Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction (standing) and

12(b)(6) for failure to state a claim upon which relief may be granted.  In ruling on a

motion to dismiss for lack of standing under Rule 12(b)(1), we first must determine

whether a factual challenge or a facial challenge to standing has been raised.  *Silha v.

ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).  A factual challenge rests on the argument

that "there is *in fact* no subject matter jurisdiction," even if the pleadings in a formal

sense are sufficient, while a facial challenge is premised on an argument that the plaintiff

has not sufficiently "*alleged* a basis of subject matter jurisdiction."  *Apex Digital, Inc. v.

Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009) (emphasis in original).  We

construe Defendant's Rule 12(b)(1) motion to be "a facial challenge because [it]

contend[s] that Plaintiffs' complaint lacks sufficient factual allegations to establish

standing."  *Silha*, 807 F.3d at 173.  "In reviewing a facial challenge, the court must accept

all well-pleaded factual allegations as true and draw all reasonable inferences in favor of

the plaintiff."  *Id.* (citing *Apex Digital*, 572 F.3d at 443–44).  "When assessing standing

on the basis of the facts alleged in a complaint, this means we apply the same standard of

review we use when assessing a motion to dismiss for failure to state a claim."

*Finkelman v. National Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

<div align="center">A-5</div>

Similarly, in addressing a motion under Rule 12(b)(6), the Court accepts as true all well-pled factual allegations in the complaint and draws all ensuing inferences in favor of the non-movant. *Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009). Nevertheless, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and its "[f]actual allegations must . . . raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (citations omitted). The complaint must therefore include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* FED. R. CIV. P. 8(a)(2). Stated otherwise, a facially plausible complaint is one which permits "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.     Discussion

The NCAA's motion to dismiss targeting all the claims brought against it by Plaintiffs rests in part on its contention that Plaintiffs lack standing to seek prospective relief, which thus necessitates the striking of the class allegations. The motion also asserts that the claims brought by Does 4–6 and 8–14 are time-barred and that any claims which have survived must be dismissed for failure to state a claim under Rule 12(b)(6). As previously noted, Plaintiffs oppose the NCAA's motion on all grounds. We address the parties' arguments in turn below.

### A.     Standing Entitling Prospective Relief (Does 1–3)

A-6

The NCAA seeks dismissal of Does 1–3's request for injunctive and declaratory relief under Rule 12(b)(1) on behalf of themselves and the prospective class, arguing that Does 1–3 lack Article III standing to seek such relief.[5]  The NCAA argues that they lack standing to pursue injunctive and declaratory relief against it because their allegation that they face an increased risk of harm due to the NCAA's failure to enact policies preventing sexual abuse and harassment is too speculative to satisfy the concrete injury predicate to receiving an award of prospective relief.  Plaintiffs rejoin that Does 1–3's allegations of an ongoing and heightened and substantial risk of abuse above the societal baseline, coupled with actual past abuse, all of which is attributable to the NCAA's lack of regulations, is a sufficiently concrete injury for standing purposes.

Article III standing requires prospective plaintiffs to satisfy the three-part test set forth by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  Under *Lujan*, plaintiffs must have "suffered an injury in fact" that is concrete, particularized, and actual or imminent, and not merely "conjectural" or "hypothetical." *Id.* at 560.  There must also be a causal link between the injury and the conduct alleged, and it must be "likely, as opposed to merely speculative" that the injury will be remedied by a judicial decision.  *Id.*

To establish an injury in fact based on an increased risk of future harm, as alleged in this case, the "threatened injury must be certainly impending to constitute injury in fact, and … allegations of possible future injury are not sufficient."  *Prosser v. Becerra*, 2

---

[5] It is undisputed that no other named plaintiff has standing to seek prospective relief for themself or on behalf of the putative class.

A-7

F.4th 708, 714 (7th Cir. 2021) (internal quotation marks and citation omitted); *accord*

*Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (holding that

there must be "certainly impending future harm" not just "allegations of possible future

injury" to satisfy injury-in-fact requirement of standing) (internal quotation marks and

citation omitted).  This means, there must be "a substantial risk that the harm will occur,"

and that risk cannot be hypothetical.  *Prosser*, 2 F.4th 708, 714, 715 (7th Cir. 2021)

(quoting *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019)); *see also Lewert*, 819 F.3d

at 966 (finding injury in fact when "objectively reasonable likelihood" that the threatened

injury would occur).

Does 1–3 allege that from 2020 to 2022 they were subjected to emotional and

physical abuse and retaliation at USF for failing to "play along" with the sexualized

culture created by the Coaches, and that, as student-athletes, they face an increased risk

of future sexual harassment or abuse at NCAA-member schools based on the lack of

NCAA regulations preventing such harm.  Specifically, Plaintiffs allege that at least by

2012 the NCAA recognized that sexual abuse and harassment of student-athletes by

college coaches had become a "serious problem" and that student-athletes are particularly

vulnerable to sexual exploitation and other abuse at the hands of their coaches in part

because of the power dynamics involved in those relationships.  Am. Compl. ¶¶ 46, 95.

However, twelve years later the NCAA has still not instituted any centralized regulations

or reporting requirements aimed at preventing such abuse and harassment by coaches,

instead continuing to "foist" responsibility for ensuring the safety of NCAA student-

athletes on colleges and universities, which institutions are incented to ignore and

8

A-8

minimize such abuse in order to protect their reputations and retain alumni donations, athletic revenue, and enrollment. *Id.* ¶¶ 98, 112, 114. Plaintiffs maintain that, as a result of the NCAA's failure to promulgate rules for its member-schools to report abuse and deter perpetrators, abusive coaches are able to act with impunity and "move unchecked" among NCAA-member institutions, placing NCAA student-athletes at a substantial and heightened risk of future sexual, physical, and emotional abuse and harassment. *Id.* ¶¶ 2, 4.

Taking these allegations as true, as is required in a facial standing challenge, Plaintiffs fail to allege facts that plausibly suggest that the heightened risk of future abuse or harassment they allegedly face as student-athletes due to the lack of NCAA regulations aimed at prohibiting such harm satisfies the "certainly impending" or "substantial risk" standard required to establish an injury in fact under an increased risk of injury theory. We accept for purposes of deciding this motion to dismiss that NCAA student-athletes in general face an undefined "heightened" risk of abuse and harassment at the hands of coaches, given the dynamics of those relationships, which risk is exacerbated in part by the NCAA's failure to enact centralized regulations and reporting requirements. However, to satisfy the injury in fact requirement for standing to seek prospective relief, Plaintiffs must allege more than a generalized, "maybe someday" risk of future harm; rather, they must allege facts that plausibly suggest that they personally face an imminent or substantial risk of injury. *See Lujan*, 504 U.S. at 565 (observing that "some day" injuries "do not support a finding of the 'actual or imminent' injury that our cases require"). Plaintiffs have fallen well short of doing so here.

9

A-9

Our judicial colleague, the Honorable James R. Sweeney II, recently addressed this issue which was presented under similar circumstances in *Aldrich v. National Collegiate Athletic Association*, 565 F. Supp. 3d 1094 (S.D. Ind. 2021), *appeal docketed*, No. 21-3036 (7th Cir. Nov. 2, 2021).  In *Aldrich*, the plaintiff was a member of Princeton University's rowing team and, like Plaintiffs here, had alleged that as a student-athlete she faced an increased risk of sexual assault due to the nature and power dynamics of the relationship between a college coach and athlete and the lack of NCAA regulations regarding sexual assault.  However, she had never personally been abused or harassed by her college coach or threatened with such abuse or harassment, nor did she allege that any of her teammates had been so victimized.  Emphasizing the required high level of risk to properly allege standing under an increased risk of injury theory, Judge Sweeney dismissed the plaintiff's claims for prospective relief for lack of standing, holding that that the risk of injury she had identified was "too speculative" and "far too generalized, broad and remote to qualify as an injury in fact."  *Id.* at 1102, 1103.  Any other result, Judge Sweeney opined, "would stretch the 'imminent injury' requirement beyond its purpose."  *Id*.

So, too, in our case.  Seeking to escape the ruling in *Aldrich*, Plaintiffs contend that the facts in that case were materially distinguishable from those at bar because Does 1–3 *do* allege that they were previously abused and subjected to harassment by their coaches while "under the NCAA's watch" as student-athletes at USF.  Pls.' Resp. at 9.  It is true that past wrongs can constitute relevant "evidence bearing on 'whether there is a real and immediate threat of repeated injury'" for standing purposes. *City of Los Angelos*

10

A-10

*v. Lyons*, 461 U.S. 95, 102 (1983).  Here, however, Does 1–3 have all now departed USF, the institution where they were allegedly subjected to harassment, and attend (or in the case of Doe 3, plan to attend) other NCAA-member organizations.  They do not allege in their complaint or their briefing that they have been subjected to or threatened with sexual harassment or abuse by their coaches at their new programs, nor do they allege that those new programs have a history of ignoring abuse and harassment or that their current coaches have been abusive to other student-athletes, either at their current institutions or previous NCAA-member organizations.

Under these circumstances, the prior abuse alleged by Does 1–3 has very limited relevance to whether there exists an imminent and substantial threat of injury going forward, involving entirely different coaching staffs at new institutions.  Without *any* allegations plausibly suggesting that the NCAA-member organizations Does 1–3 currently attend (or plan to attend) have a history of harboring abusive coaches or otherwise taking advantage of the lack of centralized NCAA regulations regarding coach-on-athlete harassment to avoid reporting or addressing abuse, the unquantified "heightened" risk of abuse or harassment due to the lack of NCAA regulations identified by Plaintiffs is simply too hypothetical and speculative to qualify as an injury in fact.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding that injury must be "actual or imminent, not conjectural or hypothetical").

To support their contention that the allegations here satisfy the injury in fact requirement for prospective relief, Plaintiffs rely heavily on two out-of-circuit district court cases, *Roe W.M. v. Devereux Foundation*, 650 F. Supp. 3d 319 (E.D. Penn. 2023)

11

A-11

and *Doe v. University of Tennessee*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016).[6]  In

*Devereux*, three current and former residents of residential facilities for children with

psychiatric, behavioral, developmental, or intellectual disabilities sought prospective

relief against the operator of the facilities after suffering abuse by other residents and

staff, alleging that they faced a "heightened risk of abuse" going forward because the

facility operator failed to implement and enforce policies to prevent and respond to abuse.

650 F. Supp. 3d at 327.  Similarly, in *University of Tennessee*, current and former female

students who had been sexually assaulted on campus by other students sought injunctive

relief against the school, alleging that the university's policies rendered female students

vulnerable to sexual assault.  Plaintiffs here argue that, like the plaintiffs in *Devereux* and

*University of Tennessee*, they have alleged against the NCAA "well-pled claims of past

harm coupled with a policy, pattern, or practice that suggests those harms are likely to

recur," which allegations are sufficient to satisfy the actuality or imminence requirement

for prospective relief standing.  *Devereux*, 650 F. Supp. 3d at 329 (collecting cases).

We find the analyses and conclusions in both *Devereux* and *University of*

*Tennessee* readily distinguishable from the case before us.  There, the plaintiffs, who were

---

[6] We do not find the remaining decisions cited by Plaintiffs relevant to the standing inquiry as those cases either involved a distinguishable type of exposure to harm (*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 631 (7th Cir. 2007); *Leslie v. Medline Indus., Inc.*, No. 20-cv-01654, 2021 WL 4477923, at *5 (N.D. Ill. Sept. 30, 2021); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 569, 571 (6th Cir. 2005); *Rolan v. Atl. Ritchfield Co.*, No. 1:16-CV-357-TLS, 2017 WL 3191791, at *5 (N.D. Ind. July 26, 2017); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011)), applied outdated legal standards (*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005); *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003), or did not specifically analyze standing (*303 Creative LLC v. Elenis*, 600 U.S. 570, (2023); *Helling v. McKinney*, 509 U.S. 25 (1993); *Doe v. Baylor Univ.*, 240 F. Supp. 3d 646 (W.D. Tex. 2017)).

A-12

determined to have standing for prospective relief, remained confined at or continued to attend the specific institution where they had been abused, which locations they alleged continued to maintain the longstanding policies and practices of covering up and failing to address abuse that had led to their past injuries.  In contrast, Does 1–3 are no longer enrolled at USF and thus are no longer under the control and supervision of the Coaches allegedly responsible for the past abuse they suffered as well as the university administrators they allege to have ignored and hidden the abuse, nor have Does 1–3 adduced any facts to plausibly suggest that similar conditions exist or are threatened in the athletic programs overseen by their current NCAA-member institutions.  Accordingly, the risk of future injury Does 1–3 have identified stemming from a lack of centralized NCAA regulations and reporting requirements is based on a much more "'highly attenuated' causal chain separating present reality and future harm," *Devereux*, 650 F. Supp. 3d at 331 (quoting *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013)), than was faced by the *Devereux* and *University of Tennessee* plaintiffs.  For these reasons, we hold that the increased risk of abuse or harassment Does 1–3 have cited fails to satisfy the "imminent injury" requirement required for Article III standing to seek prospective relief on their tort claims.

Plaintiffs alternatively argue that Does 1–3 have established prospective standing based on their breach of contract claims.  The Amended Complaint alleges that the NCAA breached its contractual obligations to Plaintiffs by failing to regulate sexual misconduct by coaches, which breach ultimately resulted in Plaintiffs having been subjected to abuse and harassment by the Coaches at USF.  Does 1–3 argue that, because

13

A-13

the NCAA continues to breach its contractual obligations, they remain exposed to an increased risk of sexual misconduct sufficient to satisfy the injury-in-fact requirement for prospective standing. However, in our view, this theory fails for the same reasons detailed above, namely, that any increased risk of abuse or harassment to which Does 1–3 remain exposed at their new universities by their new coaches is too speculative and uncertain to constitute an imminent injury as required for prospective standing.

For these reasons, we conclude that Does 1–3 lack the requisite standing to seek injunctive relief in this case. Since no other Plaintiff has standing either, the Court shall strike the request for injunctive relief from the Amended Complaint.

### B.    Statute of Limitations (Does 4–6 and 8–14)

We turn next to address the issue of the statute of limitations. Although statutes of limitations arguments generally are not appropriate for consideration in the context of motions to dismiss, such a defense can be addressed at an early stage of the litigation "where the allegations of the complaint set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbot Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quotation marks and citation omitted). That said, so long as a plausible theory of relief has been advanced that would defeat a statute of limitations defense, "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* (citation omitted).

In diversity jurisdiction cases (such as this), the Court applies state based statutes of limitations. *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007).

A-14

Thus, we "look[] to Indiana law for the statute of limitations, its exceptions, and its rules on equitable relief." *Aldrich*, 565 F. Supp. 3d at 1104. "Indiana courts view statutes of limitations favorably, finding that such rules 'rest upon sound policy and tend to the peace and welfare of society.'" *Id.* (quoting *Shideler v. Dwyer*, 417 N.E.2d 281, 283 (1981)).

As relevant here, the statute of limitations under Indiana law governing tort claims is two years. *See* IND. CODE § 34-11-2-4 ("An action for … injury to person or character … must be commenced within two (2) years after the cause of action accrues."). Indiana applies a ten-year statute of limitations to actions based on contracts in writing and a six-year limitations period to actions alleging breach of an oral contract. IND. CODE § 34-11-2-11; IND. CODE § 34-11-2-7. However, even if the statute of limitations is determined to have run, a plaintiff may still have an actionable claim if an equitable doctrine, such as fraudulent concealment or equitable estoppel, applies to toll the limitations period. *Aldrich*, 565 F. Supp. 3d at 1104.

Here, the NCAA argues that all claims raised by Does 4–6 and 8–14 are barred as untimely.[7] Specifically, the NCAA contends that: (1) the tort claims alleged by Does 4–6 and 8–14 are beyond Indiana's two-year limitations period for such claims; (2) the contract claims alleged by Does 4–6 and 8–14 are premised on tort harms and thus governed by the two-year limitations period applicable to tort claims, rather than the more generous limitations periods that typically govern contract claims in Indiana; and (3) there is no justification for tolling the statute of limitations periods. Plaintiffs rejoin

---

[7] The NCAA does not challenge the claims raised by Does 1–3 on untimeliness grounds.

A-15

that: (1) under the discovery rule, the claims alleged by Does 4–6 and 8–14 did not

accrue until 2022, and are therefore timely; (2) even if the discovery rule does not apply,

the contract claims raised by Does 4–8, 10, and 12–14 are timely because they fall within

the six- or ten-year limitations period applicable to contracts in Indiana; and (3)

regardless of the applicable limitations period, all their claims are timely because

equitable tolling principles apply.  We address each of these arguments in turn below.

## 1.  Applicable Limitations Periods

It is undisputed that a two-year statute of limitations applies to the tort claims

alleged by Does 4–6 and 8–14, and that more than two years elapsed between the

commencement of this lawsuit and the most recent instance of abuse alleged by these

plaintiffs.  Accordingly, the statute of limitations forecloses the gross negligence,

negligence, breach of fiduciary duty, failure to supervise, intentional infliction of

emotional distress, and negligent infliction of emotional distress claims alleged by Does

4–6 and 8–14.  Thus, the only remaining issues are whether the discovery rule or an

equitable tolling doctrine suspends the two-year limitations period.  We address those

issues in detail below.

Regarding the contract claims as alleged by Does 4–6 and 8–14 in Counts 1

through 3 of the Amended Complaint, the parties disagree as to the applicable statutes of

limitations.  Indiana applies a ten-year statute of limitations to actions based upon

contracts in writing and a six-year limitations period to actions alleging breach of an oral

contract.  IND. CODE § 34-11-2-11; IND. CODE § 34-11-2-7.  Does 4–6 and 8–14 maintain

that these six- and ten-year limitations periods apply to their contract claims, which make

16

A-16

the breach of contract claims alleged by Does 4–8, 10, and 12–14 timely, regardless of whether the discovery rule or any equitable tolling doctrine applies. The NCAA responds that because the contract claims alleged by Does 4–6 and 8–14 sound in tort, Indiana's two-year limitations period governing tort claims applies, rendering their breach of contract claims untimely.

Under Indiana law, "[t]he substance of a cause of action, rather than its form, determines the applicability of the statute of limitation." *Powers & Sons Const. Co. Inc. v. Healthy E. Chi.*, 919 N.E.2d 137, 142 (Ind. Ct. App. 2009) (quoting *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1284 (Ind. 2009)). Thus, "[w]here the characterization of the claim matters for purposes of deciding which statute of limitations should be applied, the Supreme Court of Indiana consistently stresses that 'the applicable statute of limitations should be ascertained by reference to the nature of the harm alleged rather than by reference to theories of recovery.'" *Lewis v. Methodist Hosp., Inc.*, 326 F.3d 851, 853 (7th Cir. 2003) (quoting *Whitehouse v. Quinn*, 477 N.E.2d 270, 273 (Ind. 1985)). However, "[i]n considering how to classify a claim for statute-of-limitations purposes, the Supreme Court of Indiana has warned that Indiana courts (and thus federal courts sitting in diversity that are applying Indiana law) must not collapse all breach of contract claims into tort claims" as "[d]oing so would impermissibly effect a judicial repeal of the separate statutes of limitations that the Indiana legislature has enacted for breach of contract and oral contract claims." *Id.* (citing *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 247 (Ind. 1992)).

A-17

Here, the gravamen of Plaintiffs' lawsuit is in tort, as they seek recovery for personal injury sustained as a result of the NCAA's failure to protect their health and safety. However, they also allege that the NCAA had undertaken contractual obligations to protect them which duties it failed to satisfactorily perform. Counts 1 through 3 of the Amended Complaint set out each of the elements of a breach of contract claim under Indiana law, to wit, the existence of a contract, breach, and damages. *See Morris v. Crain*, 71 N.E.3d 871, 880 n.5 (Ind. Ct. App. 2017) (setting forth elements of breach of contract claim). The NCAA argues that Plaintiffs' contract claims nonetheless are merely tort claims in disguise because the relief they seek, to wit, payments covering tuition and the costs of therapy, counseling, and medication due to emotional distress, are not contract remedies.

Plaintiffs' recovery on their contract claims will, of course, "be defined by the law of contract," *Schuman v. Kobets*, 716 N.E.2d 355, 357 (Ind. 1999), but the core of these claims concerns breaches of contract terms and Plaintiffs' alleged failure to receive the benefit of their bargain—a safe environment in exchange for their athletic performance. We hold that Indiana courts would characterize Counts 1 through 3 of the Amended Complaint, which allege that the NCAA unsatisfactorily performed its contractual obligations to protect their health and safety as student-athletes, as breach of contract claims for statute of limitations purposes.

### 2. Application of the Discovery Rule

Indiana's discovery rule provides that "a cause of action for either tort or written contracts begins to run when a party knows, or in the exercise of ordinary diligence could

18

A-18

discover, that the contract has been breached or that an injury had been sustained as a result of the tortious acts of another." *Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005) (citation omitted). "'It is not necessary that the extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred.'" *Wright v. Draeger, Inc.*, No. 1:22-cv-02144-KMB-JMS, 2023 WL 6958704, at *10 (S.D. Ind. Oct. 20, 2023) (quoting *C & E Corp. v. Ramco Indus., Inc.*, 717 N.E.2d 642, 644 (Ind. Ct. App. 1999)).

Here, Plaintiffs concede that Does 4–6 and 8–14 were aware of their abuse by the Coaches at the time it occurred. They contend, however, that Does 4–6 and 8–14 could not in the exercise of reasonable diligence have known of the NCAA's involvement in their injury until March 11, 2022, when the San Francisco Chronicle published a story entitled "Intolerable sexualized environment: Ex-USF baseball players sue coaches, school, NCAA," when they first learned that other student-athletes had previously complained to USF and USF's NCAA Faculty Athletic Representative about the Coaches' conduct, that the NCAA (or at least USF's NCAA Faculty Athletic Representative) knew about the Coaches' abuse, and that, by ignoring the known risk of such abuse, the NCAA had enabled and perpetuated it.

However, the purpose of Indiana's discovery rule is not to suspend the running of the statute of limitations "until a plaintiff discovers every defendant who might be legally liable for [their] injury." *Rieth-Riley Const. Co., Inc. v. Gibson*, 923 N.E.2d 472, 476 (Ind. Ct. App. 2010). Rather, its purpose "is to limit the injustice that would arise by requiring a plaintiff to bring [their] claim within the limitation period during which, even

19

A-19

with due diligence, [they] could not be aware a cause of action exists." *Id.* Thus, under Indiana law, the discovery rule does not apply "where the indeterminate fact is not the existence of an injury, but rather the identity of a tortfeasor." *Id.* at 476–77.

Plaintiffs admit that Does 4–6 and 8–14 knew that the Coaches' alleged behavior toward them was abusive and that they had experienced it as abusive as it was occurring. Their tort and contract claims against the NCAA are all predicated on the NCAA's alleged breach of its duty (contractual or otherwise) to provide appropriate rules and regulations to protect student-athletes' health and safety. Assuming the NCAA had such a duty, Plaintiffs do not argue that anything about the NCAA's presence and role as the regulatory body for college athletics among its member institutions or its failure to have in place centralized regulations and reporting requirements regarding coach-on-athlete abuse was unknown to Does 4–6 and 8–14 at the time they were subjected to the Coaches misconduct and harassment. The only facts that were unknown to Plaintiffs at the time the abuse occurred were the broad-based nature of the Coaches' misconduct and that similar complaints regarding such behavior had previously been made to USF's athletic director and to USF's NCAA Faculty Athletic Representative, but none of that information was essential to their legal claims against the NCAA. Because Plaintiffs' tort and contract claims are all predicated on the NCAA's failure to have adequate protections in place to shield them from the Coaches' abuse, which abuse was both overt and known and thus "ascertainable" at the time it occurred, we hold that Indiana's statutes of limitations began to run on those claims on the dates when Does Does 4–6 and 8–14 were first subjected to the abuse.

A-20

Plaintiffs contend that it would be "incongruous" for us to find the discovery rule inapplicable to the tort and contract claims alleged by Does 4–6 and 8–14 against the NCAA here when in their parallel litigation in the District Court for the Northern District of California, Judge Beeler applied the discovery rule to allow their claims for related institutional indifference against USF to proceed under California and federal law. *See Doe I v. Univ. of San Francisco*, 685 F. Supp. 3d 882 (N.D. Cal. 2023). Contrary to Plaintiffs' assertion, Judge Beeler did not apply the discovery rule to the tort and breach of contract claims brought against USF by Does 4–6 and 8–14, having determined, as we do here, that those tort claims "rested on known, overt abuse," which abuse "also [was] the predicate for the contract claims." Dkt. 149 at 5. The only claims to which Judge Beeler applied the discovery rule were the Title IX discrimination claims brought by Does 4–6 and 8–14 against USF and the California Education Code claims. In applying the discovery rule to those claims, Judge Beeler explained that "[w]hat distinguishes the discrimination claims … is the coverup that was the cause of the … injury," 685 F. Supp. 3d at 901, not the abuse itself. In other words, the injury underlying the California litigation was USF's deliberate indifference to the Coaches' misconduct, of which Plaintiffs had alleged that they were unaware, whereas the injury in the tort and contract claims brought against USF was tied to the known abuse.[8] Clearly, our conclusion that

---

[8] In applying the discovery rule to Plaintiffs' Title IX claims against USF, Judge Beeler relied heavily on the Sixth Circuit's opinion in *Snyder-Hill v. Ohio State University*, 48 F.4th 686 (6th Cir. 2022), which Plaintiffs cite here in support of their arguments seeking application of the discovery rule to their tort and contract claims. However, *Snyder-Hill* was limited to Title IX claims, meaning, as previously noted, the injury there, *un*like here, was the defendant's deliberate indifference, of which the plaintiffs plausibly alleged they had no knowledge at the time the

A-21

the discovery rule does not apply to the tort and contract claims alleged by Does 4–6 and 8–14 against the NCAA does not conflict with Judge Beeler's rulings in the parallel litigation.

### 3. Equitable Estoppel

Plaintiffs next contend that, despite other findings by the Court, the doctrine of equitable estoppel operates to toll the statute of limitations on the claims alleged by Does 4–6 and 8–14. The doctrine of equitable estoppel "provides that if a party's actions prevent another party from obtaining the requisite knowledge to pursue a claim, then 'equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay.'" *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 383 (Ind. 2019) (quoting *Perryman v. Motorist Mus. Ins. Co.*, 846 N.E.2d 683, 690 (Ind. Ct. App. 2006)). While equitable estoppel is often connected with claims of fraudulent concealment, it is a distinct doctrine that "also applies to other conduct that lulls a party into inaction." *Id.* (citation and quotation marks omitted).

Under Indiana law, to establish equitable estoppel, "a party's conduct 'must be of a sufficient affirmative character to prevent inquiry *or* to elude investigation *or* to mislead and hinder.'" *Id.* (quoting *Paramo v. Edwards*, 563 N.E.2d 595, 599 (Ind. 1990)) (emphasis added by *Kenworth*). Equitable estoppel "may arise from silence or acquiescence as well as from positive conduct," but "silence will not form the basis of an

---

abuse occurred. *Id.* at 704. Additionally, unlike Does 4–14, the *Snyder-Hill* plaintiffs alleged that they did not recognize their abuser's conduct as abuse at the time it occurred. *Id.* at 706. Thus, *Snyder-Hill* is distinguishable from the facts at bar.

A-22

estoppel unless the silent party has a duty to speak." *Town of New Chi. v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010) (citing *City of New Albany v. Cotner*, 919 N.E.2d 125, 133–34 (Ind. Ct. App. 2009), *reh'g denied, trans. denied*).

Plaintiffs maintain that the statute of limitations on the tort and contract claims alleged by Does 4–6 and 8–14 should be deemed tolled under the doctrine of equitable estoppel because the NCAA was aware of student-athletes' risk of sexual exploitation at the hands of the coaches yet failed to inform student-athletes of that risk, despite having a duty to do so, and deliberately chose "not to prohibit sexualized misconduct by NCAA coaches" even after other sports organizations began adopting policies to prevent similar misconduct.  Am. Compl. ¶ 93.  Even assuming these allegations to be true, equitable estoppel tolls the limitations period only where the defendant's "fraud or other misconduct has prevented a party from commencing his action or induced him to delay the bringing of his action beyond the time allowed by law." *Davis v. Shelter Ins. Co.*, 957 N.E.2d 995, 998 (Ind. Ct. App. 2011) (quotation marks and citation omitted).  Plaintiffs have failed to identify the way in which the NCAA's failure to inform student-athletes of the risk of sexual exploitation by coaches and/or to address previous instances of sexualized misconduct directed at other student-athletes prevented Does 4–6 and 8–14 from bringing their tort and contract claims against the NCAA or otherwise induced them to delay filing suit once they themselves were subjected to sexualized abuse and harassment by the Coaches.  As Judge Beeler recognized in rejecting a similar argument raised by Plaintiffs in the parallel California litigation involving USF, the information

23

A-23

allegedly concealed by the NCAA did not involve "critical facts that prevented the plaintiffs from learning the facts underlying their claims"; rather, "the plaintiffs knew about the conduct and left the team because of it." *Doe 1*, 2023 WL 105096, at *13.

These facts distinguish our case from those presented in *Langston v. Mid-America Intercollegiate Athletics Association*, 448 F. Supp. 3d 938 (N.D. Ill. 2020), where plaintiffs, all former NCAA football players, alleged that the NCAA concealed information from them regarding the risk of latent, concussion-related degenerative brain injuries. In *Langston*, although plaintiffs were aware they had suffered concussions while playing NCAA football, they alleged that the NCAA concealed facts regarding the risk that suffering concussive and sub-concussive hits in football could later result in the development of CTE and other degenerative brain injuries. In contrast, Does 4–6 and 8–14, "unlike the plaintiffs in *Langston*, … were aware of the facts" relevant to bringing their lawsuit. *Doe 1*, 2023 WL 105096, at *15. Thus, Plaintiffs have not plausibly alleged that any information the NCAA concealed from them either prevented them from filing their claims or induced them to forbear from filing a lawsuit until after the statute of limitations had run.

Plaintiffs also allege that USF's NCAA Faculty Athletic Representative affirmatively "led Plaintiffs to believe that there was no basis and thus need for a claim given that the Coaches' conduct was 'normal' and did not constitute sexual abuse." Am. Compl. ¶ 515. Even assuming such allegations of gaslighting are sufficient to avoid the statute of limitations, Plaintiffs target the USF's NCAA Faculty Athletic Representative— who was not alleged to have been hired, employed, or controlled by the NCAA—only on

A-24

the basis that he engaged in such behavior.  There is no allegation or argument that anyone from the NCAA engaged in similar affirmative conduct aimed at normalizing the alleged abuse and harassment suffered by Does 4–14 so as to induce them to delay filing a lawsuit until after the limitations period had run.

For these reasons, we hold that the allegations upon which Plaintiffs rely and the reasonable inferences that could be drawn from those allegations do not give rise to equitable grounds sufficient to toll the statute of limitations.

### 4.  Time-Barred Claims

Having found that the tort and contract claims alleged by Does 4–6 and 8–14 accrued at the time the sexualized abuse and harassment allegedly occurred and that Plaintiffs have failed to adequately allege any grounds to toll the applicable limitations periods, the following claims are ruled untimely and will be dismissed: (1) all tort claims brought by Does 4–6 and 8–14; (2) the contract claims brought by Does 9 and 11.

### C.    Negligence Claims (Does 1–3)

Plaintiffs have brought the following negligence-based claims against the NCAA based on its failure to protect Does 1–3 from the sexualized misconduct alleged to have been inflicted by the Coaches: (1) gross negligence; (2) negligence; (3) breach of fiduciary duty; (4) negligent failure to warn, train, or educate;[9] and (5) negligent infliction of emotional distress.

---

[9] Plaintiffs contend that the NCAA waived any argument in support of dismissal of their claim that the NCAA negligently failed to warn, train, or educate *student-athletes* on the risk of sexual abuse or harassment by coaches by addressing that claim only as to the NCAA's alleged failure to train NCAA *coaches* not to engage in such conduct.  In its opening brief, however, the NCAA

To recover damages based on negligence under Indiana law, a plaintiff must establish: "(1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach." *Wiley v. ESG Sec. Inc.*, 187 N.E.3d 267, 272 (Ind. Ct. App. 2022), *trans. denied* (citation omitted). "A duty of reasonable care is 'not, of course, owed to the world at large,' but arises out of a relationship between the parties." *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind. Ct. App. 2004) (quoting *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991)). Likewise, there is no "duty … to control the conduct of a third person as to prevent him from causing physical harm to another" without a special relationship between the defendant and the third person or the defendant and the plaintiff. *Buchanan ex rel. Buchanan v. Vowell*, 926 N.E.2d 515, 522 (Ind. Ct. App. 2010) (quoting Restatement (Second) of Torts § 315 (1965)). "In the absence of any duty, no negligence or liability can be based upon the alleged breach." *Tolbert v. Redbones, Inc.*, --- N.E.3d ---, 2024 WL 3050183, at *3 (Ind. June 19, 2024) (citing *Wiley*, 187 N.E.3d at 272). Duty, therefore, "is an indispensable element of a negligence claim." *Pennington v. Mem. Hosp. of South Bend, Inc.*, 223 N.E.3d 1086, 1096 (Ind. 2024). Whether a duty exists is a question of law that courts decide. *Id.*

Here, the NCAA seeks dismissal of each of the negligence-based claims alleged against it by Does 1–3, arguing that, while timely filed, these claims must be dismissed

---

argued that all Plaintiffs' negligence claims were subject to dismissal for failure to adequately plead the element of duty and both sides had the opportunity to fully brief that issue. Accordingly, we hold that there was no waiver.

A-26

due to Plaintiffs' failure to adequately plead that the NCAA had a legally-recognized duty to take measures to protect student-athletes from sexually-motivated abuse and harassment at the hands of their coaches.  Plaintiffs rejoin that they have adequately pled four grounds for finding that the NCAA had a duty to student-athletes: (1) voluntary assumption; (2) fiduciary relationship; (3) special relationship; and (4) the common law. We address each of these grounds in turn below.

### 1.  Voluntary Assumption

Under Indiana law, "[a] duty of care may … arise where one party assumes such a duty, either gratuitously or voluntarily.  The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999) (citation omitted).  This assumption under the law "requires affirmative, deliberate conduct such that it is 'apparent that the actor … specifically [undertook] to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully.'" *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014) (quoting *Lather v. Berg*, 519 N.E.2d 755, 766 (Ind. Ct. App. 1988)).  "Although the existence and extent of an assumed duty is generally a question of fact for the jury, it may be resolved as a matter of law if the designated evidence is insufficient to establish an injury." *Spierer v. Rossman*, 798 F.3d 502, 511 (7th Cir. 2015) (affirming dismissal for failure to state a claim for negligence under the theory that the defendants assumed a duty of care) (citation omitted).

A-27

Here, Plaintiffs maintain that the NCAA constitution and bylaws specifically promise that "athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes," which promise appears on the NCAA website and was orally reiterated by the NCAA's former president, Mark Emmert, in remarks made when he represented in testimony before the United States Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." Am. Compl. ¶¶ 1, 67, 75. Plaintiffs stress that the NCAA directly oversees and controls the conduct of coaches at NCAA member institutions by, for example, proscribing sports wagering, tobacco use, and marketing to sports agents; that the NCAA has the power to discipline coaches for violations of NCAA rules; and that the NCAA has, in fact, on a number of occasions, issued sanctions against coaches following investigations into NCAA rules violations. Plaintiffs contend that these facts plausibly establish that the NCAA was in a position to keep student-athletes safe and had expressly promised to do so, and are sufficient to show that the NCAA voluntarily assumed a special duty of care to protect the health and safety of NCAA student-athletes.

The NCAA responds that such general statements of support for enhancing and protecting student-athletes' wellbeing as are contained in its policies and allegedly reiterated by a former official before Congress are far too broad and aspirational to adequately support a finding that the NCAA assumed a specific duty to protect Plaintiffs from sexualized misconduct or abuse by their coaches. Moreover, the NCAA maintains that Plaintiffs have not adequately alleged that the NCAA has the type of day-to-day

28

A-28

oversight and control over the conduct of NCAA coaches with respect to student-athlete welfare conditions and issues as would be required to establish that it had assumed such a duty under Indiana law.

We agree with the NCAA that Plaintiffs' allegations do not plausibly allege that the NCAA assumed a duty to protect student-athletes from sexual harassment and abuse by their coaches. As noted above, under Indiana law, the concept of assumed duty "requires a focus upon the specific services undertaken." *Yost*, 3 N.E.3d at 521. Here, Plaintiffs rely on claims that the NCAA has publicly espoused and included in its constitution and bylaws aspirational goals and statements of generic intent to promote student-athlete health and safety in its athletic programs, has recognized that improper sexual relationships between coaches and student-athletes are a "serious problem," and, to that end, has published educational resources for its member institutions regarding sexual abuse prevention and has issued statements and resolutions reminding its member institutions of their responsibility to ensure student-athlete health and safety, specifically in the context of combating sexual abuse. *See*, *e.g.*, Am. Compl. ¶¶ 95, 97, 99, 102. The Amended Complaint specifically acknowledges, however, that the NCAA itself has not accepted day-to-day responsibility for protecting student-athletes on college and university campuses, only that the NCAA "foists responsibility for ensuring college student-athlete environments are safe and health solely on the [member] institutions themselves …." Am. Compl. ¶ 100.

These kinds of generalized, sweeping assertions allegedly made by the NCAA regarding student-athlete welfare and its efforts to educate its member institutions on

29

A-29

sexual abuse prevention are not sufficient as a matter of law to plausibly claim that the NCAA undertook any specific affirmative tasks amounting to a voluntary undertaking extending to actual oversight and control over the behavior of individual coaches and their daily interactions with student-athletes to protect their health and safety, which is the duty Plaintiffs assert that the NCAA assumed here.  Although Plaintiffs allege that the NCAA promulgates and enforces standards regarding the employment of coaches, including compensation and permissible number of coaches, and certain aspects of coaches' conduct with respect to, *inter alia*, recruiting, sports wagering, and tobacco use, and that the NCAA has the authority to discipline and sanction coaches for violations of NCAA bylaws, Plaintiffs allege no facts plausibly suggesting that the NCAA assumed responsibility and control over the day-to-day management and supervision of college coaches' daily interactions and relationships with student-athletes, which is the cause of the harm alleged here.  In fact, a close reading of the Amended Complaint discloses that Plaintiffs have affirmatively alleged the exact opposite.

Under similar circumstances, Indiana courts have consistently found no assumption of duty on behalf of national associations to ensure the safety of individual members of their local institutions where the national associations have undertaken analogous or even broader services than Plaintiffs have alleged were undertaken here by the NCAA.  *See, e.g.*, *Lanni v. Nat'l Coll. Ath. Ass'n*, 42 N.E.3d 542, 553 (Ind. Ct. App. 2015) (holding that evidence that the NCAA assumed a broad duty to ensure student-athlete welfare did not "demonstrate that it undertook or assumed a duty to actually oversee or directly supervise the actions of the member institutions and the NCAA's

30

A-30

student athletes"); *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014) (holding that a national fraternity's provision of information to the local fraternity to discourage hazing and alcohol abuse and disciplining chapters and member for violations did not establish the assumption of a duty to ensure the safety of the local fraternity's members from injury or death related to hazing or alcohol abuse); *Yost*, 3 N.E.3d at 521 (holding that evidence that a national fraternity "engaged in educational outreach programs to enhance proper behavior and to discourage hazing" and had the power to suspend the charters of local chapters and to discipline individual members was insufficient as a matter of law to prove the specific undertaking "extend[ed] to actual oversight and control over the behavior of individual student members of the local fraternity" such that the national fraternity had undertaken a specific duty to protect students from hazing). Although we acknowledge, as Plaintiffs argue, that these cases were all decided on summary judgment and thus applied a different legal standard than is applied at the motion to dismiss stage, they are nonetheless relevant here as we assess whether, assuming all facts in the Amended Complaint are true, Plaintiffs have plausibly alleged that the NCAA assumed a duty to protect student-athletes from sexual abuse and harassment by their coaches. For the reasons detailed above, we find that they have not.

Plaintiffs' only cited cases to the contrary are all readily distinguishable. In *Greiber v. National Collegiate Athletic Association*, No. 600400/17, 2021 WL 8442463 (N.Y. Sup. Ct. Nov. 29, 2021), for example, the trial court, applying New York law, denied summary judgment on a negligence claim brought against the NCAA by a women's lacrosse player, finding that because the NCAA "exercised significant control

31

A-31

over the rules of play and equipment for women's lacrosse, and imposed conditions of membership on its member institutions which included requirements regarding head injury protocols," the NCAA "was charged with carrying out these functions with reasonable care," and that genuine issues of material fact regarding the NCAA's discharging of that duty remained in light of an NCAA rule that prohibited lacrosse players from wearing helmets. *Id.* at *5. Unlike *Greiber*, where the NCAA was shown to have direct control over the head injury protocol alleged to have resulted in the plaintiffs' harm, Plaintiffs here have not alleged a similarly specific undertaking by the NCAA in the area of sexual abuse and harassment of student-athletes by coaches. A review of applicable precedent strengthens our finding that Plaintiffs' have failed to plausibly allege that the NCAA assumed a duty to protect them from such misconduct.

### 2. Fiduciary Relationship

We turn next to address Plaintiffs' claim that the NCAA owed them a fiduciary duty to protect their health and safety. Under Indiana law, "[a] confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Butler v. Symmergy Clinic, PC*, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020) (quoting *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 281 (Ind. Ct. App. 2005), *trans. denied*). The types of relationships typically recognized as fiduciary relationships "require an unusually high degree of care," *Aldrich*, 565 F. Supp. 3d at 1108, such as "attorney and client, guardian and ward, principal and agent, pastor and parishioner, husband and wife, and … parent and child." *Leever v. Leever*, 919 N.E.2d 118, 123 (Ind. Ct. App. 2009). Whether a fiduciary duty exists is

32

A-32

ordinarily a question of fact in Indiana. *Kapoor v. Dybwad*, 49 N.E.3d 108, 129 (Ind. Ct. App. 2015) (quoting *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998)).

Plaintiffs allege that fiduciary duty owed them arose from the "special relationship of trust and confidence" between the NCAA and student-athletes. Am. Compl. ¶ 586. According to Plaintiffs, the NCAA's fiduciary duty was created when the NCAA "actively promoted itself as providing a safe environment for its student-athletes and intended that student-athletes rely on this promise, including in its governing documents, on its website, and with its president's own words." Pls.' Resp. at 33 (citing Am. Compl. ¶¶ 67, 75, 77). Plaintiffs contend that, because the NCAA is in the best position to protect against the risk of harm, student-athletes depend on it to do so, and the NCAA is therefore "duty bound to act for the benefit of its student-athletes to protect them from sexually abusive and exploitative coaches." *Id.*

These facts as alleged are insufficient to plausibly frame a special relationship of confidence between the NCAA and each of the student-athletes participating in intercollegiate athletics as required to impose a fiduciary duty. While we accept as true that "there is certainly trust between [student-athletes] and the NCAA, … trust is not enough." *Aldrich*, 565 F. Supp. 3d at 1109 (citation and quotation marks omitted). Plaintiffs have failed to allege any facts that would plausibly suggest the existence of the type of "close, confidential relationship" between the NCAA and each of its student-athletes as is required to adequately plead fiduciary duty under Indiana law. *Id.*

Moreover, Plaintiffs have cited no cases in which a similar relationship gave rise to a fiduciary duty, nor have we identified any. To the contrary, the courts that have

33

A-33

addressed this issue have uniformly held that the relationship between the NCAA and student-athletes is not fiduciary in nature. *See id.* (holding that the plaintiffs' allegation that the NCAA "actively promoted itself as providing a safe and nurturing environment for its student-athletes" was insufficient to plead a fiduciary relationship between the NCAA and student-athletes); *Flood v. Nat'l Collegiate Ath. Ass'n*, No. 1:15-CV-890, 2015 WL 5785801, at *11 (M.D. Pa. Aug. 26, 2015), *report and recommendation adopted*, 2015 WL 5783373 (M.D. Pa. Sep. 30, 2015) ("[C]ourts have flatly rejected the notion that the relationship between student-athletes, colleges, and the NCAA somehow rises to the level of a fiduciary relationship."); *Schmitz v. Nat'l Collegiate Ath. Ass'n*, 67 N.E.3d 852, 870 (Ohio Ct. App. 2016) ("To suggest that the NCAA maintains a 'special relationship' akin to a fiduciary relationship with all of its 400,000 students who participate in intercollegiate athletics is simply not supported under the law."). Our view accords with this overwhelmingly consistent precedent.

### 3. Special Relationship/Common Law Duty

In the absence of allegations sufficient to plausibly allege that the NCAA has assumed a duty to protect student-athletes from sexual misconduct and abuse by coaches or that it has a fiduciary duty to do so, we consider next whether Plaintiffs have alleged sufficient facts to support the existence of a common law duty, based in part on some form of special relationship between the parties. For the reasons detailed below, we conclude they have not.

As set forth above, "[a] duty of reasonable care is 'not, of course, owed to the world at large,' but arises out of a relationship between the parties." *Williams*, 809

34

A-34

N.E.2d at 476 (quoting *Webb*, 575 N.E.2d at 997).  Likewise, there is no "duty … to control the conduct of a third person as to prevent him from causing physical harm to another," without a special relationship between the defendant and the third person or the defendant and the plaintiff.  *See Neal v. IAB Fin. Bank*, 68 N.E.3d 1114, 1118 (Ind. Ct. App. 2017) (quoting Restatement (Second) of Torts § 315).  Where, as here, no other test has been declared or articulated on which to determine whether a common law duty in negligence exists, Indiana courts employ the three-part balancing test set forth in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), requiring consideration of: (1) the relationship between the parties; (2) the reasonable foreseeability of the harm; and (3) public policy concerns.  *Id.* at 995, *disapproved of in other circumstances by Goodwin v. Yeakle's Sports Bar & Grille, Inc.*, 62 N.E.3d 384, 391 (Ind. 2016)).[10]  Whether a duty exists is generally a question of law for the Court, although "factual questions may be interwoven with the determination of the existence of a relation, rendering the existence of a duty a mixed question of law and fact, ultimately to be resolved by the fact-finder."  *Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1261–62 (Ind. Ct. App. 1989), *trans. denied*.

    i.       **Relationship**

---

[10] Plaintiffs argue that the *Webb* balancing test has "been called into question as being overly restrictive" and is now "only used 'where the element of duty has not already been declared or otherwise articulated.'"  Pls.' Resp. at 32 (quoting *Goodwin*, 62 N.E.3d at 387).  Unlike in *Goodwin*, however, where the law was clear as to what duty was owed by a business owner to an invitee and thus did not require application of the *Webb* factors, here, the law as to the existence of a common law duty is unsettled.  Accordingly, application of the *Webb* balancing test in the case at bar is appropriate to determine whether a duty exists.  *See, e.g.*, *Springbrook Village Batesville LLC v. Se. Ind. Title Co.*, 195 N.E.3d 398, 403 (Ind. Ct. App. 2022) (applying *Webb* factors post-*Goodwin* where "the element of duty [was] not already … declared or otherwise articulated").

A-35

The relationship between the NCAA and the "[n]early half a million" student-athletes that comprise the 19,886 teams competing in NCAA sports annually at more than 1,000 schools throughout the country is simply too attenuated to create a legally cognizable duty to protect each of those students against third-party sexual misconduct. Am. Compl. ¶¶ 29, 67. Although the Amended Complaint alleges that the NCAA has expressed the broad goal of conducting its intercollegiate athletics program in a manner that promotes student-athlete welfare, Plaintiffs do not allege any facts that plausibly suggest that the NCAA exerts the kind of day-to-day oversight and control over (and thus responsibility for) student-athletes as required to give rise to such a common law duty of care under Indiana law. *See*, *e.g.*, *Yost*, 3 N.E.3d at 521.

In *Yost v. Wabash College*, the Indiana Supreme Court addressed whether the national fraternity defendant owed a common law duty to protect its local chapter's individual members from hazing at the hands of other members. Despite evidence that the national fraternity defendant had the power to discipline or expel individual members, the Indiana Supreme Court found that the fraternity "lacked any direct oversight and control of the individual fraternity members" when the national fraternity "did not have any employees present in the fraternity house, and the day-to-day management was the responsibility of the local fraternity." *Id.* The Indiana Supreme Court ruled that, despite the national fraternity's "aspirational objectives" and efforts to "promote their fulfillment," the relationship between the national fraternity and its members was too "remote and tenuous" to impose a common law duty of care on the national fraternity in favor of its individual members. *Id.* Because Plaintiffs' allegations regarding the

36

A-36

NCAA's relationship with student-athletes are indistinguishable from the evidence reviewed and found insufficient to establish a common law duty in *Yost*, even accepting Plaintiffs' allegations here as true, they are insufficient to plausibly allege the type of relationship that gives rise to a legally cognizable and enforceable common law duty of care under Indiana law. *See Lanni*, 42 N.E.3d at 549 (finding *Yost* determinative in holding that the NCAA owed the plaintiff student-athlete no common law duty of care to protect her from injury sustained as a spectator at a NCAA-sanctioned competition).

Nor have Plaintiffs adequately alleged that the NCAA's relationship with college coaches created a legally cognizable duty to control the coaches' conduct and prevent them from sexually harassing and abusing student-athletes. Plaintiffs assert that the NCAA is in the best position to protect against the risk of harm to student-athletes from their coaches because the NCAA regulates the conduct of college coaches "in a myriad of ways," Pls.' Resp. at 29, including through the NCAA Faculty Athletic Representative, who, Plaintiffs allege, plays a "leading role" in the matters of student-athlete welfare at each member institution. Plaintiffs nevertheless concede that the Faculty Athletic Representative is an employee of the member institution, not the NCAA; thus, the NCAA lacks a basis of control over the Faculty Athletic Representative's conduct. Moreover, while Plaintiffs allege that the NCAA has the authority to promulgate rules and enforce standards that impact the conduct of coaches as well as the power to discipline and sanction coaches for violations of those rules and standards, Plaintiffs have not alleged (nor could they) that the NCAA has direct oversight or control over coaches' conduct or the ability to monitor coaches on a day-to-day basis as would place the NCAA "in a

A-37

unique position to protect against the risk of harm" alleged by Plaintiffs.  *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1102 (Cal. Ct. App. 2019) (quoting *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 80 (Cal. Ct. App. 2019)).  Absent facts plausibly suggesting that the NCAA has such control over coaches, Plaintiffs' allegations regarding the NCAA's post-conduct disciplinary powers are insufficient to constitute a special relationship between the NCAA and college coaches sufficient to impose a common law duty of care.

<div align="center">

**ii.     Reasonable Foreseeability**

</div>

For the purpose of determining whether an act is foreseeable in the context of duty, Indiana courts assess "whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it."  *Goodwin*, 62 N.E.3d at 392 (quotation marks and citation omitted).  This analysis looks to "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence."  *Id.* at 393 (quoting *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind. Ct. App. 1996)).  "Because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome is 'sufficiently likely' is not enough to give rise to a duty."  *Id.* at 392.  Thus, in determining foreseeability in the context of duty, Indiana courts also consider whether the defendant "knew or had reason to know of any present and specific circumstances that would cause a reasonable person to recognize the probability or likelihood of imminent harm."  *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 840 (Ind. 2020).

<div align="center">

38

</div>

<div align="center">

A-38

</div>

In the case at bar, the "broad type of plaintiff" at issue is a student-athlete, and the "broad type of harm" is sexual abuse or harassment by a coach.  As a general matter, it is, of course, foreseeable that a coach could take advantage of the power imbalance in their relationship with a student-athlete to engage in sexual harassment or abuse, but the fact that such an outcome can be said to be "sufficiently likely" is not enough to give rise to a duty under Indiana law.  Plaintiffs have fallen short in alleging facts plausibly suggesting that the NCAA knew or should have known of any "present and specific circumstances" rendering the probability of harm more imminent.  It is not alleged, for example, that the NCAA was privy to any knowledge of prior incidents of sexual misconduct or harassment at USF.  Although according to Plaintiffs, reports of sexual misconduct were made to USF's NCAA Faculty Athletic Representative, Plaintiffs concede that that official is the employee of USF, not the NCAA.  Further, there is no allegation that the USF's NCAA Faculty Athletic Representative ever informed the NCAA of such reports of abuse.  Plaintiffs' remaining allegation regarding the defendant's knowledge is that the NCAA was aware of a high student-athlete transfer rate from USF.  Assuming the NCAA had such knowledge, we view it as not plausible that the NCAA would or should have known, based on USF's high transfer rate, that the Coaches were engaging in sexual harassment and abuse.  Accordingly, the case before us is distinguishable from the circumstances in *Doe v. Delta Tau Delta Beta Alpha Chapter*, No. 1:16-cv-01480-JMS-DML, 2018 WL 3375016 (S.D. Ind. July 11, 2018), in which the Court ruled that a local fraternity had a duty to protect the plaintiff from sexual assault while she was a guest at the fraternity house when it was also alleged that the defendant *did* have knowledge of a

39

A-39

prior sexual assault allegation against the member accused of causing the same harm to the plaintiff. *Id.* at \*4–\*5.

For these reasons, we hold that the facts alleged in the Amended Complaint are insufficient as a matter of law to plausibly suggest that the probability or likelihood of sexually harassing conduct by the USF Coaches was reasonably foreseeable to the NCAA under the standard set forth under Indiana law.

### iii.     Public Policy

Plaintiffs next argue that, as the only entity with control over and responsibility for intercollegiate sports, the NCAA is in the best position to protect student-athletes from sexual harassment and abuse by coaches, such that the interests of sound public policy favor imposing such a duty on the NCAA.  However, as detailed above, Plaintiffs have not alleged that the NCAA exerts everyday oversight and control over the coaches or student-athletes or that any NCAA employee is present during the day-to-day interactions between coaches and student-athletes.  Under similar circumstances, the Supreme Court of Indiana found in *Yost* that public policy concerns did "*not* favor recognition of a specific duty of care" toward individual student members of the national organization, reasoning that the national organization "should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior …."  3 N.E.3d at 521 (emphasis added).

For the foregoing reasons, we find that Plaintiffs' allegations in their Amended Complaint are insufficient under *Webb* to plausibly allege that the NCAA has a common

40

A-40

law duty to protect student-athletes from sexual harassment and abuse by their coaches under Indiana law.

### D.    Vicarious Liability (Does 1–3)

Plaintiffs also seek to hold the NCAA vicariously liable for USF's and the Coaches' intentional infliction of emotional distress through the doctrine of respondeat superior. The NCAA has moved to dismiss this claim on grounds that Plaintiffs have failed to adequately allege that it has an agency relationship with USF and the Coaches as required to impose vicarious liability.

Under Indiana law, "for the liability of an agent to be imputed to a principal, an agency relationship must exist, and an essential element of that relationship is that the agent must 'act on the principal's behalf.'" *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 164 (Ind. 2014) (quoting Restatement (Third) of Agency § 1.01 (2006)). The agent must also "consent to act on the principal's behalf, as well as be subject to the principal's control." *Id.* (citations omitted). Whether an agency relationship exists is generally a question of fact but may be decided on a motion to dismiss if the complaint fails to adequately "allege facts demonstrating a principal/agent relationship." *United States v. Rathbone Ret. Cmty., Inc.*, No. 3:08-cv-174-RLY-WGH, 2009 WL 2147878, at *2 (S.D. Ind. July 15, 2009).

Plaintiffs' allegations here are not sufficient to plausibly allege the existence of an agency relationship between the NCAA and either its member institutions or college coaches. Although the Amended Complaint alleges that the NCAA promulgates and enforces standards regarding the employment of coaches and certain aspects of their

41

A-41

conduct with respect to, *inter alia*, recruiting, sports wagering, and tobacco use; that the NCAA has exercised authority to discipline and sanction coaches for violations of NCAA bylaws; and that the NCAA promulgates joint aspirational goals with its member institutions to promote student-athletes' health and safety, the Amended Complaint is devoid of facts that plausibly suggest that the "everyday management and supervision of activities and conduct" by member institutions and coaches related to student-athlete welfare is "undertaken at the direction and control" of the NCAA as is necessary for an agency relationship to exist. *Smith*, 9 N.E.3d at 164; *accord Yost*, 3 N.E.3d at 522.

According to Plaintiffs, they have sufficiently alleged the element of control having alleged that the NCAA promulgates "extensive policies governing the day-to-day conduct of college coaches" and that "[c]oaches may even be subject to disciplinary or corrective action for violating NCAA Bylaws." Pls.' Resp. at 35. The NCAA rejoins noting that the Indiana Supreme Court has held that post-conduct or "remedial" disciplinary powers such as those the NCAA is alleged to hold are an insufficient basis on which to establish an agency relationship. *See Smith*, 9 N.E.3d at 164 (holding that a national fraternity's "right to discipline, suspend or revoke its affiliation with the local fraternity or its members" did not render a local fraternity or its members agents of the national fraternity); *Yost*, 3 N.E.3d at 522 (national fraternity's "right to suspend or revoke its affiliation with the local fraternity or its members" did not create an agency relationship).

Additionally, Plaintiffs have alleged no facts suggesting that the NCAA has any control over the "day-to-day conduct of college coaches" with regard to their individual

42

A-42

interactions with student-athletes.  *See Cox v. Gov't Employees Ins. Co.*, 126 F.2d 254, 257 (6th Cir. 1942) ("A voluntary association is not liable for the tort of a member when perpetrated beyond the scope of its control over his acts.").  Thus, taking Plaintiffs' allegations as true, as we are required to do at this stage of the litigation, they are not sufficient to plausibly allege an agency relationship as they do not plausibly suggest that the "actual management and control" over the coaches with regard to student-athlete health and safety "is a responsibility consensually exercised by" each member institution "as the agent and at the direction of and on behalf of" the NCAA.  *Yost*, 3 N.E.3d at 522.

### E.    Contract Claims (Does 1–8, 10, 12–14)

The NCAA also argues that Plaintiffs' breach of express and implied contract claims must be dismissed because they have failed to adequately allege the existence of a valid contract under either theory.  The NCAA moves to dismiss Plaintiffs' third-party beneficiary contract claim as well on grounds that they have not properly alleged their third-party beneficiary status.  Plaintiffs contend that they have plausibly alleged the existence of three express or implied contracts, to wit, the National Letter of Intent ("NLI"), the Student-Athlete Statement (the "SA Statement"), and the Division I Manual's Constitution and Bylaws (the "Manual"),[11] which is incorporated by reference in the NLI

---

[11] The NLI and the SA Statement are both attached to Plaintiffs' Amended Complaint and, although not attached, the Manual is both referenced in the Amended Complaint and essential to Plaintiff's claims; thus, these documents may be considered in evaluating the NCAA's motion to dismiss under Rule 12(b)(6) without converting the motion to one for summary judgment.  *See Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").

A-43

and the SA Statement.  Alternatively, Plaintiffs argue that they have plausibly alleged that they are third-party beneficiaries of the Manual, which is a valid contract between the NCAA and each of its member institutions that includes a promise to protect the safety and well-being of student-athletes.  We address these arguments in turn below.

### 1. Express Contract

Plaintiffs allege that by failing to protect them from the Coaches' abuse and harassment, the NCAA breached Plaintiffs' signed NLIs and SA Statements as well as the Manual, as incorporated into those two documents.  The NCAA responds that neither the NLIs nor the SA Statements contains an expression of mutual assent between the student-athlete and the NCAA to enter into a contractual relationship and thus do not qualify as contracts between the NCAA and the student-athletes.  For the following reasons, the Court agrees.

Under Indiana law, "[t]he basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction." *Perrill v. Perrill*, 126 N.E.3d 834, 840 (Ind. Ct. App. 2019) (quoting *Jernas v. Gumz*, 53 N.E.3d 434, 445 (Ind. Ct. App. 2016), *trans. denied*).  "An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) (quoting Restatement (Second) of Contracts § 24 (1981)).  "Whether a contract exists is a question of law." *Buskirk v. Buskirk*, 86 N.E.3d 217, 223 (Ind. Ct. App. 2017)

44

A-44

(citing *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009)).

The NLIs are documents signed by the matriculating NCAA student-athlete and the NCAA member-institution, which bind the matriculating student-athlete and the school.  Specifically, the student agrees to attend the member institution full-time for one academic year, participate in an NCAA sport, and abide by the NCAA's rules on eligibility and recruiting.  The institution, in turn, provides a "written offer of athletics financial aid" for the academic year.  Exh. A to Am. Compl.  Although the NLI states that it is "administered by the NCAA" and references certain NCAA rules contained in the Manual related to eligibility requirements, the NLI is silent regarding any NCAA bylaws addressing student health or safety and does not include any promises or obligations on behalf of the NCAA with regard to student-athlete health and safety.  *See id.*

The SA Statement, which is signed only by the matriculating student-athlete (or if the student is a minor, also by their parent or legal guardian), states that its purpose is "[t]o assist in certifying eligibility."  Exh. B to Am. Compl.  The form requires NCAA student-athletes to provide their schools certain information relevant to their eligibility and to acknowledge that they have read the NCAA rules regarding eligibility, recruitment, financial aid, amateur status, sports-wagering activities, drug testing, and penalties for providing false information.  As with the NLI, while the SA Statement references the eligibility provisions of the Manual and informs student-athletes that they are "responsible for knowing and understanding the application of all NCAA Division I regulations related to your eligibility," the SA Statement contains no reference to any

45

A-45

NCAA rules addressing student health or safety nor does it specify any affirmative commitments on behalf of the NCAA, including to protect or promote the health and safety of student-athletes.  *See id.*

In sum, neither the NLI, the SA Statement, nor the incorporated provisions of the Manual regarding eligibility demonstrates any manifestation of a willingness on the part of the NCAA, never mind a commitment, to enter into a bargain regarding student-athlete health and safety that could be interpreted to give rise to an offer to enter a contract pursuant to which each student-athlete agrees to provide their athletic services in NCAA intercollegiate competition in exchange for the NCAA promising to protect their wellbeing.  Furthermore, these documents are devoid of any reasonably certain and definite contract terms addressing student-athlete health and safety sufficient to form such a contract.  Having failed to plausibly plead the existence of an express contract, Plaintiffs' breach of express contract claim must be dismissed.

### 2. Implied Contract

We turn next to address Plaintiffs' breach of implied contract claim.  Plaintiffs allege that, even if no express contracts are found to exist between Plaintiffs and the NCAA, the same "facts and circumstances" referenced above establish an implied contract "wherein student-athletes, in return for participation under the NCAA's governance, agreed to be bound by the NCAA's rules and expected the NCAA to provide appropriate rules and regulations to protect their health and safety to the extent possible." Am. Compl. ¶ 544.  The NCAA seeks dismissal of Plaintiffs' breach of implied contract claim on the same grounds their breach of express contract claim fails.

A-46

Implied contracts are "not created or evidenced by the explicit agreement of the parties," but are instead "inferred by the law, as a matter of reason and justice from [the parties'] acts or conduct, [with] the circumstances surrounding the transaction making it a reasonable, or even a necessary, assumption that a contract existed between them by tacit understanding." *Wayt v. Town of Crothersville*, 866 F. Supp. 2d 1008, 1018–19 (S.D. Ind. 2012) (quotation marks and citation omitted).  To withstand a motion to dismiss under Indiana law, "a claim of breach of implied contract requires facts concerning the promises allegedly made by the parties to the contract, how those promises were communicated and how the exchange of obligations created an implied contract." *Robinson v. Leonard-Dent*, No. 3:12-cv-417-PPS, 2013 WL 5701067, at *13 n.5 (N.D. Ind. Oct. 18, 2013); *see also Bissessur v. Ind. Univ. Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) (holding that, to state a claim for breach of implied contract under Indiana law, a plaintiff must allege more than that "he had a contract with the defendant, gave the defendant consideration, and the defendant breached the contract").

Here, Plaintiffs have alleged no acts or conduct on the part of the NCAA that could be construed as a communication of a promise to them to undertake a contractual obligation.  As discussed above, neither the NLI nor the SA Statement contains any promises to student-athletes that would plausibly suggest the existence of an implied contract between the NCAA and student-athletes of the nature alleged by Plaintiffs.  The only other "fact" or "circumstance" alleged by Plaintiffs that might arguably support the existence of an implied contract with the NCAA to protect student-athlete health and safety is the Manual, specifically, the recitation of the text of Articles 1 and 2 of the

47

A-47

NCAA's constitution.  However, "[t]he mere existence of the NCAA's constitution and bylaws is insufficient to constitute the NCAA's communication of a promise to Plaintiffs." *Rose v. Nat'l Coll. Ath. Ass'n*, 346 F. Supp. 3d 1212, 1228 (N.D. Ill. 2018). Without facts "indicating that the NCAA … directed the statements in those documents to communicate a promise" to them, Plaintiffs have failed to plausibly allege the existence of an implied contract.  *Id.*  Accordingly, Plaintiffs' breach of implied contract claim must be dismissed.

### 3.  Third Party Beneficiary

Alternatively, Plaintiffs claim that they are third party beneficiaries of a contract between the NCAA and its institutional members that they allege the NCAA breached. Specifically, Plaintiffs allege that "[a]s an express condition of its membership into the NCAA, each institution must abide by its respective NCAA Division Manual, which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws," rendering the Manual "a contract between the NCAA and its member institutions, such as USF."  Am. Compl. ¶ 549.  The Amended Complaint cites portions of the Manual that describe standards for athletic programs, protecting student-athlete health and safety, and fostering a positive environment between students and coaches.  As to these portions, Plaintiffs highlight the following:

In the Manual, the NCAA promises to do the following for student-athletes:

a. "initiate, stimulate and improve intercollegiate athletics programs;"

b. "uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

48

A-48

c. "legislate … upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

d. conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

e. require each member institution [to] "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f. require each member institution [to] "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g. require each member institution [to] "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h. "assist the institution in its efforts to achieve full compliance with all rules and regulations and … afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."

Am. Compl. ¶ 551.  Plaintiffs contend that they are third party beneficiaries of these promises in the Manual "because the parties to the contract intended to benefit the student-athletes."  *Id.* ¶ 550.

Under Indiana law, a third party suing for breach of contract must show "(1) [a] clear intent by the actual parties to the contract to benefit the third party; (2) [a] duty imposed on one of the contracting parties in favor of the third party; and (3) [that] performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citation omitted) (emphasis removed).  Intent to benefit the third party "is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Id.*  "The requisite intent 'is not a desire or purpose to confer a particular

49

A-49

benefit upon the third party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." *CFA, Inc. v. Conduent State & Local Sols., Inc.*, No. 1:22-cv-01575-TWP-TAB, 2024 WL 1859804, at *4 (S.D. Ind. Apr. 29, 2024) (quoting *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 276 (Ind. Ct. App. 2001)).  Thus, "[i]t is not enough that performance of the contract would be of benefit to the third party"; rather, "[t]o be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party." *Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990).

Even assuming that the Manual constitutes a contract between the NCAA and its member institutions, Plaintiffs' allegations fail to plausibly suggest that the Manual creates an enforceable obligation to student-athletes as third-party beneficiaries under Indiana law.  The Manual contains a variety of rules and bylaws governing the relationship between the NCAA and its member institutions, including those quoted in the Amended Complaint, many of which it is plausible to infer are intended in some way to benefit NCAA student-athletes.  But, as explained above, the fact that a contract may incidentally benefit a third party or even that the contracting parties intended that a third party benefit from their contract is not sufficient to confer third party beneficiary status under Indiana law.  Rather, the contract itself must evince the contracting parties' intent to impose, and for at least one party to assume, a direct obligation in favor of the third party.

The allegations in the Amended Complaint do not plausibly reveal such an intent on the part of the NCAA and its member institutions.  At most, the principles set forth in

50

A-50

the Manual, as quoted in Plaintiffs' Amended Complaint, reflect an aspirational goal to conduct athletic programs in a manner that promotes NCAA student-athletes' health, safety, and overall welfare, but do not plausibly demonstrate an intent to create a direct contractual obligation to do so on the part of the NCAA or its member schools to individual student-athletes.  As Judge Beeler observed in dismissing Plaintiffs' corresponding third-party beneficiary claim against USF in the parallel California litigation, while "[t]he NCAA principles may describe some of the rules of the road" relative to the duty of care applicable in the negligence context, "that does not make a hortatory pronouncement (however important) a contractual obligation that benefits the plaintiffs as third-party beneficiaries."  *Doe I*, 685 F. Supp. 3d at 906; *see also Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1320 (9th Cir. 1996) (affirming the district court's holding that NCAA football players were not third-party beneficiaries of a contract among the Pac-10 member institutions that promised, *inter alia*, quality competitive opportunities and increased educational opportunities for student-athletes because such "vague, hortatory pronouncements in the contract" were not "by themselves … sufficient to support the players' claim that the Pac-10 intended to assume a direct contractual obligation to every football player on a Pac-10 team") (cleaned up).[12]

---

[12] We recognize, as Plaintiffs highlight, that other courts have permitted student-athletes' third party beneficiary claims against the NCAA to survive past the motion to dismiss stage.  *See*, *e.g.*, *Weston v. Big Sky Conference, Inc.*, 466 F. Supp. 3d 896 (N.D. Ill. 2020); *Richardson v. Se. Conf.*, 612 F. Supp. 3d 753 (N.D. Ill. 2020).  However, because the court in those cases either did not analyze the language of the Manual itself (*Weston*) or analyzed contractual obligations expressing "specific commitments" targeted at the health and safety of NCAA football players (*Richardson*), we find that the decisions have limited applicability here.

For these reasons, Plaintiffs' third-party beneficiary claim must be dismissed.

## III.   Conclusion

For the foregoing reasons, the NCAA's Motion to Dismiss [Dkt. 54] is <u>GRANTED</u> without prejudice.  If Plaintiffs seek to amend their complaint in an effort to overcome the deficiencies identified in this order, they must file an amended pleading within forty (40) days from the date of this Order.  If Plaintiffs fail to file a second amended complaint within the forty days allowed, final judgment will be entered, and the case dismissed with prejudice.[13]

IT IS SO ORDERED.

Date:        7/2/2024

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[13] The docket reveals other currently pending motions that we anticipate the parties will review in light of this Order.

A-52

A-53

Distribution:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Nicholas Blake Alford
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Nicholas.Alford@faegredrinker.com

Hailyn Jennifer Chen
Munger, Tolles & Olson LLP
hailyn.chen@mto.com

Melissa Ryan Clark
Fegan Scott LLC
melissa@feganscott.com

Lynn A. Ellenberger
Fegan Scott LLC
lynn@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT, LLC
beth@feganscott.com

Kathleen Foley
Munger, Tolles & Olson LLP
kathleen.foley@mto.com

Michelle A. Lamy
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
mlamy@lchb.com

Carolyn Hoecker Luedtke
MUNGER, TOLLES & OLSON LLP
carolyn.luedtke@mto.com

Jessica A. Moldovan
Lieff Cabraser Heimann & Bernstein, LLP
jmoldovan@lchb.com

A-53

A-54

Andrea Roberts Pierson
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
andrea.pierson@faegredrinker.com

Jonathan David Selbin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
jselbin@lchb.com

Paige Smith
Fegan Scott LLC
paige@feganscott.com

Ariel Tal Teshuva
Munger, Tolles & Olson LLP
ariel.teshuva@mto.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

A-54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE 1, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:23-cv-00542-SEB-MJD |
| ) | |
| NATIONAL COLLEGIATE ATHLETIC ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |

**ORDER DIRECTING ENTRY OF FINAL JUDGMENT**

On July 2, 2024, the Court dismissed Plaintiffs' complaint without prejudice, instructing them that if they elected to proceed with this litigation, they "must file an amended pleading within forty (40) days …. or final judgment will be entered, and the case dismissed with prejudice." Dkt. 270 at 52. That deadline has now passed, and Plaintiffs have not filed an amended complaint. Accordingly, Plaintiffs' claims for injunctive relief are dismissed without prejudice for lack of standing and all remaining claims are dismissed with prejudice. Final judgment shall now be entered.

IT IS SO ORDERED.

Date: 10/4/2024

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

1

A-55

Case: 24-2993    Document: 18    Filed: 01/27/2025    Pages: 155
Case 1:23-cv-00542-SEB-MJD   Document 279   Filed 10/04/24   Page 2 of 3 PageID #:
&lt;pageID&gt;

Distribution:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Nicholas Blake Alford
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Nicholas.Alford@faegredrinker.com

Hailyn Jennifer Chen
Munger, Tolles & Olson LLP
hailyn.chen@mto.com

Kristina Ann Coleman
UNITED STATES DISTRICT COURT (Indianapolis)
kristina.coleman@faegredrinker.com

Wesley P. DeVoll
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue
50th Floor
Los Angeles, CA 90071-3426

Bianca M. Eddy
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
bianca.eddy@faegredrinker.com

Lynn A. Ellenberger
Fegan Scott LLC
lynn@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT, LLC
beth@feganscott.com

Michelle A. Lamy
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
mlamy@lchb.com

Carolyn Hoecker Luedtke
MUNGER, TOLLES & OLSON LLP
carolyn.luedtke@mto.com

A-56

Jessica A. Moldovan
Lieff Cabraser Heimann & Bernstein, LLP
jmoldovan@lchb.com

Alice McKenzie Morical
Faegre Drinker Biddle & Reath LLP
alice.morical@faegredrinker.com

Andrea Roberts Pierson
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
andrea.pierson@faegredrinker.com

Jonathan David Selbin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
jselbin@lchb.com

Ariel Tal Teshuva
Munger, Tolles & Olson LLP
ariel.teshuva@mto.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

Michael von Klemperer
Fegan Scott LLC
mike@feganscott.com

A-57

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN DOE 1, et al.,                          )
                                             )
                    Plaintiffs,              )
                                             )
          v.                                 )      No. 1:23-cv-00542-SEB-MJD
                                             )
NATIONAL COLLEGIATE ATHLETIC                 )
ASSOCIATION,                                 )
                                             )
                    Defendant.               )

**JUDGMENT**

The Court having this day made its Order directing the entry of final judgment, the

Court now enters FINAL JUDGMENT.  Plaintiffs' claims for injunctive relief are

dismissed without prejudice for lack of standing and all other claims are dismissed with

prejudice.

Date:  10/4/2024                          _____
                                          SARAH EVANS BARKER, JUDGE
                                          United States District Court
                                          Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____
        Deputy Clerk, U.S. District Court

1

A-58

Distribution:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Nicholas Blake Alford
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Nicholas.Alford@faegredrinker.com

Hailyn Jennifer Chen
Munger, Tolles & Olson LLP
hailyn.chen@mto.com

Kristina Ann Coleman
UNITED STATES DISTRICT COURT (Indianapolis)
kristina.coleman@faegredrinker.com

Wesley P. DeVoll
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue
50th Floor
Los Angeles, CA 90071-3426

Bianca M. Eddy
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
bianca.eddy@faegredrinker.com

Lynn A. Ellenberger
Fegan Scott LLC
lynn@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT, LLC
beth@feganscott.com

Michelle A. Lamy
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
mlamy@lchb.com

Carolyn Hoecker Luedtke
MUNGER, TOLLES & OLSON LLP
carolyn.luedtke@mto.com

2

A-59

Case: 24-2993   Document: 18   Filed: 01/27/2025   Pages: 155
Case 1:23-cv-00542-SEB-MJD   Document 280   Filed 10/04/24   Page 3 of 3 PageID #:
&lt;pageID&gt;

Jessica A. Moldovan
Lieff Cabraser Heimann & Bernstein, LLP
jmoldovan@lchb.com

Alice McKenzie Morical
Faegre Drinker Biddle & Reath LLP
alice.morical@faegredrinker.com

Andrea Roberts Pierson
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
andrea.pierson@faegredrinker.com

Jonathan David Selbin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
jselbin@lchb.com

Ariel Tal Teshuva
Munger, Tolles & Olson LLP
ariel.teshuva@mto.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

Michael von Klemperer
Fegan Scott LLC
mike@feganscott.com

3

A-60