**No. 24-2993**

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

**JOHN DOE 1, et al.,**

*Plaintiffs-Appellants,*

*v.*

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**

*Defendant-Appellee.*

---

Appeal from United States District Court
Southern District of Indiana
Hon. Sarah Evans Barker
U.S. District Court Case No. 1:23-cv-00542

---

**BRIEF OF DEFENDANT-APPELLEE**

---

**MUNGER, TOLLES & OLSON LLP**

Carolyn Hoecker Luedtke
carolyn.luedtke@mto.com
560 Mission St., 27th Fl.
San Francisco, CA 94105
(415) 512-4000

Hailyn J. Chen
hailyn.chen@mto.com
350 S. Grand Ave., 50th Fl.
Los Angeles, CA 90071
(213) 683-9548

Ginger D. Anders
ginger.anders@mto.com
601 Massachusetts Ave. NW,
Suite 500 E
Washington, DC 20001
(202) 220-1100

Attorneys for Defendant and Appellee
National Collegiate Athletic Association

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2993</u>

Short Caption: <u>John Doe 1, et al v. NCAA, et al</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        **☑**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Collegiate Athletic Association</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Munger, Tolles & Olson LLP</u>

<u>Faegre Drinker Biddle & Reath LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

      i)      Identify all its parent corporations, if any; and

         <u>None; appellee, an unincorporated association, has no corporate parent.</u>

      ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

---

Attorney's Signature: <u>/s/ Carolyn Hoecker Luedtke</u>     Date: <u>11/18/2024</u>

Attorney's Printed Name:  <u>Carolyn Hoecker Luedtke</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address:  <u>560 Mission Street, 27th Floor, San Francisco, California 94105</u>

Phone Number: <u>(415) 512-4000</u>     Fax Number:  <u>(415) 512-4077</u>

E-Mail Address: <u>Carolyn.Luedtke@mto.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2993</u>

Short Caption: <u>John Doe 1, et al v. NCAA</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Collegiate Athletic Association</u>

 

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Munger, Tolles & Olson LLP</u>

<u>Faegre Drinker Biddle & Reath LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>None; appellee, an unicorporated association, has no corporate parent</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

---

Attorney's Signature: <u>/s/ Ginger D. Anders</u>    Date: <u>02/07/2025</u>

Attorney's Printed Name: <u>Ginger D. Anders</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>601 Massachusetts Ave. NW, Suite 500E, Washington, DC 20001-5369</u>

Phone Number: <u>202.220.1100</u>    Fax Number: <u>    </u>

E-Mail Address: <u>Ginger.Anders@mto.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As          Clear Form

Appellate Court No: <u>24-2993</u>

Short Caption: <u>John Doe 1, et al v. NCAA, et al</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>National Collegiate Athletic Association</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Munger, Tolles & Olson LLP</u>

<u>Faegre Drinker Biddle & Reath LLP</u>

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

   <u>None; appellee, an unincorporated association, has no corporate parent.</u>

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s /Hailyn J. Chen</u>   Date: <u>2/11/2025</u>

Attorney's Printed Name: <u>Hailyn  J  Chen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: <u>350 South Grand Avenue, 50th Floor, Los Angeles, California 90071</u>

Phone Number: <u>(213) 683-9100</u>   Fax Number: <u>(213) 687-3702</u>

E-Mail Address: <u>Hailyn.Chen@mto.com</u>

rev. 12/19 AK

**TABLE OF CONTENTS**

<u>Page</u>

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...................................................................1

    A.    Factual and Legal Background............................................5

    B.    Procedural History.........................................................11

SUMMARY OF ARGUMENT ................................................................14

ARGUMENT ......................................................................................17

I. The District Court Correctly Held That the Allegations in the Complaint Are Legally Insufficient to Establish That the NCAA Owed Any Duty to the Plaintiffs.........................................................................................17

    A.    The District Court Did Not Err by Deciding the Issue of Duty on the Pleadings.....................................................18

    B.    Under the Facts Alleged in the Complaint, the NCAA Did Not Voluntarily Assume a Duty to Protect Student-Athletes From Sexual Misconduct by Their Coaches...............................20

    C.    Under the Facts Alleged in the Complaint, the NCAA Does Not Owe a Common-Law Duty to Protect Student-Athletes From Sexual Misconduct by Their Coaches...............................27

        1.    The NCAA Does Not Have a Special Relationship with Coaches or Student-Athletes.......................................27

        2.    Foreseeability Considerations Do Not Support Imposing a Duty .............................................................33

        3.    Public Policy Concerns Weigh Strongly Against Imposing a Duty...........................................................38

II. Doe 1 Lacks Standing to Seek Injunctive Relief Because He Has Not Plausibly Alleged a Substantial Risk of Future Injury at His New School .............................................................................................42

CONCLUSION..................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................38

*Bennett v. Schmidt*,
153 F.3d 516 (7th Cir. 1998) ........................................................19

*Bradley v. National Collegiate Athletic Association*,
249 F. Supp. 3d 149 (D.D.C. 2017)..............................................26

*Brown v. Arizona*,
82 F.4th 863 (9th Cir. 2023) .........................................................40

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).....................................................................passim

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)..................................................................44, 45

*Cox v. Glanz*,
800 F.3d 1231 (10th Cir. 2015) ....................................................38

*Davis v. Monroe County Bd. of Educ.*,
526 U.S. 629 (1999)..........................................................................8

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........................................................................44

*Dinerstein v. Google, LLC*,
73 F.4th 502 (7th Cir. 2023) ....................................................44, 49

*Doe 1 v. Nat'l Collegiate Athletic Ass'n*,
2023 WL 105096 (N.D. Cal. Jan. 4, 2023).....................................11

*EEOC v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ........................................................19

*Franklin v. Gwinnett County Public Schools*,
503 U.S. 60 (1992).........................................................................10

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (9th Cir. 1998) ..............................................................40

*Jennings v. Univ. of North Carolina*,
  482 F.3d 686 (4th Cir. 2007) ...............................................................9

*John Doe 1, et al. v. University of San Francisco, et al.*,
  No. 3:22-cv-1559-LB (N.D. Cal.) ....................................................11, 13

*Johnson v. Allsteel, Inc.*,
  259 F.3d 885 (7th Cir. 2001) ..............................................................44

*Lac Du Flambeau Band v. Norton*,
  422 F.3d 490 (7th Cir. 2005) ..............................................................44

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................42

*Manning v. Miller*,
  355 F.3d 1028 (7th Cir. 2004) ............................................................19

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ...........................................................44, 45, 46, 47

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ......................................................................45, 46

*Pisciotta v. Old National Bancorp*,
  499 F.3d 629 (7th Cir. 2007) ..............................................................44

*Prosser v. Becerra*,
  2 F.4th 708 (7th Cir. 2021) ................................................................43

*Sierakowski v. Ryan*,
  223 F.3d 440 (7th Cir. 2000) .......................................................5, 48, 49

*Smith v. RecordQuest, LLC*,
  989 F.3d 513 (7th Cir. 2021) ..............................................................22

*Spierer v. Rossman*,
  798 F.3d 502 (7th Cir. 2015) .....................................................18, 19, 28

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).........................................................................43

*Swanigan v. City of Chicago*,
  881 F.3d 577 (7th Cir. 2018) ..........................................................43

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)..........................................................................43

STATE CASES

*Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*,
  140 N.E.3d 837 (Ind. 2020) ............................................................37

*Cowe v. Forum Group, Inc.*,
  575 N.E.2d 630 (Ind. 1991) ............................................................30

*Est. of Staggs by & through Coulter v. ADS Logistics Co.*,
  102 N.E.3d 319 (Ind. Ct. App. 2018) ....................................34, 35, 36

*Goodwin v. Yeakle's Sports Bar and Grill, Inc.*,
  62 N.E.3d 384 (Ind. 2016) .......................................................passim

*Hawn v. Padgett*,
  598 N.E.2d 630 (Ind. Ct. App. 1992) ..............................................28

*J.A.W. v. Roberts*,
  627 N.E.2d 802 (Ind. 1994) ................................................28, 30, 31

*Lanni v. Nat'l Collegiate Athletic Ass'n*,
  989 N.E.2d 791 (Ind. Ct. App. 2013) ..............................................19

*Lanni v. Nat'l Collegiate Athletic Ass'n*,
  42 N.E.3d 542 (Ind. Ct. App. 2015) .........................................passim

*Miller v. Griesel*,
  308 N.E.2d 701 (Ind. 1974) ............................................................30

*Neal v. IAB Fin. Bank*,
  68 N.E.3d 1114 (Ind. Ct. App. 2017) ..............................................28

*ONB Ins. Grp., Inc. v. Est. of Megel*,
  107 N.E.3d 484 (Ind. Ct. App. 2018) .............................35, 36, 38, 39

iv

*Putnam County Sheriff v. Price*,
    954 N.E.2d 451 (Ind. 2011) ...................................................................18

*Regents of Univ. of Cal. v. Super. Ct.*,
    413 P.3d 656 (Cal. 2018) ........................................................31, 32, 40

*Smith v. Delta Tau Delta*,
    9 N.E.3d 154 (Ind. 2014) .............................................................passim

*Webb v. Jarvis*,
    575 N.E.2d 992 (Ind. 1991) ...................................................13, 27, 42

*Williams v. Cingular Wireless*,
    809 N.E.2d 473 (Ind. Ct. App. 2004) ..........................................18, 33

*Yost v. Wabash College*,
    3 N.E.3d 509 (Ind. 2014) .............................................................passim

**FEDERAL STATUTES**

20 U.S.C. § 1681 ............................................................................passim

20 U.S.C. § 1682 ...................................................................................9, 40

36 U.S.C. § 220541 ...................................................................................41

36 U.S.C. § 220542 ...................................................................................41

42 U.S.C. § 1988 ...............................................................................10, 40

**STATE STATUTES**

Cal. Educ. Code § 66281.8 ..................................................................10, 40

Cal. Educ. Code § 66281.9 ..................................................................10, 40

Mass. Gen. Laws Ann. Chapter 6, § 168E...............................................40

**FEDERAL REGULATIONS**

34 C.F.R. § 106.4 ...................................................................................9, 40

34 C.F.R. § 106.8 .......................................................................................9

34 C.F.R. § 106.44 .....................................................................................9

v

**TREATISES**

Restatement (Second) of Torts § 315 (Am. Law Inst. 1965)..................................28

Restatement (Third) of Torts § 37 (Am. Law Inst. 2012) .......................................28

Restatement (Third) of Torts § 40 (Am. Law Inst. 2012) .......................................28

Restatement (Third) of Torts § 41 (Am. Law Inst. 2012) .......................................28

**OTHER AUTHORITIES**

2020–21 NCAA Division I Manual,
     https://www.ncaapublications.com/productdownloads/D121.pdf
     (last visited April 9, 2025) .........................................................................passim

California State Auditor, Report 2017-125: University of California
     (June 21, 2018), available at
     https://information.auditor.ca.gov/reports/2017-125/index.html .......................10

California State Auditor, Report 2022-109: California State University
     (July 18, 2023), available at
     https://information.auditor.ca.gov/reports/2022-109/index.html .......................10

U.S. Dept. of Health & Human Services, Voluntary Resolution
     Agreement with Michigan State University (Aug. 6, 2019),
     available at https://www.hhs.gov/sites/default/files/vra-between-
     msu-and-ocr.pdf...............................................................................................10

U.S. Dept. of Justice Civil Rights Division, Resolution Letter and
     Agreement with San Jose State University (Sept. 21, 2021),
     available at https://www.justice.gov/archives/opa/pr/justice-
     department-reaches-16m-agreement-remedy-title-ix-violations-
     san-jos-state-university; ...................................................................................9

U.S. Dept. of Justice Civil Rights Division, Resolution Letter and
     Agreement with University of Maryland, Baltimore County
     (Apr. 3, 2024), available at https://www.justice.gov/archives/opa/
     pr/justice-department-secures-414-million-settlement-student-
     athletes-remedy-title-ix; ...................................................................................9

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Appellants' brief is complete and correct.

## STATEMENT OF THE ISSUES

1.     Did the district court err in concluding that Plaintiffs-Appellants failed to plausibly allege that the National Collegiate Athletic Association (NCAA) owes a legal duty to protect student-athletes from sexual misconduct by coaches and athletics personnel at their colleges and universities?

2.     Did the district court err in concluding that Plaintiff-Appellant John Doe 1 lacks standing to seek injunctive relief because he failed to plausibly allege a substantial risk of future injury?

## STATEMENT OF THE CASE

Plaintiffs-Appellants John Doe 1, John Doe 2, and John Doe 3 ("Appellants") are former baseball players at the University of San Francisco ("USF"), who allege that their coaches sexually harassed them during their time on the team.  Appellants are pursuing claims against the coaches and USF under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*., as well as under state statutory and common law, in a separate action in the Northern District of California. In this case, they seek to hold the NCAA accountable for the harm they suffered at USF, asserting (as relevant here) Indiana common-law negligence claims premised

1

on the theory that the NCAA has a wide-ranging duty to protect student-athletes from sexual misconduct committed by their coaches.

Sexual abuse and harassment on college and university campuses is a serious problem. This case, however, is not about whether Appellants will receive *any* redress for their alleged injuries—it is undisputed that Title IX and state law provide direct remedies against universities and their employees for sexual misconduct. Instead this case is about whether the NCAA—a nationwide voluntary unincorporated association with no day-to-day management and supervision over its member institutions' employees and no presence on college campuses—can be held liable under Indiana law for negligence in failing to prevent the alleged abuse.

Binding Indiana precedent clearly establishes that the answer is no. As the Complaint acknowledges, the NCAA's governing documents provide that the NCAA exercises only the authority delegated to it by its member institutions, and those institutions have specifically retained for themselves responsibility for fostering student-athlete well-being. That makes sense: it is the colleges and universities that vet, hire, and fire coaching staff; that maintain the programs and premises on which coach-student interactions occur; and that are required by federal and state law to prevent and address sexual misconduct. With over 1,000 member institutions that collectively house nearly 20,000 sports teams involving almost half a million student-athletes plus their coaches across fifty states, the NCAA does not

and cannot exercise day-to-day supervisory authority over coach interactions with student-athletes. So the member institutions have sensibly retained that responsibility for themselves. In materially identical circumstances, the Indiana Supreme Court and lower courts have repeatedly held that nationwide membership organizations (including the NCAA itself) that do not exercise day-to-day control over operations and individuals at their local chapters do not owe a duty of care to prevent alleged injuries occurring in those local chapters. *See, e.g., Yost v. Wabash College*, 3 N.E.3d 509, 521 (Ind. 2014); *Smith v. Delta Tau Delta*, 9 N.E.3d 154, 163 (Ind. 2014); *Lanni v. Nat'l Collegiate Athletic Ass'n*, 42 N.E.3d 542, 552–53 (Ind. Ct. App. 2015) (*Lanni II*).

Appellants' arguments on appeal wholly ignore the basic allocation of responsibility between the NCAA and its member institutions, and the NCAA's consequent lack of the day-to-day direct control that is dispositive under Indiana law. Appellants emphasize throughout that the NCAA has adopted rules governing various aspects of intercollegiate athletics—in particular, rules that ensure consistency and a level playing field among all institutions—and that it has the authority to enforce them. But *Yost* and its progeny establish that such rules, without more, do not as a matter of law establish the kind of direct control that would make the NCAA responsible for the actions of individual coaches.

The NCAA is, of course, committed to supporting its member institutions in their efforts to eradicate sexual misconduct on their campuses—but it must do so within the confines of its delegated authority. The NCAA thus supports member institutions with resources those institutions can use on their respective campuses to combat misconduct. For example, as Plaintiffs acknowledge, the NCAA has assembled commissions to bring attention to the subject and developed publications and model policies that campuses and athletics departments can use. But that does not mean that the NCAA should be liable in tort for actions over which the member institutions have expressly retained responsibility. To impose liability on the NCAA under the circumstances alleged in the Complaint would "abandon the notion of liability based on negligence and enter the realm of strict liability in tort," contrary to Indiana's public policy. *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E.3d 384, 394 (Ind. 2016). The district court therefore correctly held that the facts alleged in the Complaint did not give rise to any duty on the NCAA's part, and this Court should affirm that ruling.

The district court also correctly struck Doe 1's request for prospective relief for lack of standing. Doe 1 has transferred away from USF, and his allegations that he could face similar sexual harassment by a different coaching staff at his new school are entirely speculative. Doe 1 does not allege that coaches at his new school have engaged in such conduct, or that the school maintains policies that would

4

permit or foster it. The Supreme Court and this Court have consistently held that such speculative allegations of future injury in fact inflicted by third parties are insufficient to establish standing. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Sierakowski v. Ryan*, 223 F.3d 440 (7th Cir. 2000). The district court correctly applied those settled principles.

### A.    Factual and Legal Background

1.    The NCAA is a voluntary, unincorporated association created by colleges and universities across the country to administer intercollegiate athletic competition. First Amended Complaint ("Complaint" or "FAC") ¶ 29. Over 1,000 member institutions make up the NCAA, and nearly half a million student-athletes on almost 20,000 teams compete in NCAA sports each year. *Id.* ¶¶ 29, 67. Member institutions have adopted the NCAA Constitution, which sets forth basic principles governing intercollegiate athletics and a legislative process for enacting additional bylaws. *Id.* ¶¶ 74–76. The NCAA Constitution and bylaws are included in an NCAA Manual (the "Manual") published each year.[1]

The NCAA is able to act only where its member institutions have expressly delegated authority to it. Conversely, it cannot act where members have retained

---

[1] This brief cites the 2020–21 NCAA Division I Manual, which was incorporated by reference in the Complaint. *See* FAC ¶¶ 71–83. The Manual is included in the NCAA's supplemental appendix, and is also available at https://www.ncaapublications.com/productdownloads/D121.pdf (last visited April 9, 2025). The parties agree that the Court may consider the Manual. *See* Br. 10 n.4.

responsibility for themselves. Indeed, one of the core principles in the NCAA Constitution is the Principle of Institutional Control and Responsibility. Manual § 2.1. That principle states that "[i]t is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association," and that "[t]he institution's responsibility for the conduct of its intercollegiate athletics program includes responsibility for the actions of its staff members and for the actions of any other individual or organization engaged in activities promoting the athletics interests of the institution." *Id.* § 2.1.1 & 2.1.2.

Another core principle is the Principle of Student-Athlete Well-Being. Manual § 2.2. That principle states that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes." FAC ¶ 75 (citing Manual § 2.2). But as the Complaint acknowledges, member institutions have not delegated responsibility for student-athlete well-being to the NCAA: "It is the responsibility *of each member institution* to protect the health of, and provide a safe environment for, each of its participating student-athletes," and "to establish and maintain an environment that fosters [a] positive relationship between the student-athlete and coach." *Id.* ¶ 75 (citing Manual § 2.2.3 & 2.2.4 (emphasis added)); *see also id.* ¶¶ 100, 114.

6

Member institutions also use the NCAA's legislative process to establish rules and regulations ("bylaws") governing intercollegiate athletic competition. *See generally* FAC ¶¶ 79–80. Those bylaws cover subjects like recruiting; athletics and academic eligibility; financial aid; awards, benefits, and expenses for enrolled student-athletes; and the rules governing playing and practice seasons for each sport. Manual arts. 12–17. Some bylaws address ethical conduct, prohibiting, for example, sports wagering, use of banned drugs, and providing improper financial incentives to prospective student-athletes. *Id.* § 10.1–10.3. The bylaws also impose certain additional rules on athletics personnel, such as requiring disclosure of outside income from athletics apparel and equipment companies, prohibiting use of tobacco at competitions and practices, and adopting certification requirements for strength and conditioning coaches. *Id.* § 11.1.

When the NCAA has a bylaw governing a subject, it can enforce that bylaw through an infractions program that can impose sanctions on member institutions and individuals. *See generally* Manual art. 19. To assist in their compliance efforts, member institutions also "designate an individual to serve as faculty athletics representative." *Id.* § 6.1.3. As the Complaint alleges, the "Faculty Athletic[s] Representative is a member of the faculty at an NCAA member institution who has been designated by the institution to serve as a liaison between the institution and the athletics department, and also as a representative of the institution in conference

7

and NCAA affairs." FAC ¶ 159; *see id.* ¶¶ 160–165. Consistent with the principle of local institutional control, the NCAA Constitution states that the "[d]uties of the faculty athletics representative shall be determined by the member institution." Manual § 6.1.3.

Because member institutions have not delegated to the NCAA authority to oversee and protect the well-being of individual student-athletes, member institutions are responsible under the NCAA Constitution for addressing the problem of sexual misconduct on their campuses. The NCAA is committed to supporting its member institutions' efforts. Consistent with its limited role, the NCAA has assembled commissions to bring attention to the subject, provided its member institutions with educational resources, and developed publications and model policies that college and university athletics departments may use. *See, e.g.*, FAC ¶¶ 95–103.

2.    Member institutions are required by federal law to prevent and remedy sexual misconduct on their campuses. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, provides that "[n]o person" shall be subject to discrimination "on the basis of sex" under an educational program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). That prohibition extends to sexual harassment and other forms of sexual misconduct. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). Accordingly, Title IX

imposes obligations on all colleges and universities receiving federal funds to prevent, redress, and remediate sexual misconduct on their campuses, including misconduct committed by athletics personnel. *See, e.g.*, *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 691 (4th Cir. 2007). Specifically, colleges and universities must adopt and publish policies prohibiting sexual misconduct and implement a fair and impartial process for investigating and adjudicating complaints and imposing disciplinary sanctions. *See* 34 C.F.R. §§ 106.8, 106.44.

Those obligations are enforced through oversight by federal agencies and private civil litigation. Title IX conditions the receipt of federal financial assistance on an educational program's compliance with its non-discrimination mandate, and any federal department or agency extending such assistance is empowered to enforce the statute. 20 U.S.C. § 1682; 34 C.F.R. § 106.4. The Department of Education's Office of Civil Rights, the Department of Health and Human Services, and the Department of Justice primarily enforce Title IX through resolution agreements and consent decrees, although termination of federal funding is an available sanction in certain circumstances.[2] 20 U.S.C. § 1682; 34 C.F.R. § 106.4. Title IX also gives

---

[2] For examples of recent resolution agreements based on Title IX violations in university athletics programs, see, e.g., U.S. Dept. of Justice Civil Rights Division, Resolution Letter and Agreement with San Jose State University (Sept. 21, 2021), available at https://www.justice.gov/archives/opa/pr/justice-department-reaches-16m-agreement-remedy-title-ix-violations-san-jos-state-university; U.S. Dept. of Justice Civil Rights Division, Resolution Letter and Agreement with University of Maryland, Baltimore County (Apr. 3, 2024), available at https://www.justice.gov/

aggrieved individuals a private right of action, including for damages, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992), and a prevailing party may recover attorneys' fees, *see* 42 U.S.C. § 1988.

Many member institutions are also subject to state laws that impose similar requirements to prevent and address sexual misconduct on their campuses. California, for example, where USF is located, conditions state financial assistance to postsecondary institutions on compliance with both Title IX and a host of additional state-specific measures designed to prevent and remedy the effects of sexual harassment.  *See* Cal. Educ. Code §§ 66281.8, 66281.9.  In recent years, the California State Auditor's Office has enforced those state-level obligations through audits of California-based university systems, resulting in extensive reports documenting issues and prescribing steps to improve compliance with federal and state law.[3]

---

archives/opa/pr/justice-department-secures-414-million-settlement-student-athletes-remedy-title-ix; U.S. Dept. of Health & Human Services, Voluntary Resolution Agreement with Michigan State University (Aug. 6, 2019), available at https://www.hhs.gov/sites/default/files/vra-between-msu-and-ocr.pdf.

[3] *See* California State Auditor, Report 2022-109: California State University (July 18, 2023), available at https://information.auditor.ca.gov/reports/2022-109/index.html; California State Auditor, Report 2017-125: University of California (June 21, 2018), available at https://information.auditor.ca.gov/reports/2017-125/index.html.

**B.    Procedural History**

1.    Appellants (Does 1–3) and their co-plaintiffs were fourteen current and former student-athletes who played baseball at the University of San Francisco ("USF") between 1999 and 2022.  *See* FAC ¶¶ 15–28.  They allege that throughout that 23-year period, the baseball coaches at USF created a sexualized and abusive team environment.  *Id.* ¶ 5; *see generally id.* ¶¶ 120–470.  They also allege that the NCAA had constructive knowledge of the abusive culture at USF based on reports to USF's Faculty Athletics Representative ("FAR") in 2014 and 2016 and the USF baseball program's high rate of attrition.  *Id.* ¶¶ 166–188.  Appellants no longer attend USF, as they have transferred to other schools.  *Id.* ¶¶ 4, 94, 260, 476.

Appellants originally filed a lawsuit against their coaches, USF, and the NCAA in the Northern District of California.  After the court dismissed the claims against the NCAA for lack of personal jurisdiction, *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 105096, at *1 (N.D. Cal. Jan. 4, 2023), Appellants brought this action in the Southern District of Indiana.  Appellants continue to pursue state statutory and common-law claims and a claim under Title IX against their coaches and USF in California.  *See John Doe 1, et al. v. University of San Francisco, et al.*, No. 3:22-cv-1559-LB (N.D. Cal.).

The FAC, the operative complaint here, asserts claims against the NCAA under theories of negligence, breach of contract, and breach of fiduciary duty; and

under a theory of vicarious liability for the coaches' and USF's intentional infliction of emotional distress. FAC ¶¶ 525–618. Appellants sought damages for themselves and declaratory and injunctive relief on behalf of a nationwide class of all NCAA student-athletes. *Id.* ¶ 516 & § VIII (Prayer for Relief). The requested injunction would have required the NCAA to enact policies and procedures to prevent and redress sexual misconduct committed by athletics personnel against student-athletes on college and university campuses. *See id.* § VIII (Prayer for Relief).

2.     The district court granted the NCAA's motion to dismiss the entire action on July 2, 2024. SA-2. The court dismissed the claims of all plaintiffs except Appellants Does 1–3 as time-barred under the statute of limitations. Those plaintiffs have not appealed that ruling.

With respect to the merits of Appellants' claims, the court concluded that the FAC failed to state a claim against the NCAA under any theory of liability. As relevant to this appeal, the court dismissed the negligence claims because Appellants failed to plausibly allege that the NCAA either had voluntarily assumed a duty to protect them or owed them such a duty under the common law.[4] SA-25 (listing negligence theories); SA-25–41. The court explained that in order to assume a duty of care under Indiana law, the defendant must have specifically undertaken to

---

[4] Appellants have not appealed the dismissal of their contract claims.

perform the services in question, SA-29, and must have assumed "responsibility and control over the day-to-day management and supervision of college coaches' daily interactions and relationships with student-athletes." SA-30. The court concluded that Appellants had not alleged that the NCAA had undertaken to protect student-athletes from sexual misconduct by coaches, and that the NCAA's rules governing other aspects of collegiate sports, including recruiting and wagering, did not suggest that the NCAA exercised the necessary control over the relationship of coaches and student-athletes. *Id.*

The court also held that the Complaint did not allege facts giving rise to a common-law duty. The court explained that Indiana law required "consideration of: (1) the relationship between the parties; (2) the reasonable foreseeability of the harm; and (3) public policy concerns." SA-35 (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991)). The court held that Appellants had not alleged facts suggesting that the NCAA had either a special relationship with students such that the NCAA had a responsibility to protect them, or a special relationship with coaches such that the NCAA had a responsibility to control their conduct. SA-36–37 (citing *Yost v. Wabash Coll.*, 3 N.E.3d 509, 521 (Ind. 2014)). In considering foreseeability, the court observed that sexual misconduct by coaches against student-athletes is generally foreseeable, but that it was not "sufficiently likely" to give rise to a duty under Indiana law. SA-39. Public policy concerns did not weigh in favor of

13

imposing a duty, the court concluded, because the NCAA's member institutions, not the NCAA itself, were in the best position to regulate and prevent sexual misconduct. SA-40.

The district court also held that Appellants lacked standing to pursue prospective relief against the NCAA because they had departed USF and were attending, or planned to attend, other NCAA-member organizations. SA-6–14. The court explained that Appellants had not plausibly alleged a substantial risk of harm at their new schools due to the NCAA's failure to enact sexual misconduct regulations.[5] SA-13.

## SUMMARY OF ARGUMENT

The district court correctly dismissed Appellants' negligence claims for failure to plausibly allege a duty of care, and correctly concluded that Doe 1 lacked standing to seek prospective relief. The Court should affirm.

I.      The district court correctly held that the facts alleged in the Complaint did not give rise to a duty of care obligating the NCAA—a nationwide membership organization that exercises only those authorities delegated to it by its member

---

[5] Because the claims of Does 2 and 3 have since become moot, Br. 9 n.3, only Doe 1 appeals the district court's holding that he lacked standing to seek prospective relief.

institutions—to prevent sexual misconduct by coaches on well over a thousand campuses.

Contrary to Appellants' arguments, the district court did not err by deciding the existence of a duty at the motion to dismiss stage. This Court has affirmed decisions doing exactly that, and the district court simply applied well-established pleading standards in concluding that the alleged facts, taken as true, are insufficient to give rise to any duty under Indiana law.

Appellants failed to plead facts establishing that the NCAA voluntarily assumed a duty to protect nearly half a million student-athletes across the country from sexual misconduct perpetrated by their coaches. Indiana precedent establishes that to voluntarily assume a duty, the defendant must have specifically undertaken to perform the services in question. Appellants, however, allege that the NCAA has *not* undertaken to protect student-athletes from sexual misconduct from coaches, as the NCAA Constitution establishes that that responsibility lies with colleges and universities—who are required by Title IX to prevent and address sexual misconduct. In addition, to assume the type of duty charged here, the defendant must exercise day-to-day oversight and control over the third party causing harm. But Indiana decisions definitively establish that the NCAA rules and bylaws on which Appellants rely are legally insufficient to establish the direct, day-to-day supervisory authority required to assume a duty.

15

Appellants also failed to plausibly allege the existence of a common-law duty. The NCAA does not have a special relationship with either individual coaches, who are employed by college athletics programs rather than the NCAA, or student-athletes, whose educational and athletic experiences are overseen by their colleges or universities rather than the NCAA. Although sexual misconduct by coaches is foreseeable as a general matter, Indiana law considers foreseeability in conjunction with the defendant's role, and here the NCAA's lack of day-to-day control over coaches and student-athletes prevents foreseeability from weighing in favor of imposing a duty. Finally, public policy concerns weigh strongly against imposing a duty, given that it is the student-athletes' colleges and universities, not the NCAA, that exercise control over their athletics staff and campuses and are therefore best positioned to protect student-athletes from harm.

II. Doe 1 lacks standing to seek prospective relief because his assertion that he continues to face a substantial risk of sexual misconduct is entirely speculative. Doe 1 has transferred away from USF, and he has not alleged that his current coaches are likely to engage in sexual misconduct or that his new school is unlikely to comply with its Title IX obligations to prevent and redress such behavior. Doe 1 therefore has failed to allege a substantial, non-speculative risk of future harm under well-established standing precedent. *See, e.g.*, *Lyons*, 461 U.S. at 102. Indeed, accepting Doe 1's standing arguments would mean that the nearly 500,000 student-athletes

currently enrolled at NCAA institutions would have standing to seek prospective relief against the NCAA with respect to sexual misconduct—without any showing that they faced any risk of being subject to such conduct.  The district court correctly rejected that near-limitless theory of standing.

## ARGUMENT

**I.    The District Court Correctly Held That the Allegations in the Complaint Are Legally Insufficient to Establish That the NCAA Owed Any Duty to the Plaintiffs.**

Appellants' arguments that the district court should have held that the NCAA owed Appellants a duty to prevent sexual misconduct by coaches ignore the fundamentally limited nature of the NCAA's role as a nationwide voluntary association exercising authority delegated by its member institutions.  Under the NCAA's Constitution, responsibility for day-to-day well-being of student-athletes rests with *colleges and universities*, who are in the best position to foster and protect the well-being of their students and are required by federal law to prevent and remedy sexual misconduct.  The NCAA, by contrast, lacks any role in or authority over the day-to-day interactions between coaches and student-athletes.  Those basic points—undisputed, alleged in the Complaint, and established by NCAA governing documents incorporated by reference in the Complaint—foreclose imposing on the NCAA a duty to prevent coach sexual misconduct, either as a matter of voluntary assumption or the common law.

17

**A.     The District Court Did Not Err by Deciding the Issue of Duty on the Pleadings**

Appellants contend at some length that the existence of a duty to Appellants is, as a per se matter, not susceptible to resolution at the motion to dismiss stage. That is simply incorrect. This Court has adjudicated the existence of a duty of care at the motion to dismiss stage, affirming the dismissal of a plaintiff's negligence claims under Indiana law after concluding that the factual allegations in the complaint, even if proven, would not establish a duty. *Spierer v. Rossman*, 798 F.3d 502, 510–13 (7th Cir. 2015). As this Court explained, although "the existence and extent of an assumed duty is generally a question of fact for the jury, it may be resolved as a matter of law if the designated evidence is insufficient to establish an injury." *Id.* at 511. Indiana courts frequently take the same approach. *See, e.g.*, *Putnam County Sheriff v. Price*, 954 N.E.2d 451, 455–56 (Ind. 2011); *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476–79 (Ind. Ct. App. 2004).

That should be unsurprising. As the Indiana Supreme Court has explained, "whether a set of facts gives rise to the existence of duty is a judicial determination." *Yost*, 3 N.E.3d at 517. Therefore, where "the record contains insufficient evidence to establish such a duty, the court will decide the issue as a matter of law." *Id.* (citation omitted). Appellants complain that the district court relied on summary-judgment cases like *Yost* and its progeny in dismissing the Complaint, Br. 33–34, but there is nothing improper about that routine practice: those summary-judgment

18

cases establish the legal standards governing whether the relevant duties arise and the facts necessary to establish those duties. To be sure, at the motion-to-dismiss stage, the court evaluates the legal sufficiency of the *allegations*, "accepted as true," while at the summary-judgment stage, the court evaluates the legal sufficiency of the undisputed *evidence*. *Spierer*, 798 F.3d at 510; *Yost*, 3 N.E.3d at 516 (on summary judgment, undisputed evidence did not give rise to duty). But either way, the basic question is whether the facts are legally sufficient to create a duty of care under the relevant legal standards. And here, the district court correctly concluded that the allegations in the Complaint, taken as true, were legally insufficient to establish any duty of care.[6] *See, e.g.*, SA-6; SA-31; SA-40; *see also Spierer*, 798 F.3d at 510.

---

[6] The cases on which Appellants rely do not suggest that a court may never dismiss a complaint for failure to adequately plead the existence of a duty. Br. 33–35. *Lanni v. National Collegiate Athletic Association*, 989 N.E.2d 791 (Ind. Ct. App. 2013) (*Lanni I*), concerned the trial court's procedural error under an Indiana rule governing when a motion to dismiss should be treated as a motion for summary judgment. The remaining cases involved whether specific allegations adequately stated a claim, often under pre-*Twombly* pleading standards. *See, e.g., Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998) (reversing dismissal of employment discrimination claim under pre-*Twombly* pleading standard); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 780 (7th Cir. 2007) (affirming dismissal of Title VII unlawful retaliation claim); *Manning v. Miller*, 355 F.3d 1028, 1031 (7th Cir. 2004) (deciding issues of absolute and qualified immunity on the pleadings).

19

**B.    Under the Facts Alleged in the Complaint, the NCAA Did Not Voluntarily Assume a Duty to Protect Student-Athletes From Sexual Misconduct by Their Coaches**

Appellants have failed to allege facts that, if true, would establish that the NCAA voluntarily assumed "a duty to regulate sexual misconduct by coaches and athletics personnel." Br. 36; FAC ¶¶ 577–578.

1.    Under Indiana law, "[a] duty of care may arise where one party assumes such a duty, either gratuitously or voluntarily." *Yost*, 3 N.E.3d at 517 (cleaned up & citation omitted). As the "voluntary" label suggests, the duty of care arises only when the party affirmatively chooses to take on the duty in question. "The assumption of such a duty requires affirmative, deliberate conduct such that it is 'apparent that the actor specifically undertook to perform the task that he is charged with having performed negligently.'" *Id.* (cleaned up & citations omitted). The court must "identify and focus on the specific services undertaken," because "liability attaches only for the failure to exercise reasonable care in conducting the 'undertaking.'" *Id.*

The Supreme Court of Indiana has addressed the assumption of a duty of care in circumstances analogous to those at issue here. In *Yost*, a fraternity pledge was injured during a hazing incident at a fraternity house, and he sued the national fraternity organization (among others), alleging that the national organization had assumed a duty to protect him from hazing. The court rejected that argument. The

20

court acknowledged that "the national fraternity strongly disapproved of hazing and promoted gentlemanly behavior in its printed charters and bylaws through its aspirational enactments and promotional materials"; that it provided educational instruction on the dangers of hazing; and that it had authority to suspend and discipline individual fraternity chapters and members. *Id.* at 520. Critically, however, the national organization's "specific undertaking did not extend to *actual oversight and control* over the behavior of individual student members of the local fraternity." *Id.* at 521 (emphasis added).

Subsequently, in *Smith v. Delta Tau Delta*, the Indiana Supreme Court explained that the sine qua non of an assumed duty "to ensure the safety of … pledges at the local fraternity" was assumption of "a right to exercise *direct day-to-day oversight and control* of the behavior of the activities of the local fraternity and its members." 9 N.E.3d 154, 163 (Ind. 2014) (emphasis added). There, the national fraternity regulated hazing and underage drinking through its constitution, bylaws, and membership responsibility guidelines, which could be enforced by suspending local chapters and disciplining individual members. *Id.* at 161–63. Despite those "robust and extensive" measures, the court held that "the specific services assumed by the national fraternity did not rise to the level of assuring protection of the freshman pledges from hazing and the dangers of excessive alcohol consumption" because the national fraternity lacked any "direct day-to-day oversight and control"

21

over the behavior of individual fraternity members towards each other. *Id.* at 163. The national fraternity did have "a duty of reasonable care in the performance of its assumed duty of providing information and guidance." *Id.* But its provision of that guidance did not "demonstrate any assumption of a duty directly to supervise and control the actions of the local fraternity and its members." *Id.*

Finally, in *Lanni v. National Collegiate Athletic Association*, the Indiana Court of Appeals applied *Yost* and *Smith* to hold that the NCAA had not assumed any duty to protect student-athletes from injuries at sporting events. 42 N.E.3d 542, 552–53 (Ind. Ct. App. 2015) (*Lanni II*); *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021) (in applying state law, "we consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree" (citation omitted)). Despite the NCAA's maintenance of rules and procedures governing safety at fencing matches, *Lanni II*, 42 N.E.3d at 545, the court held that the "[a]ctual oversight and control" required by *Yost* and *Smith* "cannot be imputed merely from the fact that the NCAA" has facilitated the adoption of "rules and regulations" and its membership "require[s] compliance with [them]," *id.* at 553. Therefore, the court concluded, "[t]he NCAA's conduct does not demonstrate that it undertook or assumed a duty to actually oversee or directly supervise the actions of the member institutions and the NCAA's student-athletes" at sporting events. *Id.*

22

2.      The Complaint fails to allege facts raising any plausible inference that the NCAA specifically undertook the duty of protecting student-athletes from their coaches on over a thousand campuses around the country.  The Complaint contains no allegations whatsoever that the NCAA exercises "day-to-day oversight and control" over the relationship between student-athletes and their coaches.  *Smith*, 9 N.E.3d at 163.  To the contrary, NCAA governing documents cited in the Complaint *foreclose* any conclusion that the NCAA exercises the necessary day-to-day control.

a.      Appellants rely heavily on their allegations that the NCAA Manual states that intercollegiate "athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes."  Br. 37.  But general pronouncements on safety, and general standards of conduct, are not sufficient to impute a specific undertaking to prevent injuries to student-athletes.  *Lanni II*, 42 N.E.3d at 553; *Smith*, 9 N.E.3d at 163.  Moreover, the Complaint itself acknowledges that the NCAA's Constitution (which is contained in the Manual) states that "[i]t is *the responsibility of each member institution*" to "protect the health of, and provide a safe environment for, each of its participating student-athletes" and to ensure they have "positive relationship[s]" with their coaches.  FAC ¶ 75 (emphasis added) (citing Constitution §2.2.3–2.2.4); *see also* FAC ¶ 100 (alleging that member institutions bear sole "responsibility for ensuring college student-athlete environments are safe and healthy").  The Complaint's

allegations thus foreclose any inference that the NCAA has voluntarily assumed any duty to exercise control and supervision over relationships between individual student-athletes and coaches. That responsibility is clearly reserved to the member institutions.

Appellants also rely on congressional testimony by the NCAA's former president that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." Br. 37. But the law is clear that such "aspirational" statements also are insufficient to show the NCAA specifically undertook to protect student-athletes from sexual misconduct by their coaches. *Yost*, 3 N.E.3d at 520.

b.    Appellants next point to the Manual's more specific rules governing certain aspects of athlete and coach conduct, including certification requirements for strength and conditioning coaches, restrictions on marketing and scouting activities, use of nutritional supplements, and marketing of student-athletes to agents and professional sports teams. Br. 12; Br. 38 (citing Bylaws 11.1.4, 13.11.3.8.1, 16.5.2.7, & 17.1.7). As an initial matter, many of the rules cited by Appellants are irrelevant to the specific duty the NCAA is alleged to have assumed. To assume a duty, the defendant must "specifically under[take] to perform *the task that he is charged with having performed negligently*." *Yost*, 3 N.E.3d at 517 (emphasis added). Rules that have nothing to do with protecting student-athletes from sexual

24

misconduct have no bearing on whether the NCAA assumed *that* specific duty. Appellants attempt to turn that point on its head, complaining that the NCAA has regulated in other areas but has "fail[ed] to take steps to regulate in *this one area*." Br. 39. That misapprehends the role of the *voluntary* duty doctrine, which is to permit liability when the defendant has affirmatively assumed the duty in question. The common-law duty doctrine, by contrast, can *impose* a duty when the defendant has not assumed it voluntarily (though Appellants have failed to satisfy that doctrine's requirements as well).

In all events, that the NCAA's members enact rules and enforce them is insufficient as a matter of law to establish that the NCAA assumed a duty to supervise coaches' interactions and relationships with student-athletes. National-organization rules—even rules governing the conduct that allegedly caused the plaintiff's injury—do not give rise to the necessary "direct day-to-day oversight and control of the [tortfeasors'] behavior." *Smith*, 9 N.E.3d at 163. In *Smith*, *Yost*, and *Lanni*, the defendant national organization had promulgated rules governing the conduct in question (hazing, safety at sporting matches) and had the power to enforce those rules through discipline—but the courts held that those rules and enforcement powers did not establish the necessary day-to-day control. *Lanni II*, 42 N.E.3d at 553; *Smith*, 9 N.E.3d at 162–63. NCAA rules governing general athletics administration, including the requirement that student-athletes who wish to transfer

25

disclose their disciplinary record with respect to sexual misconduct, Br. 39–40 (citing FAC ¶¶ 89, 106–07), are therefore insufficient to raise a plausible inference that the NCAA exercised the day-to-day control necessary to assume a duty to protect student-athletes from their coaches.

Appellants do not identify, and their Complaint does not contain, any other allegations raising an inference that the NCAA exercised direct day-to-day control over the relationships between student-athletes and their coaches at over a thousand member institutions. Br. 38–40. Instead, they argue that *Smith*, *Yost*, and *Lanni* are distinguishable. The only purported basis they offer is the conclusory assertion that "[h]ere, Appellants plausibly alleged that the NCAA had precisely that actual oversight and control over the behavior of coaches and athletics personnel (and student-athletes)." Br. 41; *id*. at 42. But those decisions establish otherwise, for the reasons stated above. Appellants also cite a single district court case declining to dismiss a complaint against the NCAA, *Bradley v. National Collegiate Athletic Association*, 249 F. Supp. 3d 149 (D.D.C. 2017), but that decision held that the plaintiff had adequately alleged that the NCAA's conduct had *caused* its injuries— not, as Appellants would have it, that the "plaintiff pleaded sufficient facts to establish the NCAA had a duty." Br. 40; *Bradley*, 249 F. Supp. 3d at 167 n.8 (explaining that the NCAA "predicate[d] its argument solely on the causation element of a negligence claim" and forfeited any argument with respect to duty by

26

"failing to address" that issue). Thus, Appellants have not identified a single case holding that a national organization's facilitation of its members' adopting and enforcing rules and bylaws constitutes voluntary assumption of a duty to oversee, and prevent harm arising from, misconduct that might occur at local member institutions. This case should not be the first.

## C. Under the Facts Alleged in the Complaint, the NCAA Does Not Owe a Common-Law Duty to Protect Student-Athletes From Sexual Misconduct by Their Coaches

The district court correctly held that Appellants' allegations do not state facts giving rise to a common-law duty. To determine whether a common-law duty of care exists, Indiana courts evaluate three factors: (1) the relationship between the parties, (2) public policy concerns, and (3) the foreseeability of the harm alleged. *Webb. v. Jarvis*, 575 N.E.2d 992, 995–97 (Ind. 1991). The district court correctly concluded that none of those factors weigh in favor of imposing a common-law duty on the NCAA to protect student-athletes from sexual misconduct committed by their coaches.

### 1. The NCAA Does Not Have a Special Relationship with Coaches or Student-Athletes

By far the most important of the *Webb* factors is the relationship between the parties. That is because, generally speaking, Indiana courts will refuse to recognize a duty to control the conduct of a third-party tortfeasor unless there is a special relationship (1) between the defendant and the third party that gives rise to a duty to

27

"control the third person's conduct," or (2) between the defendant and the plaintiff that gives the plaintiff a "right to protection." *Neal v. IAB Fin. Bank*, 68 N.E.3d 1114, 1118 (Ind. Ct. App. 2017); *J.A.W. v. Roberts*, 627 N.E.2d 802, 809 (Ind. 1994) ("Absent a special relationship between a plaintiff and a defendant, we will not impose a duty on the defendant to take affirmative steps to prevent harm to the plaintiff."); *Spierer*, 798 F.3d at 512 ("'Indiana courts have shown great reluctance to require an individual to take any action to control a third party when there is no special relationship between them.'" (quoting *Hawn v. Padgett*, 598 N.E.2d 630, 634 (Ind. Ct. App. 1992))).[7] Here, Appellants have failed to plausibly allege either special relationship.

**Relationship with Coaches.** *Yost* establishes that the existence of a special relationship entailing "control" over third parties' conduct, *Neal*, 68 N.E.3d at 1118, requires the same sort of day-to-day control as in the assumed-duty analysis. *Yost*, 3 N.E.3d at 521. The *Yost* court held that the national fraternity lacked a special relationship with control over individual fraternity members because the national fraternity "did not have any employees present in the fraternity house, and the day-

---

[7] That established common-law principle is also reflected in the Restatement (Second) and Restatement (Third) of Torts, which Indiana courts follow. Restatement (Second) of Torts § 315 (Am. Law Inst. 1965); Restatement (Third) of Torts §§ 37, 40, 41 (Am. Law Inst. 2012); *see Neal*, 68 N.E.3d at 1118 & n.3 (citing Restatement (Second)); *Yost*, 3 N.E.3d at 517 (citing Restatement (Third)).

28

to-day management of the house was the responsibility of the local fraternity." *Id.* Although each local chapter had a liaison to the national fraternity, that liaison was employed by the local chapter and therefore did not exercise control on behalf of the national fraternity. *Id*. at 520. Because the "national fraternity lacked any direct oversight and control of the individual fraternity members," its relationship with individual members was too "remote and tenuous" to support the imposition of a common-law duty. *Id*. at 521. Critically, that was true even though the national fraternity's bylaws and policies prohibited hazing by fraternity members and the national fraternity could revoke the charters of local chapters and, moreover, expel or discipline individual members of the fraternity. *Id*.

Similarly, the NCAA does not exercise any direct oversight and control over coaches. *See* pp. 25–26, *supra*. Appellants do not allege that the NCAA has "any employees present" to supervise athletics programs at member institutions, or that the NCAA exercises "day-to-day management" of either those programs or their coaches. *Yost*, 3 N.E.3d at 521. Indeed, the Complaint's emphasis on the FAR—an employee of the *member institution* who serves as a liaison to the NCAA and may report alleged violations to it (FAC ¶¶ 159–65)—confirms that the NCAA lacks any direct control over coaches. Like the national fraternity in *Yost*, the NCAA must rely on an employee of the local entity to report issues to it. That is irreconcilable with any direct day-to-day oversight and control.

Appellants' only contrary argument relies, once again, on the NCAA's rules prohibiting certain conduct by coaches (such as sports wagering, use of banned drugs, offering improper financial incentives, and other unethical practices). Br. 47–48 (citing FAC ¶¶ 79–80). But as discussed above, Indiana courts have definitively rejected the argument that a national organization's rules of conduct give the organization "actual oversight and control" directly over individual members. *Lanni II*, 42 N.E.3d at 553; *see also Yost*, 3 N.E.3d at 521; *Smith*, 9 N.E.3d at 163. The NCAA's bylaws concerning certain coaching conduct therefore cannot establish day-to-day control. And Appellants have not alleged any facts beyond the NCAA's bylaws that could raise any plausible inference that the NCAA exercises any sort of day-to-day control over coaches. That makes sense: it is patently implausible that the NCAA, as a nationwide voluntary association, could supervise thousands of coaches at over a thousand member institutions in fifty states.

***Relationship with Student-Athletes.*** A special relationship between the defendant and the plaintiff requires a "level of interaction or dependency between the parties that surpasses what is common or usual." *J.A.W.*, 627 N.E.2d at 809. Courts have recognized such a special relationship where the plaintiff is in a position of particular vulnerability, such that the plaintiff relies on and reasonably should expect protection from the defendant. *Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974) (student and teacher); *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 636 (Ind.

1991) (patient and nursing home); *see also Regents of Univ. of Cal. v. Super. Ct.*, 413 P.3d 656, 665 (Cal. 2018) (noting that "quintessential example[s]" include jailers and their prisoners or common carriers and their passengers).

The Complaint fails to allege facts showing a level of interaction or dependency between student-athletes and the NCAA that "surpasses what is common or usual." *J.A.W.*, 627 N.E.2d at 809. Indeed, the Complaint barely alleges any interactions at all between student-athletes and the NCAA. Appellants highlight only the fact that when a student-athlete transfers between schools, she must use the NCAA's transfer portal. Br. 45–46 (citing FAC ¶¶ 9 n.5, 187). But that limited interaction for a subset of student-athletes upon transferring between schools (something that may never happen during an athlete's career) is hardly the sort of unusual level of interaction that could create a special relationship between the NCAA and student-athletes generally. Moreover, the Complaint fails to allege *any interactions at all* between Appellants and the NCAA; all of Appellants' interactions were with employees of USF, including USF's Title IX office. *See* FAC ¶¶ 189–260. The Complaint's almost-total silence on interactions between students and the NCAA is unsurprising, given that the NCAA has no official presence or authority on the campuses of its member institutions, and thus no practical way of supervising student-athletes' day-to-day interactions with their coaches. *See* pp. 28–30, *supra*. As the district court observed, "the relationship between the NCAA and the 'nearly

31

half a million' student-athletes that comprise the 19,886 teams competing in NCAA sports annually at more than 1,000 schools throughout the country is simply too attenuated to create a legally cognizable duty to protect each of those students against third-party sexual misconduct" committed by coaches. SA-36 (citing FAC ¶¶ 29, 67).

Appellants attempt to bolster their position by citing *Regents of University of California v. Superior Court*, 413 P.3d 656 (Cal. 2018), *see* Br. 46 n.7, but that case only confirms the inappropriateness of recognizing a special relationship here. There, the court found a special relationship between students *and their colleges*, based on students' dependency on their colleges "for a safe environment" and colleges' control over students' activities and living and learning spaces. *Id.* at 668. The NCAA, which exercises no day-to-day management on college campuses, has no comparable ability to ensure the safety of students from misconduct committed by college employees. And colleges' ability to ensure a safe environment for their students is precisely why they are the institutions obligated under Title IX to prevent and redress sexual misconduct on their own campuses and by their own employees. *See* pp. 39–41, *infra*.

Appellants also turn, once again, to the NCAA's rules governing student-athlete conduct. That reliance fails for the reasons already discussed. In *Lanni II*, for example, the court declined to recognize a special relationship of protection

32

between the NCAA and student-athletes despite the fact that the plaintiff student-athlete was injured during a fencing competition and the NCAA had adopted and enforced detailed rules governing intercollegiate fencing competitions. *Lanni II*, 42 N.E.3d at 544–46. The court saw "no daylight" between the fraternity's relationship with local members in *Yost* and "the relationship between the NCAA and a student-athlete participating at an event on the campus of a member institution." *Id.* at 549. Thus, national association rules governing conduct at local institutions do not give rise to a special relationship between the national association and individual members.

### 2.     Foreseeability Considerations Do Not Support Imposing a Duty

Appellants' arguments concerning foreseeability rest primarily on the foreseeability of sexual misconduct to the public at large. But under Indiana law, the general foreseeability of misconduct is not sufficient to justify imposing a duty—particularly where, as here, it is undisputed that the defendant has a far more attenuated relationship to the plaintiff than others in a better position to prevent the alleged harm. *See, e.g.*, *Williams*, 809 N.E.2d at 478 ("Simply because an action may have some degree of foreseeability does not make it sound public policy to impose a duty.").

a.     In evaluating foreseeability to determine the existence of a common-law duty, Indiana courts examine "the broad type of plaintiff and harm involved"

33

and ask whether that harm would be foreseeable to the general type of defendant. *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 391 (Ind. 2016). *Goodwin* cautioned, however, that framing the inquiry at too high a level of generality would render it meaningless: "in the broadest sense, all crimes anywhere are 'foreseeable.'" *Id*. at 394. Therefore, "the mere fact that a particular outcome is 'sufficiently likely' is not enough to give rise to a duty." *Id*. at 392. Instead, foreseeability turns on "whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Id*. (citation omitted).

That inquiry takes into account the role played by the general type of defendant relative to the role played by others—that is, whether the defendant would anticipate that its own conduct would result in or prevent the harm. Thus, in a case involving a plaintiff injured by cargo falling off a truck, the Indiana Court of Appeals held that "the broad type of defendant here—a warehousing entity—would have no reason to foresee that its own conduct, in warehousing the cargo or in loading the cargo onto another entity's vehicle, at the instruction of the other entity's driver, would result in harm to motorists." *Est. of Staggs by & through Coulter v. ADS Logistics Co.*, 102 N.E.3d 319, 325–26 (Ind. Ct. App. 2018). That was so even though "[a]s a general matter, of course it is foreseeable that large and heavy cargo, which is secured to a flatbed trailer, could become unsecured on a public roadway

and cause injuries to nearby motorists." *Id.*; *accord ONB Ins. Grp., Inc. v. Est. of Megel*, 107 N.E.3d 484, 493–94 (Ind. Ct. App. 2018) (holding that insurance agency that had "no role" in "the decision to put the vehicle on the road in its condition, could not foresee that its actions relevant to this matter … would result in injury to a motorist," even though accident would have been foreseeable to others).

b.     Appellants have not plausibly alleged that sexual misconduct by coaches was foreseeable to the NCAA within the meaning of *Goodwin*.  Appellants rely primarily on the Complaint's allegations that sexual misconduct by coaches is generally foreseeable.  Br. 48.  But as the district court recognized, SA-39, that is insufficient to plausibly allege foreseeability.  There is no question that sexual misconduct by those in positions of authority over others is a serious societal issue. The NCAA has acknowledged that issue, working to support member institutions in combatting it.  *See* FAC ¶¶ 46 n.20, 48, 95–102 (the NCAA has developed publications and model policies that member institutions can use to combat sexual abuse).  But that foreseeability "in the broadest sense," *Goodwin*, 62 N.E.3d at 394, does not equate to foreseeability to a national entity *in the NCAA's position*. *Staggs*, 102 N.E.3d at 325–26; SA-39.

A national association with no day-to-day control over coaches and student-athletes at individual member institutions would have no reason to foresee that "its own conduct" could result in or prevent the harm alleged here.  *Staggs*, 102 N.E.3d

35

at 325–26.  As the Complaint alleges, the NCAA Manual provides that it is the responsibility of member institutions to ensure the safety and welfare of student-athletes enrolled at those institutions.    FAC ¶ 75 (emphasis added) (citing Constitution § 2.2.3); *see also* FAC ¶ 10.  Title IX reinforces that point, imposing a duty on the institution to protect its students, including student-athletes, from sexual misconduct.  *See* pp. 8–10, *supra*.  And it is the member institutions that employ (and therefore vet, hire, and fire) the coaches who interact with students and maintain the premises on which those interactions occur.  FAC ¶ 5 (alleging that USF, the member institution, employed the coaches alleged to have engaged in the misconduct here).  In those circumstances, a national organization like the NCAA that has "no role" in day-to-day operations, or the decision to hire and retain individual coaches at thousands of member institutions, would have no reason to think that its actions could result in or prevent the harm alleged.  *See ONB Ins. Grp.*, 107 N.E.3d at 493–94 (vehicular accident was not foreseeable to defendant that had "no role" in "the decision to put the vehicle on the road in its condition"); *Staggs*, 102 N.E.3d at 325–26 (warehouse that loaded cargo onto truck at direction of truck's driver had no reason to think that its actions would result in harm of cargo falling off).

c.    Appellants contend that the district court improperly focused on whether the NCAA had specific knowledge of the alleged conduct here.  Br. 53–54.

36

But the district court's discussion of that issue came in response to *Appellants'* argument that the NCAA had actual knowledge of the alleged sexual misconduct at USF.  MTD Opp. 31.  In the context of premises liability, Indiana courts have observed that a duty may arise if a property owner gains knowledge of specific circumstances indicating imminent harm on the property (for instance, if a bar owner sees a patron brandish a weapon).  *See Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 840 (Ind. 2020).  Although Appellants offer no justification for applying that rule here, given that the NCAA is not analogous to a property owner, in all events the district court correctly concluded that Appellants failed to plausibly allege knowledge.  SA-26.

Appellants point to two reports submitted to USF's Faculty Athletics Representative (FAR) in 2014 and 2016, but that allegation does not raise a plausible inference that the NCAA knew or should have known of misconduct at USF.  Br. 25–26.  As the Complaint alleges, the FAR is an employee of the member institution, not the NCAA.  FAC ¶ 159.  Reporting alleged misconduct to the FAR therefore is not equivalent to reporting misconduct to the NCAA; for the NCAA to learn of the allegations, the FAR must report them in turn to the NCAA.  FAC ¶ 164–65.  The Complaint does not allege that the FAR reported either incident to the NCAA.  And in any event, neither report alleged sexual misconduct by USF coaches.  The first report alleged that coaches were using abusive language by calling players

"pathetic," "weak-minded," and "a cancer to the team." *Id.* ¶ 168. The second report did not concern any conduct by coaches; it alleged that student-athletes on the baseball team hazed another student by challenging him to spank the team nutritionist. *Id.* ¶ 173. Even if the FAR had reported those incidents to the NCAA, neither suggested that coaches were sexually harassing student-athletes. Those reports therefore cannot give rise to any plausible inference that the NCAA knew or should have known that USF coaches were engaged in sexual misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (allegations must "permit the court to infer more than the mere possibility of misconduct").

Appellants also point to the USF baseball program's allegedly high attrition rate. But even assuming the NCAA was aware of a claimed high transfer rate—though the Complaint does not allege that it was—it is not plausible that the NCAA should have deduced from that fact alone that USF's coaches were engaging in sexual misconduct. *See id.* at 679; *Cox v. Glanz*, 800 F.3d 1231, 1250 (10th Cir. 2015) (complaint must allege facts plausibly suggesting that defendant had knowledge of misconduct in question).

### 3. Public Policy Concerns Weigh Strongly Against Imposing a Duty

Public policy concerns also weigh against imposing a duty. The public policy inquiry considers "who is, or should be, in the best position to prevent injury and how society should allocate the costs of such injury." *ONB Ins. Grp.*, 107 N.E.3d at

494 (citation omitted).  As the district court recognized, the NCAA has worked to address sexual misconduct in a manner consistent with its role as a national association composed of member organizations with more direct authorities and responsibilities.   The NCAA has thus "published educational resources for its member institutions regarding sexual abuse prevention and has issued statements and resolutions reminding its member institutions of their responsibility to ensure student-athlete health and safety, specifically in the context of combating sexual abuse."  SA-29; *see also* FAC ¶¶ 97–102.  But because of its status as a nationwide organization, the NCAA is hardly "in the best position to prevent injury" to student-athletes from sexual misconduct committed by their coaches.  *ONB Ins. Grp.*, 107 N.E.3d at 494.  It would be highly impractical to charge the NCAA with a duty to protect half a million student-athletes, on nearly 20,000 teams, at over 1,000 member institutions, from sexual misconduct by coaches when the NCAA does not employ or supervise those coaches.  *See* pp. 28–33, *supra*.

Instead, the parties best positioned to protect student-athletes are colleges and universities.  *See ONB Ins. Grp.*, 107 N.E.3d at 494 (party best positioned to prevent injury was the party directly responsible for taking the challenged actions).  Congress has made precisely that determination in Title IX, which Appellants wholly ignore.  Under Title IX, colleges and universities have an affirmative duty to prohibit  and  prevent  sexual  misconduct  on  their  campuses,  including  sexual

39

harassment by athletics personnel, and to investigate and remedy any misconduct when it does occur. *See* pp. 8–10, *supra*. Their ability to comply with those obligations stems from the substantial control they have over their employees, students, facilities, and the overall campus environment. *Cf. Regents of Univ. of Cal.*, 413 P.3d at 667–69.

Title IX also vitiates Appellants' remaining policy arguments. Appellants contend that member institutions lack proper incentives to address sexual misconduct on campus (Br. 59)—but to the contrary, member institutions who fail to comply with Title IX risk the termination of all federal financial assistance. *See* 20 U.S.C. § 1682; 34 C.F.R. § 106.4. Colleges and universities may also be subject to state-level oversight, based on state laws that parallel Title IX. *See, e.g.*, Mass. Gen. Laws Ann. ch. 6, § 168E; Cal. Educ. Code, §§ 66281.8 & 66281.9. Similarly, Appellants are wrong to suggest that failing to recognize a duty here would "'leave the loss on the shoulders of the individual plaintiff.'" Br. 58–59 (quoting *Prosser and Keeton on the Law of Torts* 6 (W. Page Keeton et al. eds., 5th ed. 1984)). Rather, plaintiffs have adequate remedies available, including a private right of action against their educational institution for damages and other relief under Title IX and the potential to recover attorneys' fees. *See, e.g., Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (9th Cir. 1998); 42 U.S.C. § 1988. Indeed, Appellants are currently pursuing

claims under Title IX, in addition to state common-law and statutory claims, in their parallel lawsuit against their coaches and USF in the Northern District of California. *See* p. 11, *supra*.

For similar reasons, Appellants' attempt to analogize the NCAA to the U.S. Center for Safe Sport ("SafeSport") lacks merit. *See* Br. 59–60. As the Complaint alleges, Congress created SafeSport to function within the U.S. Olympics and Paralympics movement, "as a step toward establishing consistency and accountability" in how amateur sports' national governing bodies define, investigate, and adjudicate claims of sexual misconduct. FAC ¶ 63; *see also* 36 U.S.C. §§ 220541, 220542. But those national governing bodies, unlike colleges and universities, were not already subject to Title IX's comprehensive regulatory scheme. Moreover, Congress's creation of SafeSport, like its enactment of Title IX, demonstrates that Congress is well-positioned to enact additional oversight if it believes doing so is warranted.

Against that backdrop, there is simply no policy reason why the *NCAA* should bear responsibility for the misconduct of coaches whom it did not and could not have controlled. "[S]uch a blanket duty would abandon the notion of liability based on negligence and enter the realm of strict liability in tort which 'assumes no negligence of the actor, but chooses to impose liability anyway,'" contrary to the public policy of Indiana. *Goodwin*, 62 N.E.3d at 394 (citation omitted). Given the existence of

41

local member institutions with the ability and legal obligation to protect their student-athletes, it would be deeply unfair to impose an additional strict-liability-like duty on the NCAA to act as an "insurer[]" for hundreds of thousands of student-athletes around the country. *Id*.

In short, the District Court correctly determined that none of the *Webb* factors supports imposing a common-law duty on the NCAA. This Court should affirm.

## II. Doe 1 Lacks Standing to Seek Injunctive Relief Because He Has Not Plausibly Alleged a Substantial Risk of Future Injury at His New School

Appellants' negligence claims seek both damages and prospective relief. If the Court agrees that Appellants failed to adequately plead the element of duty, then Appellants have failed to state a viable negligence claim, and that conclusion would alone dispose of this appeal. If the Court permits the negligence claims to proceed, however, it should affirm the district court's decision to strike Doe 1's request for class-wide injunctive relief for lack of standing. Because Does 2 and 3 no longer attend NCAA member institutions and therefore their claims for prospective relief have become moot, holding that Doe 1 lacks standing to seek injunctive relief would dispose of the Complaint's request for prospective relief.

A.    As the party invoking federal jurisdiction, Doe 1 bears the burden of demonstrating that he has standing to seek prospective relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form

42

of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  To establish injury in fact for purposes of prospective relief, the plaintiff cannot rest on past injury alone—rather, he must demonstrate a concrete threat of future injury.  *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018).  The threatened injury must be "certainly impending," or there must be a "'substantial risk' that the harm will occur."  *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Lyons*, 461 U.S. at 102 (threatened injury must be "real and immediate," not "conjectural" or "hypothetical").

Doe 1 briefly contends that the district court erred in requiring an "imminent" injury rather than a "substantial risk" of injury.  Br. 64.  But the district court cited both verbal formulations, and as this Court has explained, the two are essentially equivalent:  "imminence requires a showing that there is a substantial risk that the harm will occur."  *Prosser v. Becerra*, 2 F.4th 708, 714 (7th Cir. 2021) (internal quotation marks omitted); *accord Susan B. Anthony List*, 573 U.S. at 158.  The critical point is that the alleged future injuries must be "certainly impending" rather than speculative—and the courts have been particularly reluctant to find standing based on "speculation about future unlawful conduct" by "independent actors."

43

*Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019) (citations omitted).[8]  Doe

1 cannot overcome those well-established principles here.

B.      Here, Doe 1's claimed injury in fact is that coaches at his new

institution might "abuse or retaliate against" him, and the NCAA  will fail to prevent

that harm.  Br. 67.  Doe 1 must allege facts raising a plausible inference that such

abuse or retaliation by third-party coaches is certainly impending, or that there is at

least a substantial risk that the harm may occur.   The district court correctly

concluded that Doe 1's allegations "have fallen well short" of that standard.  SA-9.

Doe 1's theory of injury rests on precisely the sort of "speculative chain of

possibilities" that the Supreme Court and this Court have held are insufficient to

establish injury in fact.  *Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (quoting *Clapper*

*v. Amnesty International USA*, 568 U.S. 398, 414 (2013)).  The alleged harm would

---

[8] The cases Doe 1 cites are not to the contrary.  In two, the Court characterized the injury in question as a present injury and therefore had no occasion to address risk of future injury.  *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 890 (7th Cir. 2001) (unilateral amendment to the plaintiff's ERISA plan "immediately harm[ed]" the plaintiff by increasing administrator discretion, thereby depriving plaintiff of contractual rights); *Lac Du Flambeau Band v. Norton*, 422 F.3d 490, 498–99 (7th Cir. 2005) (state's grant of local gaming monopoly to another tribe was a present injury to the plaintiff-tribe in the form of a "denial of equal treatment").  The third decision is readily distinguishable, as there the risk that hackers who stole personal data would subsequently misuse it was far from speculative.  *Pisciotta v. Old National Bancorp*, 499 F.3d 629, 632–34 (7th Cir. 2007); *see also Dinerstein v. Google, LLC*, 73 F.4th 502, 516 (7th Cir. 2023) (observing that decisions recognizing substantial risk of harm from data breaches are motivated by "the common-sense observation" that hackers steal private information to misuse it).

materialize only if (1) Doe 1's coaches at his new school are likely to engage in sexual misconduct—conduct that is, of course, both wrongful and prohibited by federal and state law, as well as school policies; (2) the school's Title IX policies and procedures, as well as other governing legal authorities, fail to deter or prevent that abusive behavior, and (3) the coaches target Doe 1 for harm.  Doe 1 has not shown that any of the links in that "speculative chain of possibilities" are likely to come to pass—he has not alleged that he has been threatened with sexual harassment or abuse by the coaches at his new program, or that any circumstances make that possibility likely.  Absent such allegations, there is simply no reason to believe that he faces a substantial risk of harm due to the NCAA's failure to enact sexual misconduct prohibitions on top of those already set forth by Doe 1's school policies, as required by Title IX and relevant state law.  *Murthy*, 603 U.S. at 70 (quoting *Clapper*, 568 U.S. at 411); *Clapper*, 568 U.S. at 411–13 (it was speculative that plaintiffs would be targeted for surveillance and that the government would use the statute that allegedly caused plaintiffs' injury); *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (where plaintiffs challenged certain judges' discriminatory bail practices, claimed injury was too speculative where "the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners").

45

The speculative nature of Doe 1's allegations is laid bare by the fact that the alleged risk to Doe 1 is indistinguishable from the risk to any of the other half a million student-athletes at NCAA member-institutions across the country. Because Doe 1 has not alleged any basis to think that he faces a concrete risk of sexual misconduct by the different coaches at his new institution, he is no differently situated from any other student-athlete. If Doe 1's theory of standing were accepted, therefore, every single one of those student-athletes would similarly have standing to seek a structural reform injunction against the NCAA, without any showing of particular risk of injury. That cannot be right. *Cf. Lyons*, 461 U.S. at 111 ("a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional").

Doe 1 attempts to cabin the extraordinary breadth of his standing theory by arguing that here, he has alleged a "combination of past harm and substantial risk of future harm." Br. 68. But it is well established that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," *O'Shea*, 414 U.S. at 495–96, and therefore a plaintiff's "past injuries are relevant only for their predictive value," *Murthy*, 603 U.S. at 59 ("the past is relevant only insofar as it is a launching pad for a showing of imminent future injury").[9] And

---

[9] Appellants discuss *Murthy* at some length, Br. 71–72, but it does not help them. There, the Court reaffirmed the principle that a plaintiff cannot establish standing to

here, the past injuries have no predictive value: Doe 1 fails to allege facts suggesting that the misconduct that he suffered at the hands of coaches at USF makes it more likely that he will experience similar harm inflicted by the *entirely different* coaching staff at his new school. Rather, now that he has transferred, he is in the same position as any other student-athlete in the country, whose risk of harm is too hypothetical and speculative to establish a substantial risk of injury.

The Supreme Court and this Court have declined to find standing under similar circumstances. In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Lyons filed suit after being subjected to an allegedly illegal chokehold by police officers, which he alleged reflected a city policy authorizing chokeholds in certain situations. *Id.* at 97–98. The Court held that Lyons lacked standing to seek injunctive relief against the City because his fear of being subjected to another chokehold in the future was too speculative to demonstrate a "real and immediate threat" of injury. *Id.* at 105. To establish an "actual controversy," the Court held, Lyons would have had to plausibly allege that he would have another encounter with the police that likely would have involved a chokehold—and the fact that he had been subject to an allegedly illegal chokehold in the past did not make that future harm more likely. *Id.* at 105–106. "Absent a sufficient likelihood that he [would] be wronged in a

---

seek prospective relief against the defendant by "speculat[ing]" about the actions of third parties. *Murthy*, 603 U.S. at 72 (citing *Department of Commerce* and *Lyons*).

47

similar way, Lyons [was] no more entitled to an injunction than any other citizen of Los Angeles." *Id.* at 111. Similarly, this Court has held that a plaintiff previously subjected to an HIV test without consent lacked standing to enjoin an Illinois law giving physicians discretion to order such HIV tests, even though the plaintiff's condition required regular blood tests, because it was "purely speculative" whether another physician would exercise discretion in the future to order another non-consensual HIV test. *Sierakowski v. Ryan*, 223 F.3d 440, 441–42, 444 (7th Cir. 2000). Thus, that a plaintiff was allegedly harmed in the past does not relieve him of the burden of establishing that any risk of future injury is substantial rather than speculative.

Doe 1 criticizes the district court for relying on his transfer to a new school, contending that the NCAA system is a "closed universe" in which students remain constantly subject to a risk of abuse by coaches, allegedly because the NCAA has failed to enact preventative policies. Br. 66–67. But *Lyons* and *Sierakowski* preclude finding standing on the theory that the NCAA's lack of policies increases Doe 1's alleged risk of being subject to sexual misconduct. In *Lyons*, the plaintiff continued to reside in Los Angeles under the jurisdiction of the Los Angeles Police Department, and therefore any risk of a future chokehold was increased by the Police Department's chokehold policy. And the plaintiff in *Sierakowski* continued to be subject to blood tests conducted under the Illinois law he sought to challenge—a law

48

that unquestionably increased the risk of a nonconsensual HIV test.  The critical point is that in both cases, the plaintiff's alleged underlying risk of future injury (another chokehold; another nonconsensual HIV test) was too conjectural to support standing, even if the defendant's challenged policies somewhat increased that risk. *Lyons*, 461 U.S. at 98; *Sierakowski*, 223 F.3d at 444.  That is true a fortiori here, where Doe 1's alleged risk of injury arises as a result of misconduct *that is already prohibited by Title IX and state law*, rather than conduct that, as in *Lyons* and *Sierakowski*, was allegedly authorized by the challenged policies. *Cf. Dinerstein*, 73 F.4th at 515–16 (no standing for injunctive relief against Google where data use agreement specifically prohibited Google from violating plaintiff's privacy and plaintiff did not allege that Google intended to or had taken any steps to violate the agreement).

Because Doe 1 has not plausibly alleged a "certainly impending" or "substantial risk" of future injury, he lacks standing to seek prospective relief, and the district court correctly dismissed that request.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order dismissing Appellants' negligence claims as a matter of law.  If the Court permits the negligence claims to proceed, the Court should nevertheless affirm the district

49

court's order striking Doe 1's request for injunctive relief from the Complaint for lack of standing.

Dated: April 9, 2025                    Respectfully submitted,

                                */s/ Ginger D. Anders*

Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300
Email:  Ginger.Anders@mto.com

Carolyn Hoecker Luedtke
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
Email: Carolyn.Luedtke@mto.com

Hailyn J. Chen
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9548
Facsimile: (213) 687-3702
Email: hailyn.chen@mto.com

Attorneys for Defendant and Appellee
National Collegiate Athletic Association

## CERTIFICATE OF COMPLIANCE

1.　　This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32(c) because it contains 11,914 words, excluding the items in Fed. R. App. P. 32(f), and as measured by Microsoft Word's word-count feature.

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), as modified by Cir. R. 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6), because it is prepared in a proportionally spaced typeface using Times New Roman in 14-point font.

Dated: April 9, 2025

*/s/ Ginger D. Anders*
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP

51

# CERTIFICATE OF SERVICE

The undersigned, counsel for Defendant-Appellee, hereby certifies that on April 9, 2025, this brief was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: April 9, 2025

/s/ Ginger D. Anders

Ginger D. Anders
MUNGER, TOLLES & OLSON LLP