**No. 24-2993**

# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE 1, et al.,

*Plaintiffs-Appellants,*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division, No. 1:23-cv-00542-SEB-MJD.
The Honorable Sarah Evans Barker, Judge Presiding.

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Jonathan D. Selbin
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013 -1413
(212) 355-9500

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 South Wacker Drive
24th Floor
Chicago, IL 60606
(312) 741-1019

*Counsel for Plaintiffs-Appellants*

*Additional Counsel Listed on Signature Page*



COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER



# TABLE OF CONTENTS

**Page**

SUMMARY OF REPLY .................................................................................1

ARGUMENT...............................................................................................7

I.  THE DISTRICT COURT ERRED BY FINDING AS A MATTER
OF LAW THAT THE NCAA OWES ITS STUDENT-ATHLETES
NO LEGAL DUTY TO REGULATE SEXUAL MISCONDUCT
BY COACHES AND ATHLETICS PERSONNEL...................................7

    A.  The NCAA Is Nothing Like a National Fraternity.......................7

    B.  The NCAA Has a Special Relationship with Coaches and
Athletics Personnel, and with Student-Athletes........................16

        1.  The NCAA Exercises Enormous Oversight and
Control Over Coaches and Athletics Personnel...............16

        2.  The NCAA Exercises Enormous Oversight and
Control Over Student-Athletes, Giving Rise to a
Level of Interaction and Dependency that Surpasses
What Is Common. ...............................................................19

    C.  Abuse of Student-Athletes by Coaches and Athletics
Personnel Was Foreseeable to the NCAA. .................................21

    D.  *Only* the NCAA Is in a Position to Prevent Abuse of
Student-Athletes *Across* Member-Institutions. ...........................27

II.  THE DISTRICT COURT ERRED BY FINDING JOHN DOE 1
LACKED STANDING TO SEEK PROSPECTIVE RELIEF. .................30

CONCLUSION .........................................................................................35

CERTIFICATE OF COMPLIANCE .................................................................38

PROOF OF SERVICE.................................................................................39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Delta Tau Delta v. Johnson*,
   712 N.E.2d 698 (Ind. 1999), *abrogated on other grounds by*
   *Rogers v. Martin*, 63 N.E.3d 316 (Ind. 2016) ...................................................13

*EEOC v. Concentra Health Servs., Inc.*,
   496 F.3d 773 (7th Cir. 2007)............................................................................13

*Est. of Staggs by and through Coulter v. ADS Logistics Co.*,
   102 N.E.3d 319 (Ind. Ct. App. 2018) ........................................................24, 25

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.*,
   62 N.E.3d 384 (Ind. 2016) ...................................................................23, 24, 27

*Hatcher v. Bd. of Trs. of S. Illinois Univ.*,
   829 F.3d 531 (7th Cir. 2016), *overruled on other grounds by*
   *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)............................13

*J.A.W. v. Roberts*,
   627 N.E.2d 802 (Ind. Ct. App. 1994), *abrogated on other*
   *grounds by Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361
   (Ind. Ct. App. 2002)............................................................................................9

*Key v. Hamilton*,
   963 N.E.2d 573 (Ind. Ct. App. 2012) ..............................................................29

*KR Enters., Inc. v. Zerteck Inc.*,
   999 F.3d 1044 (7th Cir. 2021).........................................................................14

*Lanni v. Nat'l Collegiate Athletic Ass'n*,
   42 N.E.3d 542 (Ind. Ct. App. 2015) (*Lanni II*) .............................13, 15, 16, 18

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Lanni v. Nat'l Collegiate Athletic Ass'n,*
    989 N.E.2d 791 (Ind. Ct. App. 2013) (*Lanni I*)........................................14, 15

*Murthy v. Missouri,*
    603 U.S. 43 (2024)...............................................................................33, 34, 35

*ONB Ins. Grp., Inc. v. Est. of Megel,*
    107 N.E.3d 484 (Ind. Ct. App. 2018) ...................................................25, 26, 27

*Putnam Cnty. Sheriff v. Price,*
    954 N.E.2d 451 (Ind. 2011) ..............................................................................9

*Smith v. Delta Tau Delta,*
    9 N.E.3d 154 (Ind. 2014) ..........................................................................*passim*

*Sutton v. St. Jude Med. S.C., Inc.,*
    419 F.3d 568 (6th Cir. 2005)...........................................................................32

*Williams v. Cingular Wireless,*
    809 N.E.2d 473 (Ind. Ct. App. 2004) ..........................................................9, 10

*Yost v. Wabash College,*
    3 N.E.3d 509 (Ind. 2014) ...........................................................................*passim*

## SUMMARY OF REPLY

Reading the Brief of Defendant-Appellee NCAA, one could be forgiven for thinking this is an appeal from a summary judgment order or even after trial. It is premised upon factual contentions counter to the well-pled (and plausible) allegations in the complaint, many also contrary to undisputed facts. One could also be forgiven for believing that the NCAA is some absent entity far removed from the daily lives of its student-athletes and coaches, and not a multi-billion dollar enterprise that, until quite recently, controlled student-athletes' names, images, and likenesses.

But this is an appeal from a motion to dismiss. And the NCAA is no run-of-the-mill national member organization, like a national fraternity, merely espousing general aspirational goals but lacking any direct day-to-day oversight and control over coaches, athletics personnel, and student-athletes.

The District Court dismissed Plaintiffs-Appellants Does 1-3's claims, finding as a matter of law that the NCAA owed no duty to protect them from sexual misconduct by coaches and athletics personnel, and that Doe 1

lacked standing to seek injunctive relief because he transferred to another NCAA member-institution. To do so, the District Court made factual findings unsupported by and contrary to the well-pled (and plausible) allegations in the Complaint, an error the NCAA repeats in its brief.

Both the District Court and the NCAA try to force these claims into the Procrustean bed of cases finding that national fraternity organizations—which exercised no oversight over the day-to-day conduct of their chapters or members and merely espoused aspirational principles—lacked a duty to regulate their members' misconduct or protect others from it. But the NCAA operates *nothing* like that. As alleged in the Complaint, the NCAA regulates and dictates at a granular level the day-to-day conduct of and interactions between coaches, athletics personnel, and student-athletes in almost every conceivable way, including, among (many) other things: when they can meet and train, recruiting and scouting practices, practice and training schedules, tobacco use, gambling, and what student-athletes can eat and drink (and where, when, and with whom). First. Am. Compl. ("Complaint" or "FAC") ¶¶ 68-69, 73, 79-80, 83, 111, 113.

*Almost*, because there is one important way the NCAA does *not* regulate the conduct of coaches and athletics personnel: their sexual misconduct targeting student-athletes. *Id.* ¶¶ 2, 4, 78-83, 107. This is not due to some perceived lack of authority or ability in this one area: the NCAA *does* regulate the sexual misconduct of student-athletes. *Id.* ¶ 106. Sexual misconduct *by coaches and athletics personnel* stands alone.

That's okay, the NCAA argues, "[b]ecause member institutions have not delegated to the NCAA authority to oversee and protect the well-being of individual student-athletes," and "member institutions are responsible under the NCAA Constitution for addressing the problem of sexual misconduct on their campuses." Appellee Br. 8. Not so: Article 1, Section D of the NCAA Constitution specifically governs the principle of "Student-Athlete Well-Being" and provides that "[i]ntercollegiate athletics programs shall be conducted by *the Association*, divisions, conferences *and* member institutions in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes." Dkt. 257-2 (the

- 3 -

"Manual") (Const., Art. 1 § D) (emphasis supplied).[1] To be clear: "the Association" is the NCAA. The NCAA's own Constitution thus *expressly* places that duty on the NCAA itself as well as member-institutions, not member-institutions alone. The District Court's finding that the NCAA owed no duty as a matter of law cannot be reconciled with this fact.

No matter, the NCAA argues, it still has no duty as a matter of law because: (1) it had no special relationship with coaches or student-athletes—no control over them at all, really, if its brief is to be believed, Appellee Br. 23; (2) the risk of harm to student-athletes from sexual abuse by coaches and athletics personnel was not foreseeable to the NCAA, and was not in any event higher than the risk to the public at large; and (3) public policy does not support imposing any duty on the NCAA to protect student-athletes as a matter of law. None of that is right, and all is contradicted by the detailed well-pled allegations in the Complaint.

Appellants plausibly alleged that the NCAA has a special

---

[1] As explained in their opening brief, Appellants cite to the 2023-2024 Manual, available on the District Court docket. Opening Br. 10 n.4. The NCAA agrees that the Court may consider the Manual. Appellee Br. 5 n.1.

- 4 -

relationship with its coaches and its student-athletes by virtue of the breadth and depth of its detailed regulation of their day-to-day conduct and interactions. FAC ¶¶ 68-69, 73, 79 - 80, 83, 111, 113. These are not "general pronouncements" of aspirational goals, as the NCAA suggests now. Appellee Br. 23. They are detailed rules at the granular level that give the NCAA profound day-to-day control over coaches and athletics personnel and foster a level of interaction with and dependency by student-athletes that surpasses what is normal.

Appellants plausibly alleged that the risk of harm to student-athletes from sexual misconduct perpetrated by coaches and athletics was not only *foreseeable* to the NCAA but actually well-*known* (and well-understood) by it. FAC ¶¶ 39, 46, 96. This is not speculation: this risk was the subject of research *commissioned by the NCAA* as early as 2012. *Id.* ¶ 46. And, critically, Appellants plausibly alleged that the risk to student-athletes is well *above* the risk to the public at large. *Id.* ¶¶ 46, 94.

As for public policy, the NCAA seeks to absolve itself of any responsibility by placing all of it on its member-institutions. But it says

- 5 -

*nothing* to rebut the fact that it is the *only* entity situated to learn of, redress, and prevent abuse at and *across* its member-institutions—indeed, the *only* entity that has visibility across *all* member-institutions (and the coaches, athletics personnel, and student-athletes at them). The NCAA's complete abdication of its responsibility—again, despite its self-imposed duty to do so in its own Constitution—makes whatever actions the member-institutions undertake (or not) wholly inadequate to prevent or address the problem. Nowhere are the consequences of the NCAA's failure to act more evident than in the spate of incidents of coaches sexually abusing student athletes—including many cases involving abusive coaches moving *between* institutions with impunity, something the NCAA alone is situated to prevent. FAC ¶¶ 4, 89-94.

The District Court also erred in finding that John Doe 1 lacked standing to seek injunctive relief because he transferred out of his abusive environment at USF to a new school. He plausibly alleged both that he suffered actual abuse at USF as a result of the NCAA's failure to adopt and enforce adequate policies to protect him, and that the NCAA *continues* to

expose him (and other student-athletes like him) to an ongoing and

heightened risk of abuse because it still has done nothing in that regard.

Nothing more is required. Requiring a student-athlete to stay in an abusive

situation to maintain standing contravenes law and public policy.

The District Court erred in dismissing these claims and in finding

that John Doe 1 lacks standing to seek injunctive relief as a matter of law

based upon faulty factual conclusions contrary to the well-pled and

plausible allegations in the Complaint.

Appellants respectfully request that this Court reverse and remand.

## **ARGUMENT**

**I.     THE DISTRICT COURT ERRED BY FINDING AS A MATTER OF
        LAW THAT THE NCAA OWES ITS STUDENT-ATHLETES NO
        LEGAL DUTY TO REGULATE SEXUAL MISCONDUCT BY
        COACHES AND ATHLETICS PERSONNEL.**

**A.     The NCAA Is Nothing Like a National Fraternity.**

Appellants plausibly alleged that the NCAA voluntarily assumed a

duty to regulate sexual misconduct by coaches and athletics personnel. The

NCAA's primary argument in response is to liken itself to the national

fraternity organizations at issue in *Yost v. Wabash College*, 3 N.E.3d 509 (Ind.

2014), and *Smith v. Delta Tau Delta*, 9 N.E.3d 154 (Ind. 2014). The NCAA correctly characterizes those fraternities as "nationwide membership organizations . . . that do not exercise day-to-day control over operations and individuals at their local chapters" who therefore "do not owe a duty of care to prevent alleged injuries occurring in those local chapters." Appellee Br. at 3.

But there are two fatal flaws in the NCAA's reliance on those cases.

First, both were decided on a full evidentiary record at summary judgment, not on a motion to dismiss. That posture was *central* to their holdings, as in both the court found no support *in the evidentiary record* of actual oversight and control of day-to-day conduct. *See Yost*, 3 N.E.3d at 521 (referring to "the materials designated on summary judgment" as the basis for its conclusion); *Smith*, 9 N.E.3d at 163 (concluding no assumption of duty based on the total absence of "designated evidentiary material" of national fraternity's "right to exercise direct day-to-day oversight and control of the behavior of the activities of the local fraternity and its members").

The fact that courts *can* dismiss negligence actions on the pleadings does not mean it is appropriate to do so where, as here, the (dispositive) question of the existence of a duty is fact-sensitive, such as in the case of establishing an assumption of duty or a special relationship. *See J.A.W. v. Roberts*, 627 N.E.2d 802, 810-11 (Ind. Ct. App. 1994), *abrogated on other grounds by Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361 (Ind. Ct. App. 2002). The cases on which the NCAA relies are not to the contrary. In *Putnam Cnty. Sheriff v. Price*, the Indiana Supreme Court reversed the trial court's denial of a motion to dismiss on the existence of a duty to warn about a hazardous road condition where the plaintiff did not allege that the Sheriff "owned, operated, maintained, or controlled" any part of the road in question. 954 N.E.2d 451, 455 (Ind. 2011). That is, the plaintiff did not *allege* the facts necessary—ownership of or control over the road—to give rise to a duty; there was therefore no need for discovery to determine whether the Sheriff, in fact, owned or controlled the road in question. Likewise, in *Williams v. Cingular Wireless*, the plaintiff did not allege a special relationship—only that "Cingular furnished a cell phone to [the

- 9 -

driver], who was later involved in a car accident with [the plaintiff] while using that phone." 809 N.E.2d 473, 477 (Ind. Ct. App. 2004). There, too, discovery would have made no difference. The same is not true here: whether the NCAA, *in fact*, asserts the control over coaches and athletics personnel that Appellants plainly allege (as relevant to both Appellants' assumption and common law duty arguments) is the key.

Second, and more fundamentally, the NCAA is nothing like a national fraternity: Appellants plausibly allege *precisely* the "actual oversight and control" by the NCAA over the day-to-day behavior and activities of coaches and athletics personnel and their interactions with student-athletes that the Indiana Supreme Court found lacking in the fraternity cases. *See Yost*, 3 N.E.3d at 521, 518 (concluding that broad pronouncements disapproving of hazing in charter and bylaws and "educational outreach programs to enhance proper behavior and to discourage hazing" did not constitute "direct evidence . . . to establish that [the national fraternity] deliberately and specifically undertook to control and protect Yost from the injuries he sustained or to generally prevent its

students from engaging in injurious private conduct toward each other"); *Smith*, 9 N.E.3d at 160, 163 (holding that "providing information to the local fraternity to discourage hazing and alcohol abuse and disciplining chapters and members for violations" did not constitute "evidence that the national fraternity assumed any duty of preventative, direct supervision and control of the behaviors of its local chapter members").

The NCAA does not simply provide educational resources on issues related to safety: it specifically undertakes to regulate a student-athlete's diet, schedule, and eligibility to play a sport *at all*, with the avowed goal to protect students' safety. *See, e.g.*, Manual at 227 (Bylaw 17.1.7.1) (limiting how often student-athletes can engage in "countable athletically related activities"); *id.* at 216 (Bylaw 16.5.2.7) (limiting the substances student-athletes may consume); *id.* at 26 (Bylaw 11.1.4) (requiring coaches to take certain safety trainings before they are allowed to coach). As it relates to sexual misconduct specifically, the NCAA *requires* student-athlete transfers to disclose to prospective schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or

- 11 -

criminal conviction for sexual violence. FAC ¶¶ 106-07. It is unclear what could more explicitly constitute day-to-day control than regulations dictating what you can eat, how you spend the hours in a day, and what you must disclose to continue participating in a daily activity that has the potential to turn into your career. A fraternity flyer—or even a fraternity charter—"promot[ing] gentlemanly behavior," and the ability to shut down a party is not analogous. *Yost*, 3 N.E.3d at 520. The former set the rules for the day-to-day activities of those controlled; the latter do not. The NCAA's attempt to liken its micromanagement of coaches, athletics personnel, and student-athletes to *Yost* and *Smith*—cases that dealt only with vague, high-level pronouncements—fails.

It is not surprising that Appellants do not allege *even more* about the NCAA's "specific undertaking" to protect student-athletes' health and safety—i.e., the precise evidence that demonstrates how that duty manifests with respect to sexual misconduct by coaches and athletic personnel on par with the *evidence* provided (and found lacking) in the fraternity cases. Only discovery will reveal the precise contours of the

NCAA's "undertaking," and whether it, in fact, extends to protection from sexual misconduct by coaches and athletic personnel.[2] *See Hatcher v. Bd. of Trs. of S. Illinois Univ.*, 829 F.3d 531, 537 (7th Cir. 2016), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ("[R]equiring pleading of unknown details before discovery would improperly deny plaintiffs the opportunity to prove their claims." (citing *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781-82 (7th Cir. 2007))).

The NCAA next tracks the Indiana Supreme Court's decisions in *Yost* and *Smith* through to the Indiana Court of Appeals decision in *Lanni v.*

---

[2] For example, if discovery reveals that the NCAA operates a hotline devoted to reporting violations of student athlete safety and well-being—through which student-athletes call the hotline to complain about sexual misconduct by coaches, and the NCAA gives those student-athletes the impression that it will investigate and respond to those complaints—that evidence would demonstrate the NCAA assumed a duty specifically to prevent sexual misconduct by coaches and athletic personnel (despite the NCAA's public protestations to the contrary to avoid liability). *See, e.g., Delta Tau Delta v. Johnson*, 712 N.E.2d 698, 975 (Ind. 1999), *abrogated on other grounds by Rogers v. Martin*, 63 N.E.3d 316 (Ind. 2016) (finding that a national fraternity could be found to have voluntary assumed a duty to protect a student from date rape where it "state[d] that one could call [the national fraternity] for help with problems such as date rape or alcohol abuse"). The fact that Appellants would not know this level of detail without discovery is neither surprising nor a basis to dismiss their claims.

*Nat'l Collegiate Athletic Ass'n*, 42 N.E.3d 542 (Ind. Ct. App. 2015) (*Lanni II*).[3]

There are two flaws with its reliance on that case as well.

First, again, the case was decided on a full evidentiary record on

summary judgment, not a motion to dismiss. Indeed, prior to that holding,

the Indiana Court of Appeals *reversed* the trial court for deciding the

question of duty on a motion to dismiss, as the District Court did here.

*Lanni v. Nat'l Collegiate Athletic Ass'n*, 989 N.E.2d 791 (Ind. Ct. App. 2013)

(*Lanni I*). The NCAA breezily dismisses this critical fact in a footnote,

claiming that *Lanni I* involved "the trial court's procedural error under an

Indiana rule governing when a motion to dismiss should be treated as a

motion for summary judgment." Appellee Br. 19 n.6. Fair enough. But the

*reason* that procedural error *mattered* and required reversal was because it

"negated any opportunity [for Lanni] to present relevant materials in

opposition to the motion for summary judgment." *Lanni I*, 989 N.E.2d at

797. In other words, in *Lanni I*, the trial court erred by deciding the issue of

---

[3] While state Supreme Court decisions are binding on this Court, state court of appeals' decisions are merely persuasive. *KR Enters., Inc. v. Zerteck Inc.*, 999 F.3d 1044, 1051–52 (7th Cir. 2021).

the NCAA's duty "without awarding Lanni a reasonable opportunity to present relevant materials in opposition to the motion." *Id.* at 799. So too, here.

Second, the factual circumstances—and record ultimately made—in *Lanni II* are readily distinguishable from those alleged here. The issue in *Lanni II* was whether the NCAA owed a duty to protect student-athletes' safety at sanctioned events (on those facts, the safety of a student-athlete as a spectator at such an event). Lanni alleged—and marshalled evidence to support—only a *generalized* duty without any evidence of day-to-day control in that context: indeed, "the *specific* duties undertaken by the NCAA with respect to the safety of its student-athletes [at such events] was simply to provide information and guidance to the NCAA's member institutions and student-athletes." *Lanni II*, 42 N.E.3d at 553 (emphasis supplied).

The sum total of Lanni's evidence in that regard was that the injury occurred at an NCAA-sanctioned event and a generalized statement on the NCAA's website that it "takes appropriate steps to modify safety

- 15 -

guidelines, playing rules, and standards to minimize those risks and provide student-athletes with the best opportunity to enjoy a healthy career." *Id.* (cleaned up). But here, as discussed, Appellants allege much more detailed and active control by the NCAA over the coaches and athletics personnel and their daily interactions with student-athletes than the mere provision of "information and guidance" and a single generalized aspirational statement on a website at issue in *Lanni II*.

The facts alleged here are nothing like *Lanni II* and the fraternity cases. If nothing else, Appellants should have had the same opportunity as the plaintiffs in those cases to marshal and present *facts* in support of their claims.

### B. The NCAA Has a Special Relationship with Coaches and Athletics Personnel, and with Student-Athletes.

#### 1. The NCAA Exercises Enormous Oversight and Control Over Coaches and Athletics Personnel.

The NCAA's argument that it has no special relationship with the coaches is premised entirely upon the (remarkable) argument that "the NCAA does not exercise any direct oversight and control over coaches." Appellee Br. 29. Saying it does not make it so. As plausibly alleged—and in

fact—the NCAA enacts and enforces detailed regulations through which it exercises exacting control over the day-to-day activities of coaches and athletics personnel—including their daily interactions with student-athletes—in a whole host of areas. FAC ¶¶ 79-80, 111, 113. Beginning with coaches' employment contracts, which must include a provision stating the coach will abide by NCAA rules, the NCAA has a role in almost everything a coach does. *Id.* ¶ 80; Manual at 27 (Bylaw 11.2.1). The NCAA regulates coaching bonuses and other compensation, educational requirements, recruiting protocols, and the number and duties of coach staff and other staff members. FAC ¶ 80. The NCAA controls how many hours a coach can train players and what types of benefits a coach may provide to a prospective player. *Id.* ¶ 79; Manual at 227 (Bylaw 17.1.7). The NCAA forbids coaches from engaging in sports wagering or providing banned substances or improper inducements to student-athletes. FAC ¶ 79. The NCAA prohibits coaches from requiring student-athletes to participate in voluntary activities (or penalizing or rewarding their attendance). Manual at 226 (Bylaw 17.02.19). One cannot equate a national fraternity's general

- 17 -

"rules of conduct," Appellee Br. 30, with the 296-page NCAA Division I Manual and its labyrinth of regulations micromanaging the conduct of coaches and athletics personnel.

As pertains to the Faculty Athletic Representative ("FAR"), the NCAA's analogy to the local chapter advisor in the fraternity cases also misses the mark. In addition to being but one element of Appellants' argument regarding NCAA control, Appellants alleged that the FAR plays a (far) greater role in college athletics than the local chapter liaison plays in the *Yost* and *Smith*. Whereas the FAR is a paid employee with a "leading role in the areas of academic integrity, governance and commitment to rules compliance, and commitment to equity, which includes student-athlete welfare" and plays "a central role in any major institutional inquiries into alleged or suspected rules violations," FAC ¶¶ 160, 164, the local fraternity advisors were effectively unpaid volunteer record keepers, *see Yost*, 3 N.E.3d at 520; *Smith*, 9 N.E. 3d at 162 n.5.

Nor can one equate an offending individual fraternity member with an authority figure, like a coach. *Lanni*, which has *nothing* to do with the

NCAA's relationship with coaches and athletic personnel, is no help to the NCAA in this regard, as it had nothing to do with coaches and athletics personnel, and their interactions with student-athletes.

At bottom, Indiana courts have *not* "definitively rejected the argument that a national organization's rules of conduct" cannot give the organization "actual oversight and control." Appellee Br. 30. Indiana courts make a case-by-case assessment and do so on a full evidentiary record. The District Court failed to do the same here.

> **2. The NCAA Exercises Enormous Oversight and Control Over Student-Athletes, Giving Rise to a Level of Interaction and Dependency that Surpasses What Is Common.**

The NCAA argues that "the Complaint barely alleges any interactions at all between student-athletes and the NCAA" and "fails to allege *any interactions at all* between Appellants and the NCAA." Appellee Br. 31 (emphasis in original). Again, saying it does not make it so, especially in the face of well-pled facts to the contrary. FAC ¶¶ 68-69, 73, 83.

As just one example, as plainly alleged, under the NCAA Bylaws

"student-athletes"—which Does 1-3 are, of course—"must meet eligibility requirements established by the NCAA, their institution, and the applicable athletic conference; act with honesty and sportsmanship; act ethically; comply with drug provisions; not violate the principle of amateurism; comply with recruiting requirements; not receive any 'extra benefit' (as defined by the NCAA) for their athletic contributions; and comply with disciplinary action for failures to comply." FAC ¶ 73.

The NCAA acknowledges, as it must, that "[c]ourts have recognized . . . a special relationship where the plaintiff is in a position of particular vulnerability, such that the plaintiff relies on and reasonably should expect protection from the defendant." Appellee Br. 30 (citing cases). Appellants agree, and they plausibly alleged both that they were particularly vulnerable to sexual misconduct by coaches and athletics personnel and that they relied upon and reasonably expected protection from the NCAA. Indeed, Appellants' complaint describes in detail the ways in which the NCAA itself acknowledges that student-athletes are uniquely vulnerable to abuse by their coaches and has likened the coach-athlete relationship to

- 20 -

other asymmetrical relationships in which sexual relationships are forbidden (lawyer-client, physician-patient, judge-party/lawyer, clergy-parishioner). FAC ¶ 96. That vulnerability renders student-athletes particularly dependent on institutions, such as the NCAA, that regulate those coaches—and have the ability to stop abusive coaches from simply moving on to another school—for protection. *Id.* ¶¶ 47, 82-94. And student-athletes' expectations of protection are reasonable—indeed, every peer organization to the NCAA acknowledges its obligations in this regard. *See id.* ¶¶ 48-65.

### C.    Abuse of Student-Athletes by Coaches and Athletics Personnel Was Foreseeable to the NCAA.

According to the NCAA, "Appellants have not plausibly alleged that sexual misconduct by coaches was foreseeable to the NCAA." Appellee Br. 35. No argument by the NCAA is more obviously false—and, frankly, stunning. The long and awful history of such abuse at NCAA member-institutions over many decades alone establishes such foreseeability. And, Appellants plausibly alleged in detail not only that such abuse was foreseeable to the NCAA, but that the NCAA was *actually aware of it* both at

- 21 -

its member-institutions generally *and specifically at USF*, and did nothing

about it. FAC ¶¶ 46, 95, 97-98, 166-71, 173-74.

The NCAA dismisses the fact that sexualized incidents at USF were

reported to the NCAA's FAR on campus, noting that the FAR is an

employee of the member-institution, and arguing that Appellants did not

allege that the FAR passed those complaints on to the NCAA. Appellee Br.

37-38. But the fact that the FAR is employed by the university not the

NCAA does not change the fact that it is the FAR's duty to report such

incidents to the NCAA. And, of course, without the benefit of discovery,

Appellants cannot possibly know (or allege) that *this* FAR reported *these*

specific incidents (as job-required) to the NCAA. But they can and did

allege it was his job to do so. FAC ¶¶ 160-65.

The NCAA also argues that "Appellants' arguments concerning

foreseeability rest primarily on the foreseeability of sexual misconduct *to*

*the public at large*." Appellee Br. 33 (emphasis supplied). Again, that's false.

The first section of the fact section of the Complaint contains fourteen

paragraphs of detailed allegations all under the header "Student-Athletes

Are at *Heightened Risk* for Sexual Harassment, Exploitation, and Mental Abuse by Coaches." FAC § IV.A., ¶¶ 34-47 (emphasis supplied); *see also id.* ¶¶ 95-96 (detailing NCAA's own knowledge and conclusions to same effect). Those paragraphs exhaustively detail the literature supporting the fact that, far from being similarly-situated to the public at large, student-athletes are *especially at risk* of abuse by coaches and athletics personnel, and the NCAA's knowledge of that fact.[4] Indeed, as set out in Appellants' Opening Brief at length, Plaintiffs alleged that the NCAA itself concluded in 2012 that "[s]exual relationships between coaches and student-athletes have become a serious problem," and that the power imbalance between coaches and athletes should be treated like asymmetrical relationships— such as lawyer-client, physician-patient, judge-party/lawyer, or clergy-parishioner—for which sexual relationships are strictly forbidden. FAC ¶¶ 46, 95; *see also* Opening Br. at 14-19.

The NCAA badly misreads the holding in *Goodwin v. Yeakle's Sports*

---

[4] The next nineteen paragraphs of the Complaint provide further support, detailing the actions undertaken by *all* of the NCAA's peer organizations in response to that heightened risk. *See* FAC ¶¶ 48-66.

*Bar & Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016). It acknowledges, as it must, that "Indiana courts examine 'the broad type of plaintiff and harm involved' and ask whether that harm would be foreseeable to the general type of defendant." Appellee Br. 33-34 (quoting *Goodwin* at 391). It then claims that Appellants frame their allegations too broadly to meet the *Goodwin* test by focusing on the foreseeability of "sexual misconduct by those in positions of authority over others" writ large in society. Appellee Br. 35. But, as noted, that is *not* the risk that Appellants allege was foreseeable to the NCAA; the risk that was foreseeable to the NCAA was the heightened risk of abuse of student-athletes by coaches and athletics personnel at NCAA member-institutions. That fits squarely within *Goodwin*'s articulation: "the broad type of plaintiff and harm," i.e., student-athletes subjected to abuse by coaches and athletics personnel—without being so broad as to encompass everyone in an inferior position of authority anywhere in society or with respect to every type of harm.

The allegations of foreseeability here are nothing like those made regarding the cargo company in *Est. of Staggs by and through Coulter v. ADS*

- 24 -

*Logistics Co.*, 102 N.E.3d 319 (Ind. Ct. App. 2018), or the insurance company in *ONB Ins. Grp., Inc. v. Est. of Megel*, 107 N.E.3d 484 (Ind. Ct. App. 2018), both cases again decided on a full factual record on summary judgment, not a motion to dismiss.

In *Estate of Staggs*, the defendant ADS's "only involvement was to warehouse [a] steel coil and then load it onto [a] flatbed per [another defendant's] instructions" and other defendants were responsible for securing it safely to the truck. 102 N.E.3d at 325. As the court noted, "[a]s for the relationship between ADS and the [plaintiffs], there is none." *Id.* In finding that ADS owed no duty to motorists injured when the coil later came loose in transit, the Indiana Court of Appeals held that "an entity that has no role whatsoever in securing the cargo to the flatbed could not foresee that its own actions would result in that cargo becoming unsecured" and then injuring motorists. *Id.* at 326. That is a far cry from the NCAA, which plays an enormous role in the day-to-day activities of its member-institutions' coaches and athletics personnel, and specifically and expressly undertakes to protect the physical and mental well-being of

- 25 -

student-athletes.

Similarly, in *ONB Insurance Group*, the defendant was an insurance broker "who had no role whatsoever in the decision to put the vehicle on the road in its condition," and thus "could not foresee that its actions relevant to this matter, which are only answering questions regarding whether their client had insurance coverage, would result in injury to a motorist." 107 N.E.3d at 493-94. Again, a far cry from the involvement of the NCAA in the day-to-day activities of coaches, athletics personnel, and student-athletes here.

Moreover, unlike in those cases, the NCAA is the entity best situated to, as the NCAA puts it, "anticipate that its own conduct would result in or prevent the harm." Appellee Br. 34. Nothing the warehouse in *Estate of Staggs* or the insurance broker in *ONB Insurance Group* could have done would have made a bit of difference—they had no responsibility for the vehicle involved in the accident, and their conduct was many intervening steps removed from the ultimate injuries.[5] Not so here.

---

[5] For sake of clarity given this framing: the foreseeability test for purposes

A simple example makes the point clear: if the NCAA had required coaches (as it does student-athletes) to report sexual abuse when they transfer between schools, repeat offenders would be less likely to be in a position to repeat their abuse. Yet that is precisely what has happened again and again. FAC ¶¶ 47, 107. The NCAA anticipated—knew—that its conduct in failing to police the behavior of coaches and athletics personnel around sexual misconduct would result in the harm to student-athletes, and it knew it could take steps—as every one of its peer organizations did—to prevent it. It did not.

D.    *Only* the NCAA Is in a Position to Prevent Abuse of Student-Athletes *Across* Member-Institutions.

The NCAA asks the right public policy question but gets the answer backwards. As the NCAA notes, the question is "who is, or should be, in the best position to prevent injury" and then considers "how society should allocate the costs of such injury." *ONB Ins. Grp.*, 107 N.E.3d at 494 (cleaned up). As with the other issues in the appeal, this analysis too is

---

of imposing a duty is not as stringent as that required for proximate causation under Indiana law. *Goodwin*, 62 N.E.3d at 390.

typically made on a full factual record, not a motion to dismiss.

The NCAA argues that "[i]t would be highly impractical to charge the NCAA with a duty to protect" student-athletes "from sexual misconduct by coaches" because it does not directly "employ or supervise those coaches." Appellee Br. 39. But that ignores: (1) the granular level of control the NCAA actually exerts over coaches and athletics personnel on a day-to-day basis despite not directly employing or supervising them, FAC ¶ 80; (2) the fact that every one of its peer organizations has undertaken to do just that despite similar factual circumstances, *id.* ¶¶ 48-66; and (3) the fact that the same logic applies to NCAA student-athletes whose sexual misconduct the NCAA *does* regulate, *id.* ¶ 106.

The NCAA says nothing to rebut—or even address—the fact that it is the *only* entity situated to learn of, redress, and prevent abuse at and *across* all of its member-institutions, the *only* entity that has visibility into and *across* all of its member-institutions, as well as the coaches, athletics personnel, and student-athletes at all of them. And that matters because, as has happened repeatedly over the last decades, abusive coaches move with

impunity between member-institutions only to abuse again. FAC ¶¶ 47, 107. Not only is the NCAA in the *best* position to address that problem and prevent injury, it is the *only* entity that can do so.

While it is true, as the NCAA argues, that member-institutions are required by Title IX (and can be held liable under state law for failure) to regulate abuse by coaches on their payroll, that does not absolve the NCAA of its duty to also do so. The mere fact that one party owes a duty of care does not, as a matter of fact or law, mean that other parties do not owe a duty, too. *See Key v. Hamilton*, 963 N.E.2d 573, 582 (Ind. Ct. App. 2012) ("[M]ore than one person may have a duty of care in a particular situation."). More importantly, even where the specter of a Title IX investigation has its intended effect—which, as the epidemic of college sexual assault demonstrates, is not a given—Title IX plays *no* role in regulating the movement of coaches and athletic personnel between schools. As the NCAA acknowledges, Title IX imposes obligations on all colleges and universities receiving federal funds "to prevent, redress, and remediate sexual misconduct on *their* campuses." Appellee Br. 9 (emphasis

- 29 -

supplied). But that is where Title IX's reach ends. Only the NCAA, given its unique position atop the entire collegiate athletic world, has the ability "to prevent, redress, and remediate" the threat of a sexual predator moving *across* campuses. Indeed, that is presumably why the NCAA requires college *athlete* transfers to disclose to schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence and further requires schools to take reasonable steps to confirm this information. FAC ¶ 106.

Finally, it is important to note that while Appellants are concurrently suing USF and their coaches for the abuse they suffered and seeking monetary damages, they are here seeking not just damages but also injunctive relief against the NCAA to effect change for all student-athletes at all NCAA member-institutions. Only the NCAA can provide that relief. And Appellants are entitled to try to prove it is responsible for doing so.

## II.　THE DISTRICT COURT ERRED BY FINDING JOHN DOE 1 LACKED STANDING TO SEEK PROSPECTIVE RELIEF.

John Doe 1 plausibly alleged standing to seek injunctive relief. He

plausibly alleged both that he suffered actual abuse at USF as a direct result of the NCAA's failure to adopt and enforce adequate policies to protect him, and that the NCAA continues to expose him to an ongoing and heightened risk of abuse because it still has done nothing in that regard. Nothing more is required.

The NCAA argues that John Doe 1 cannot establish a substantial risk of future harm because there's no evidence the coaches at his new school are abusive. But that misses the point (and the nature of the claim): the NCAA still has taken no steps to protect John Doe 1 or any other student-athletes at any of its member-institutions. Appellants' alleged heightened risk exists, in fact, at *every* NCAA member-institution. FAC ¶¶ 4, 94. The breadth of that risk does not somehow absolve the NCAA.

And the long and sordid history of such abuse over and over again demonstrates that allegation to be anything but speculative. All the more so because abusive coaches move with impunity between institutions. FAC ¶¶ 47, 107. Nothing about Doe 1's claims require any speculation as to the NCAA: it is undisputed that it still has taken no action to protect student-

athletes from abuse by coaches and athletics personnel.

No caselaw requires—and the NCAA cites none—that a plaintiff stay in an abusive environment to have standing. Indeed, the NCAA does not address, much less rebut, the key principle articulated by the Sixth Circuit in *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568  (6th Cir. 2005): "there is something to be said for disease *prevention*, as opposed to disease *treatment*. Waiting for a plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient." *Id.* at 575 (emphasis in original). So too, here. John Doe 1 does not need to wait to be abused *again* at an NCAA member-institution before he has standing to sue to make it finally take action to protect him.

The NCAA argues that John Doe 1 is no differently situated than every other student-athlete in the country. To some degree, that's true: because of the NCAA's failures, *all* student-athletes at *all* NCAA member-institutions *are* at a heightened risk of abuse. That's why the injunctive relief claim was brought as a class action. But whether every student-athlete has standing to sue the NCAA for injunctive relief is not the

question before the Court. The question is whether John Doe 1 does. And, as the caselaw establishes, because he both actually suffered such abuse in the past *and* he plausibly alleges that he is at heightened risk of it now and in the future, he does.

In response, the NCAA argues that the past abuse John Doe 1 suffered has *no* predictive value. But it acknowledges, as it must, that the Supreme Court has repeatedly said otherwise, most recently in *Murthy v. Missouri*, 603 U.S. 43 (2024), where it reaffirmed that "[p]ast exposure to illegal conduct can serve as evidence of threatened future injury but does not in itself show a present case or controversy regarding injunctive relief." *Id.* at 59 (cleaned up); Appellee Br. 46. To accomplish the latter—the issue here—plaintiffs must plausibly allege a link between the defendant that caused them the past harm and that same defendant's ongoing ability to inflict that harm on them in the future. *Murthy*, 603 U.S. at 58-62. Doe 1 does so here: the NCAA is the entity that caused him the harm in the past and the NCAA has the ongoing ability to inflict that harm on him now and in the future (or prevent it).

The NCAA tries to confuse the proper inquiry, focusing on whether John Doe 1 alleges that his coaches at his new school are abusive. He does not, but that is irrelevant because it is the wrong inquiry under *Murthy*. The test is whether the NCAA is still in a position to harm him. It is.

That also disposes of the NCAA's attempt to misuse the Supreme Court's statement in *Murthy* cautioning against finding standing based upon "speculation" about the actions of third parties. 603 U.S. at 72. Nothing about John Doe 1's standing requires speculation about the conduct of any third party. Appellants' allegations plausibly—and directly—focus on the conduct of the NCAA, not any third party. FAC ¶¶ 108-119. It is the NCAA that put John Doe 1 at risk of abuse in the past, abuse he actually suffered, and it is the NCAA that is still putting him at a heightened risk of future abuse.

Lastly, the NCAA argues that *Murthy* "does not help" Appellants, but it does not explain why, other than to say that it confirms that speculation about the possibility of future injuries is insufficient. Appellee Br. 46 n.9. True. But it also holds that "past injuries" *are* relevant "for their

predictive value," and "the past is relevant" when used as "a launching pad for a showing of imminent future injury." *Murthy*, 603 U.S. at 59. That is precisely what John Doe I does here: he alleges that his past harm, coupled with the fact that he is at another NCAA member-institution still subject to a heightened risk of abuse because of the NCAA's failure to act to protect him, gives him standing. Sadly, there is nothing speculative about the heightened risk of abuse John Doe 1 is at while attending another NCAA member-institution.

John Doe 1 plausibly alleges both actual past harm as a result of the NCAA's failure to protect him and that the NCAA continues to expose him to an ongoing and heightened risk of abuse. Nothing more is required.

## CONCLUSION

For all of these reasons, Appellants respectfully request that the Court reverse and remand.

Dated: April 30, 2025                 Respectfully submitted,

                                      /s/ *Jonathan D. Selbin*
                                      Jonathan D. Selbin
                                      jselbin@lchb.com
                                      Jessica A. Moldovan
                                      jmoldovan@lchb.com
                                      **Lieff Cabraser Heimann**
                                      **& Bernstein, LLP**
                                      250 Hudson Street
                                      8th Floor
                                      New York, NY 10013
                                      Telephone: (212) 355-9500
                                      Facsimile: (212) 355-9508

                                      Michelle A. Lamy
                                      mlamy@lchb.com
                                      **Lieff Cabraser Heimann**
                                      **& Bernstein, LLP**
                                      275 Battery Street
                                      29th Floor
                                      San Francisco, CA 94111
                                      Telephone: (415) 956-1000
                                      Facsimile: (415) 956-1008

                                      Elizabeth A. Fegan
                                      beth@feganscott.com
                                      **Fegan Scott LLC**
                                      150 S. Wacker Drive, 24th Floor
                                      Chicago, IL 60606
                                      Telephone: (312) 741-1019
                                      Facsimile: (312) 264-0100

- 36 -

Michael von Klemperer
mike@feganscott.com
**Fegan Scott, LLC**
1763 Columbia Road NW, Suite 100
Washington DC 20009
Telephone: (202) 921-0002
Facsimile: (312) 264-0100

*Interim Class Counsel and Counsel for Appellants*

Lynn A. Toops, No. 26386-49
ltoops@cohenandmalad.com
Arend J. Abel, No 10763-49
aabel@cohenandmalad.com
**Cohen & Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

*Liaison Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Cir. R.

32(c) because it contains 6,727 words, excluding the items in Fed. R. App. P.

32(f), and as measured by Microsoft Word's word-count feature.

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5)(A), as modified by Cir. R. 32(b), and the type style

requirements of Fed. R. App. P. 32(a)(6), because it is prepared in a

proportionally spaced typeface using Palatino Linotype in 14-point font.

Dated: April 30, 2025          */s/ Jonathan D. Selbin*
                               Jonathan D. Selbin
                               **Lieff Cabraser Heimann**
                               **& Bernstein, LLP**
                               250 Hudson Street,
                               8th Floor
                               New York, NY 10013
                               212.355.9500
                               jselbin@lchb.com

                               *Counsel for Plaintiffs-Appellants*

## <u>PROOF OF SERVICE</u>

The undersigned, counsel for the Plaintiffs-Appellants, hereby

certifies that on April 30, 2025, the aforementioned Brief was filed with the

Clerk of the Court for the United States Court of Appeals for the Seventh

Circuit by using the appellate CM/ECF system. All participants in the case

are registered CM/ECF users and will be served by the appellate CM/ECF

system.

Dated: April 30, 2025                 */s/ Jonathan D. Selbin*
                                      Jonathan D. Selbin
                                      **Lieff Cabraser Heimann
                                      & Bernstein, LLP**
                                      250 Hudson Street,
                                      8th Floor
                                      New York, NY 10013
                                      212.355.9500
                                      jselbin@lchb.com

                                      *Counsel for Plaintiffs-Appellants*